# EXHIBIT 7



# Southwest Airlines Co.

# Contract of Carriage - Passenger

**(CoC) – English Version**

**Revision: 28th Revised**          **Effective Date:  07/01/2020**

SWA 00003

# Southwest Airlines Co. Contract of Carriage – Table of Contents

1.  Introduction ........................................................................................................3
    a.  Application of Conditions of Contract ...........................................3
    b.  Definitions....................................................................................3

2.  Reservations ......................................................................................................7
    a.  Reservations .................................................................................7
    b.  Group Policies ..............................................................................9

3.  Fares ................................................................................................................10
    a.  Application of Fares ....................................................................10
    b.  Stopovers ...................................................................................10
    c.  Special Fares ..............................................................................10

4.  Tickets ..............................................................................................................13
    a.  Tickets ........................................................................................13
    b.  Ticket Acceptability.....................................................................14
    c.  Refunds ......................................................................................14

5.  Check-in ...........................................................................................................16
    a.  Boarding Passes .........................................................................16
    b.  Check-in Requirements ...............................................................16

6.  Acceptance of Passengers ..............................................................................17
    a.  Refusal to Transport – General ...................................................17
    b.  Refusal to Transport – Unruly/Disruptive Passenger ..................18
    c.  Carriage of Children ....................................................................21
    d.  Carriage of Passengers with Disabilities ....................................23
    e.  Pets ............................................................................................25
    f.  Law Enforcement and Search and Rescue Dogs .........................26

7.  Baggage ...........................................................................................................28
    a.  Carryon Baggage ........................................................................28
    b.  Acceptance of Checked Baggage ................................................29
    c.  Surveillance and Inspection of Baggage .....................................30
    d.  Checking of Baggage ..................................................................30
    e.  Free Checked Baggage Allowance ..............................................30
    f.  Excess, Oversize, and Overweight Baggage Charges .................32

SWA 00004

g.    Special Items ............................................................................................... 33

h.    Unsuitable Baggage Subject to Limited Release of Liability ........................... 33

i.    Limitations of Liability .................................................................................. 34

8.    International Travel ................................................................................................... 37

a.    Application of Montreal or Warsaw Convention ............................................ 37

b.    Death or Injury of Passengers ...................................................................... 37

c.    Delay of Passengers ..................................................................................... 38

d.    Destruction, Loss, or Delay of Baggage........................................................ 39

e.    Time Limitations on Claims and Actions ...................................................... 40

f.    International Travel Documents .................................................................... 40

g.    Foreign Currency........................................................................................... 40

h.    Partial Tax Refunds in Limited Circumstances ............................................. 41

i.    Check-in Times for International Flights ....................................................... 41

j.    Travel by Minors ........................................................................................... 41

k.    Carriage of Animals....................................................................................... 41

l.    Firearms ........................................................................................................ 41

9.    Service Interruptions ................................................................................................ 42

a.    Failure to Operate as Scheduled .................................................................. 42

b.    Denied Boarding Procedures ........................................................................ 42

c.    Ground Transportation .................................................................................. 45

10.    Miscellaneous .......................................................................................................... 46

a.    Claims ............................................................................................................ 46

b.    Customer Service Commitment .................................................................... 46

c.    Choice of Law, Entire Agreement ................................................................. 46

SWA 00005

# 1. Introduction

a. Application of Conditions of Contract

(1)    Transportation by Southwest Airlines Co. (hereafter "Carrier") is subject to the following terms and conditions, in addition to any terms and conditions printed on any Ticket, or specified on the Carrier's website.  The terms and conditions contained in this *Contract of Carriage* shall govern all published routes and services provided by the Carrier as well as all fares and charges published by the Carrier.  This *Contract of Carriage* is subject to applicable laws, regulations and rules imposed by U.S. or foreign governmental agencies.  In the event of a conflict between the terms of this Contract and such applicable laws, regulations or rules, the latter shall apply. By purchasing a Ticket or accepting transportation, the Passenger agrees to be bound by all of the following terms and conditions.

(2)    Carrier reserves the right, in its sole discretion and to the extent not prohibited by federal law, to change, delete, or add to any of the terms of this *Contract of Carriage* without prior notice.  All changes must be in writing and approved by a corporate officer of the Carrier. To the extent there is a conflict between the *Contract of Carriage* and information printed on the Ticket or specified on the Carrier's website, the *Contract of Carriage* governs.

(3)    By purchasing and accepting transportation, the Passenger agrees to adhere to and comply with all the requirements of this *Contract of Carriage* and applicable laws and regulations, including but not limited to federal laws protecting federal, airport, and air carrier employees who have security duties from assault and interference with the performance of duties. Transportation offered by the Carrier under this *Contract of Carriage* is subject to the Passenger's compliance with these obligations, and a Passenger's failure to comply shall constitute a material breach of this *Contract of Carriage*.

(4)    Applicable terms and conditions are those in effect as of the date a Passenger commences travel on a given itinerary.  In the event these conditions of Carriage are amended after a Ticket is purchased but prior to commencement of travel in a way that substantially affects the terms and conditions of a Passenger's Carriage, a full refund of the Ticket price may be requested if the Passenger does not agree to be bound by the conditions as amended.

b. Definitions

**Baggage** means all luggage and contents contained inside, including suitcases, garment bags, tote bags, packages, camera and electronics bags, computer and equipment cases, briefcases, musical instruments, and similar articles, whether carried by the Passenger in the cabin or carried in the aircraft cargo compartments.  Coats and wraps, when carried by the Passenger in the passenger cabin, will not be considered as Baggage.

**Boarding Pass** means a document issued by Carrier entitled Boarding Pass bearing the Passenger's first and last name, flight number and date, departure and destination airports, and a boarding group letter and number, which represents the Passenger's boarding group and reserved spot in the boarding group line.  A Passenger must have a Boarding Pass to be considered as having Confirmed Reserved Space as defined in Section 9(b)(1). Boarding Passes may be obtained at Southwest.com®, or at the airport from Southwest at:

(1) E-Ticket Check-In kiosks (where available), (2) skycap podiums (where available), (3) ticket counters, or (4) departure gate podiums. Carrier reserves the right to restrict Boarding Pass distribution to the departure gate podium.

**Carriage** means the transportation of Passengers and/or Baggage by air, gratuitously or for hire, and all services of Carrier related thereto.

**Carrier** means Southwest Airlines Co. and its officers and employees, contractors and agents acting in their official capacities.

**Checked Baggage** means Baggage of which Carrier takes sole custody and for which Carrier has issued a Baggage Claim Check and affixed a Baggage Tag.

**Emotional Support Animal** means an animal which provides support related to a mental health-related disability of a Qualified Individual with a Disability, but the animal is not trained to perform a specific task(s) or work. An Emotional Support Animal must also behave properly in a public setting, remain under the control of the handler and avoid engaging in disruptive behavior at all times. A Qualified Individual with a Disability seeking to travel with an Emotional Support Animal must provide documentation of the requested accommodation that is acceptable to the Carrier.

**Fare Component** means each local currency fare (except Add-On-Fares) where more than one such fare is used in construction of the total fare for a journey.

**Flight Coupon** means the portion of the Passenger Ticket that is valid for Carriage.

**Force Majeure Event** means any event outside of Carrier's control, including, without limitation, acts of God, and meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption.  It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

**Limited Release of Liability** means Passenger's tender, and Carrier's acceptance, of Checked Baggage in a condition, or of a nature, unsuitable for Carriage where Carrier limits or excludes liability for loss, damage, or delay under Section 7.

**Montreal Convention** means, unless the context requires otherwise, the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal, May 28, 1999 ("Montreal Convention").

**Nonstop Flight** means a flight scheduled to operate between origin and destination airports without any intermediate stops.

**Nonrevenue Passenger** means a Passenger who is traveling on a Southwest reduced-rate pass of any kind (e.g., employee travel, companion pass, buddy/guest pass, dependent pass or other airline industry employee travel).

SWA 00007

**One-way** means Scheduled Air Service on Carrier from an originating airport to a destination airport.

**Passenger** means any person, except members of the Crew working on the flight, who is carried or will be carried in an aircraft with the consent of Carrier and is bound by this *Contract of Carriage*.

**Qualified Individual with a Disability**, as defined in 14 CFR § 382.3, means an individual with a disability who, as a Passenger:

1. With respect to obtaining a Ticket for air transportation on Carrier, offers, or makes a good faith attempt to offer, purchase, or otherwise validly obtain a Ticket.

2. With respect to obtaining air transportation, or other services or accommodations.

   a. Buys or otherwise validly obtains, or makes a good faith effort to obtain, a Ticket for air transportation on Carrier and presents himself at the airport for the purpose of traveling on the flight to which the Ticket pertains.

   b. Meets reasonable, nondiscriminatory *Contract of Carriage* requirements applicable to all Passengers.

3. With respect to accompanying or meeting a traveler, using ground transportation, using terminal facilities, or obtaining information about schedules, fares, reservations, or policies, takes those actions necessary to use facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by the Carrier.

**Roundtrip** means Scheduled Air Service on Carrier from an originating airport to a destination airport and back to the originating airport or Carrier-recognized co-terminal.

**Same-Plane Service** means service between an origin and destination airport with scheduled stops at one or more intermediate airports.  With the exception of unexpected ground delays or other unforeseen flight disruptions, Passengers on Same-Plane Service are not required to disembark the aircraft at any intermediate stop.

**Scheduled Air Service** means any current or future flight published on Carrier's website or in computer reservation system used by Carrier.

**Special Drawing Rights (SDR)** means a unit of currency created by the International Monetary Fund (IMF) in 1969, which operates as a supplement to the existing reserves of member countries. The current value of an SDR in U.S. dollars is provided daily by the IMF at http://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

**Standby Passengers** means Passengers who will be enplaned on a flight subject to availability of space at departure time and only after all Passengers with confirmed reserved space for such flight have been enplaned on such flight. Standby status applies to all scheduled stops at any intermediate points on the flight.

**Ticket** means the electronic six-digit alpha-numeric confirmation number issued by Carrier or an authorized travel agent, which provides for the Carriage of the Passenger occupying a single seat.

SWA 00008

**Ticketing Time Limit (TTL)** means the time by which the Passenger must secure his/her ticket for a confirmed reservation.

**Trained Service Animal** means a fully trained animal that is individually trained to perform a task(s) or work related to a physical and/or mental disability of a Qualified Individual with a Disability.  A Trained Service Animal also must be trained to behave properly in a public setting, remain under the control of the handler and to avoid engaging in disruptive behavior at all times. It also means a psychiatric service animal with equivalent training.

SWA 00009

## 2.  Reservations

a.  Reservations

(1)   Confirmation of Reservations.  A reservation on a given flight is confirmed by the issuance of a Ticket.

(2)   Cancellation of Confirmed Reservations.

(i)   Passenger Initiated Cancellation Prior to Date of Travel. If a Passenger cancels his/her reservation prior to the date of travel, his/her ticket is eligible for a refund or the funds will be available for future use consistent with the fare rule and refund procedures specified in Section 4c.

(ii)   Check-in Requirements. Failure of the Passenger to obtain a Boarding Pass and be present, available, and appropriate as discussed in Section 6 for boarding in the flight's boarding gate area at least ten minutes before the scheduled departure time may result in cancellation, at the Carrier's sole discretion, of the Passenger's reservation without notice. Section 5 contains additional information on Carrier's check-in procedures.

(iii)   No Show Policy.

(a)   If a Wanna Get Away Fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the Wanna Get Away Fare segment(s) are forfeited.

(b)   If a Business Select Fare, Anytime Fare, Child Fare, or Infant Fare  segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, and funds associated with the Business Select Fare, Anytime Fare, Infant Fare, or Child Fare  segment(s) are held as travel credit for use by the Passenger on Southwest Airlines.

(c)   When a ticket contains flight segments with mixed fare types and the ticket is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments of the reservation are canceled and the individual flight segments will follow the aforementioned rules associated with the fare type in regard to forfeiture of funds under Section 2a(2)(iii)(a) and (b) .

(d)   When a ticket is purchased using Rapid Rewards points, and the ticket is not changed or canceled at least ten (10) minutes prior to departure and the Customer does not travel, all segments associated with the reservation are canceled, but the points will be returned to the Rapid Rewards account from which the points were initially debited.  Taxes and fees associated with Rapid Rewards points and Companion Pass tickets follow the aforementioned rules under Section 2a(iii)(a)(b), and (c).

(e)   Conditions Beyond Carrier's Control. Carrier will refuse to carry and will cancel the reservations of any Passenger when such refusal is necessary to comply with a government regulation, a request for emergency transportation in connection with the national defense, or when necessary or advisable by reason of weather or other conditions beyond Carrier's control.

SWA 00010

(f)   Prohibited Booking Practices

(i)   Fraudulent, fictitious and/or abusive bookings violate Southwest Airlines' rules. Bookings made or Tickets issued by Passengers must be made only in respect of a Passenger's genuine travel requirements.  Reservations made to exploit or circumvent fare and ticket rules are strictly prohibited. Examples include (but are not limited to):

1.   Purchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities);

2.   Purchasing a Ticket without intent to travel, including to gain access to our facilities;

3.   Combining two or more roundtrip excursion fares end-to-end to circumvent minimum stay requirements (back-to-back ticketing);

4.   Booking a Ticket in someone's name without the person's consent; and

5.   Booking duplicate or impossible trips, for example multiple trips for the same Passenger around the same time (i.e., trips a Passenger physically could not complete) or multiple trips for the same Passenger departing from the same city on the same date.

(ii)   If Southwest Airlines finds evidence that the Passenger or the Passenger's travel agent is using a prohibited practice, then without advance notice to the Passenger or purchaser, Southwest Airlines reserves the right to cancel any unused part of the ticket or any other reservations that it believes, in its sole discretion, were made without intent to travel, refuse to let the Passenger fly and check bags, not refund an otherwise refundable ticket, charge the Passenger for what the ticket would have cost if the Passenger or the travel agent hadn't booked it fraudulently and/or require the Passenger or the travel agent refund to us any compensation Southwest Airlines provided (such as costs for delivering bags or reimbursements for clothes or toiletries).

(iii)   With the exception of Southwest® gift cards, funds from proactively canceled reservations by Southwest will be returned to the original form of payment. Reservations paid for with a Southwest® gift card will have the amount applied from the Southwest® gift card held as travel funds for use by the Customer on a future Southwest Airlines flight.

(g)   Limitation of Liability. Carrier is not liable for any type of special, incidental or consequential damages when it cancels the reservations of any Passenger pursuant to Section 2a(2); however, the fare paid for the unused portions of travel that are canceled by Carrier may be refunded or applied toward the purchase of future travel in accordance with the applicable fare rules and  Section 9.

SWA 00011

b.  Group Policies

(1)   Groups Booked as Individuals.  When ten or more Passengers are booked by a
single individual, company, corporation, booking agency, or other entity for travel on
the same scheduled flight(s), the reservations must be made as a group through the
Carrier's Group Desk, and all applicable group policies and procedures must be
followed.  If a booking entity fails to make such reservations as a group, Carrier
reserves the right, in its sole discretion, to assess a penalty upon and/or revoke the
authority of the booking entity to sell Carrier's transportation services.

(2)   Multiple Group Reservations. Carrier reserves the right to:

(i)   Limit seats by flight for group reservations.

(ii)   Cancel group reservation requests.

(iii)   Make changes to group reservations to accommodate Carrier's flight schedule.

(iv)   Not accept group reservations.

(v)   Require that group reservations be converted to ticketed individual reservations at
the applicable individual fare or be forfeited if group reservation utilization reveals
what Carrier considers, in its sole discretion, to be an inadequate usage of
reserved seats.

(3)   Travel on Group Reservations is valid on flights operated by Southwest Airlines only
and is not available for travel on itineraries that combine flights with other carriers.

Southwest Airlines Co.                    9

SWA 00012

## 3. Fares

a. Application of Fares

(1)   Transportation is subject to the fares and charges in effect when the Ticket is purchased. The fare is guaranteed once a reservation is made and a Ticket is purchased. If a Ticket is purchased before an increase in the fare becomes effective, the Ticket shall be honored for transportation between the airports and at the fare for which it was purchased.

(2)   Changes to any portion of a Ticket initiated by the purchaser, Passenger, or his/her authorized agent after its original issue will be subject to the fares, fare rules, tax increases, and charges in effect on the date the change is initiated.  A change constitutes a change in flight number, origin, destination, intermediate points, flight date, class of service, or fare.

Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new ticket. Our unrestricted fares are fully refundable if canceled and then refunded instead of exchanging or changing your Ticket.

(3)   Fares may be obtained on Carrier's website at Southwest.com®; through the Southwest Airlines mobile app; from Southwest Airlines by telephone at 1-800-435-9792 (1-800-I-FLY-SWA), in Spanish at 1-800-826-6667 (1-800-VAMONOS), from Mexico (Border Cities) at 001-800-435-9792 (English) or 001-800-826-6667 (Spanish), through TTY service at 1-800-533-1305; through video relay service at SWAVRS.TV; at a Southwest Airlines ticket counter; or through an authorized travel agent.

(4)   All published fares and charges are stated in U.S. currency.

b. Stopovers

(1)   A stopover is an intentional interruption of the itinerary by the Passenger.  No stopovers are permitted on published fares, except upon combination of individually purchased One-way fares.

c. Special Fares

(1)   Infant Fares

(i)    Infants at least 14 days old  and younger than two years of age on the date of travel, traveling on a confirmed reservation and occupying a reserved seat, with or without the use of an FAA-approved child restraint device, are eligible for Infant Fares.  This rule also applies to infants younger than 14 days of age traveling on a confirmed reservation and who are permitted to fly in accordance with Section 6c.

(ii)   At the time of check-in, either government-issued photo identification or another identification document acceptable to Carrier bearing the birth date of the Passenger who is traveling on an Infant Fare must be presented to Carrier.

SWA 00013

    (iii)   Infant Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter.  Those Passengers traveling on an Infant Fare whose ages have not been previously verified at a Southwest Airlines ticket counter or as a member of Southwest's Rapid Rewards program must secure their Boarding Passes at the airport and are not eligible to check in online.

(2)    Child Fares

    (i)    Children ages two through 11 who are accompanied by a Passenger at least 12 years of age or older on the date of travel are eligible for  Child Fares.

    (ii)   At the time of check-in, either government-issued photo identification or another identification document acceptable to Carrier bearing the birth date of the Passenger who is traveling on a Child Fare must be presented to Carrier.

    (iii)   Child Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter.  Those Passengers traveling on a Child Fare whose ages have not been previously verified at a Southwest Airlines ticket counter or as a member of Southwest's Rapid Rewards program must secure their Boarding Passes at the airport and are not eligible to check in online.

(3)    Military Fares

    (i)    United States military personnel on active duty (including reservists, National Guard members, and Coast Guard members with active orders, cadets/midshipmen attending the US Air Force Academy, US Naval Academy, US Military Academy [West Point], and the US Coast Guard Academy) and their authorized dependents are eligible for Military Fares.  Military dependents ages two through 11 years old must be accompanied by a military Passenger or a military dependent Passenger at least 12 years of age. Military personnel who have been discharged from active military duty and their authorized dependents traveling together remain eligible for Military Fares if travel will be completed within seven days of the military member's date of discharge.

    (ii)   Government Transportation Requests (GTRs) are not permitted or accepted for purchase of transportation booked at a Military Fare.

    A valid United States Uniformed Services Active Duty Identification Card or a copy of discharge orders must be presented at the time of check-in for military personnel.  Dependents, other than dependents traveling with a discharged military member within seven days of the member's discharge from active duty, must present a United States Uniformed Services Identification and Privilege Card marked Active.

    (iii)   Military Fares are not available on Southwest.com® and may only be purchased by calling Southwest Airlines or at a Southwest Airlines airport ticket counter.  Passengers travelling on a Military Fare will be able to check-in and secure a boarding position at 24 hours; however, since eligibility verification is required, Passengers will need to verify ID at the airport ticket counter in order to receive a boarding pass.

SWA 00014

(4)   Government Fares

   (i)   For information on both Federal Government (GVT) and State Government (GST) Fares, including Policies & Procedures specific to Federal Government bookings, contact Southwest Business at 1-800-I-FLY-SWA.

(5)   Wanna Get Away Fares

   (i)   Wanna Get Away Fares are discounted, restricted, nonrefundable fares. Unused funds can be used toward the purchase of future Tickets as long as the Passenger has canceled the confirmed reservation at least ten (10) minutes prior to the scheduled departure time for the flight. Passengers who do not cancel their confirmed reservation will forfeit any unused funds pursuant to Section 2a(2)(iii).

SWA 00015

## 4. Tickets

a. Tickets

(1)  No person shall be entitled to transportation except upon presentation of a valid Ticket or proof of identification acceptable to Carrier to confirm that transportation has been purchased.  Such Ticket shall entitle the Passenger to transportation subject to this *Contract of Carriage* and, in particular, certain terms and conditions as follows.

(i)  Such Ticket is valid between the points of origin and destination via the specific routing designated on the Passenger's itinerary only.

(ii)  Passenger is in compliance with fare requirements as provided in Section 3c, including proof of age and status where applicable, that entitle the Passenger to special or military fares.

(iii)  Passenger is in compliance with any other requirements of the Passenger's fare class.

(iv)  The Passenger's Ticket is in the Passenger's own name.

(v)  The Ticket has not been altered or improperly issued.

(2)  Tickets are Nontransferable.  Tickets, and any travel credit issued for unused Tickets, are nontransferable unless specified explicitly on the Ticket. Carrier is not liable to the holder of a Ticket for use or refund of such Ticket when presented by a person other than the person to whom the Ticket was issued. If a Ticket is used by a person other than the person to whom it was issued, Carrier shall not be liable for the loss, destruction, damage, or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

(3)  Purchase of Additional Seat.  The purchase of more than one seat for use by a single Passenger is required when necessary to transport large musical instruments or electronic audio/video, medical, or otherwise sensitive equipment unsuitable for Carriage as Checked Baggage, as specified in Section 7.

It is the Passenger's responsibility to notify Carrier of any unique seating needs. In accordance with Section 6, Carrier may refuse to transport individuals who are unable or unwilling to comply with Carrier's seating requirements.  Purchase of more than one seat for use by a single Passenger for the sole purpose of ensuring additional personal space is prohibited, except in limited circumstances when the Carrier, in its discretion, permits it.

(4)  Tickets Issued Outside of Southwest Airlines Systems

(i)  For Passengers holding a Ticket issued by an entity other than Southwest Airlines (such as an authorized travel agent), flight changes, Ticket cancelations, and Ticket exchanges and refunds must be processed via the Ticket's original booking source/agent in order to retain the forms of payment on the initial Ticket and keep the Ticket and funds associated with such Ticket accessible to the initial booking source/agent.

SWA 00016

(ii)   If a Passenger holding a Ticket issued by an authorized travel agent exchanges
such Ticket or cancels such Ticket via a Southwest Airlines system or by a
Southwest Airlines Agent then funds associated with such Ticket become
nonrefundable but remain reusable for travel on Southwest Airlines upon
cancelation in accordance with the Ticket's validity period.  Section 4 (c) (3) below
will apply to the funds associated with such Ticket.

b.   Ticket Acceptability

(1)   Tickets Accepted.  Carrier will accept only its own Tickets. Any Tickets issued in
conjunction with travel on another airline will not be accepted unless required by
federal government regulation or at the Carrier's sole discretion.

(2)   In the event that a Passenger does not comply with the terms and conditions in this
*Contract of Carriage*, his/her Ticket shall be invalidated, and Carrier has the right to:

(i)   Cancel any remaining portion of the Passenger's itinerary.

(ii)   Refuse to allow the Passenger to board or check Baggage.

(iii)   Confiscate the Ticket.

c.   Refunds

(1)   Refundable Tickets.

(i)   Ticket changes and exchanges within the same reservation will result in the initial
Ticket being applied as the form of payment for the new Ticket. The fare paid for
unused travel by Passengers who purchase fully refundable, unrestricted Tickets,
including taxes, security fees, and Passenger Facility Charges, may, for any
reason and upon surrender or cancellation of the unused Ticket, either be refunded
if canceled and refunded instead of exchanging or changing the Ticket or applied
as travel credit toward the purchase of future travel for the originally ticketed
Passenger in accordance with the form of payment utilized for the Ticket.  Such
refund or travel credit must be requested within the Ticket's eligibility period.
Refund or credit requests will not be honored after the Ticket's expiration date.

(ii)   If a fully refundable fare segment on a reservation is not changed or canceled at
least ten (10) minutes prior to departure and the Customer does not travel, all
segments associated with the reservation are canceled, and funds associated with
the fully refundable fare segment(s) are held as travel credit for use by the
Passenger on Southwest Airlines. Reservations paid for with a Southwest®  gift
card will have the amount applied from the Southwest® gift card held as travel
funds for use by the Customer on a future Southwest Airlines flight.

(iii)   When the Ticket combines a fully refundable fare with a Wanna Get Away
nonrefundable fare and the Passenger does not travel on the Wanna Get Away
segment and has not canceled, the reservation at least ten (10) minutes prior to the
scheduled departure time, all unused travel funds will be forfeited or held in
accordance with  Section 2a(2)(iii) and all remaining segments of the reservation
are canceled.

SWA 00017

(2)    Eligible fare refunds procedures:

(i)    When no portion of the transportation has been provided, the refund or credit will
be issued in an amount equal to the fare paid.

(ii)    When a portion of the transportation has been provided, the refund or credit will be
made in an amount equal to the difference, if any, between the total fare paid and
the fare applicable to the transportation provided.

(iii)    Carrier shall make eligible refunds in the same form as the original payment.
Refunds for Tickets purchased with a credit card shall be processed for crediting to
the same credit card account no later than seven business days from the date the
refund request is received by Carrier. Refunds for Tickets purchased with cash will
be issued by check no later than 20 business days after the refund request is
received by Carrier. Refunds for tickets purchased with an exchanged ticket will be
processed to the form of a travel credit for use by the Passenger on Southwest
Airlines.

(iv)    Carrier shall make all refunds in U.S. dollars. See Section 8 for additional
information for international travel.

(3)    Nonrefundable Tickets.

(i)    General.  The fare paid for unused travel by Passengers who purchase restricted,
nonrefundable Tickets are not eligible for refunds, except as provided in this
Section and Section 9b. Taxes, security fees, and Passenger Facility Charges
associated with a nonrefundable fare are also not eligible for refund except as
required by applicable regulations.

(ii)    Travel Credit. Unless otherwise stated by Carrier, the fare paid for unused
nonrefundable Tickets, including taxes, security fees, and Passenger Facility
Charges, may be applied toward the purchase of future travel on Carrier for the
originally ticketed Passenger only.  The new Ticket may be more or less expensive
or subject to different terms, conditions, or restrictions from the original Ticket.  If
the fare is lower, travel credit will be issued for the difference. No cash refund or
credit card adjustments will be made for nonrefundable Tickets.

(iii)    Travel Credit Eligibility.  The expiration date of any travel credit will apply to any
Tickets purchased with these funds.  If a Ticket is purchased with multiple travel
credits, the earliest expiration date will apply to the entire Ticket.

(iv)    Travel Credit Forfeiture. Should a Passenger fail to apply the nonrefundable Ticket
or travel credit toward the purchase of future travel within the eligibility period, the
entire amount of the fare, including all taxes, security fees, and Passenger Facility
Charges, will be forfeited.

(4)    Delays or Involuntary Cancellations. If a Passenger's scheduled transportation is
canceled, terminated, or delayed before the Passenger has reached his/her final
destination as a result of a flight cancellation, Carrier-caused missed connection,
flight delay, or omission of a scheduled stop, Carrier will either transport the
Passenger at no additional charge on another of Carrier's flights, refund the fare for
the unused transportation in accordance with the form of payment utilized for the
Ticket, or provide a credit for such amount toward the purchase of future travel.

SWA 00018

## 5. Check-in

a. Boarding Passes

   (1)   General. Boarding Passes may be obtained at Southwest.com®, the Southwest mobile app, or at the airport from Southwest at:

      (i)   E-Ticket Check-In kiosks (where available)

      (ii)   Skycap podiums (where available)

      (iii)   Ticket counters, or

      (iv)   Departure gate podiums. Carrier reserves the right, in its sole discretion, to restrict Boarding Pass distribution to the departure gate podium.

   (2)   Standby Travel. Boarding Passes for Standby Passengers are available for issuance only at the flight's departure gate.

   (3)   Invalid Boarding Passes. A Boarding Pass that has been altered or improperly issued shall not be valid and will not be accepted by Carrier.

   (4)   Transferability. Boarding Passes are nontransferable unless explicitly stated on the Boarding Pass. Carrier is not liable to the holder of a Boarding Pass for use of such Boarding Pass when presented by a person other than the person to whom it was issued. If a Boarding Pass is used by a person other than the person to whom it was issued, Carrier shall not be liable for the loss, destruction, damage or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

b. Check-in Requirements

   (1)   Ten-Minute Rule.  Failure of a Passenger to obtain a Boarding Pass and be present, available, and appropriate as described in Section 6 for boarding in the flight's boarding gate area at least ten minutes before the scheduled departure time may result in cancellation of the Passenger's reservation without notice at the Carrier's sole discretion. Refer to Section 8 for information regarding check-in requirements for international travel.

   (2)   Early Departure.  Carrier reserves the right, in its sole discretion, to depart early when all Passengers who have met the check-in requirements as outlined in Section 5.b.(1) are onboard the aircraft. The scheduled departure and arrival times as published for the flight will not be changed or otherwise affected if the Carrier departs early. It is the Passenger's responsibility to arrive at the departure airport with adequate time to allow for check-in requirements and security screening.

SWA 00019

# 6. Acceptance of Passengers

By purchasing and accepting carriage under this *Contract of Carriage,* the Passenger agrees to adhere to and comply with all the requirements of this Section 6. Transportation offered by the Carrier under this *Contract of Carriage*, including International Travel described in Section 8, is subject to the Passenger's compliance with these obligations, and a Passenger's failure to comply shall constitute a material breach of this *Contract of Carriage.*

a. Refusal to Transport – General

Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances listed below.  The fare of any Passenger denied transportation or removed from Carrier's aircraft en route under the provisions of Section 6a will be refunded in accordance with Section 9. The sole recourse of any Passenger refused transportation or removed en route under Section 6a will be the recovery of the refund value of the unused portion of his/her Ticket.  Under no circumstances shall Carrier be liable to any Passenger for any type of special, incidental, or consequential damages.

(1)  Safety. Whenever such action is necessary, with or without notice, for reasons of aviation safety.

(2)  Force Majeure Event:  Whenever advisable due to Force Majeure Events outside of Carrier's control, including, without limitation acts of God, meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

(3)  Government Request or Regulation.  Whenever such action is necessary to comply with any Federal Aviation Regulation or other applicable government regulation, or to comply with any governmental request for emergency transportation in connection with the national defense.

(4)  Incompatible Medical Requirements. Carrier will refuse to transport persons requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on Carrier's aircraft: medical oxygen for use onboard the aircraft except FAA-approved and Carrier accepted Portable Oxygen Concentrators (POCs), incubators, medical devices requiring electrical power from the aircraft, or travel on a stretcher.

(5)  Comfort and Safety. Carrier may refuse to transport, or remove from the aircraft at any point, any Passenger in any of the circumstances listed below as may be necessary for the comfort or safety of such Passenger or other Passengers and Crew members:

(i)  Persons who are barefoot and older than five years of age, unless required due to a disability.

SWA 00020

(ii)   Persons who are unable to occupy a seat with the seatbelt fastened.

(iii)   Persons who have an offensive odor, unless caused by a disability.

(iv)   Any person who cannot be transported safely for any reason.

(6)   Prisoners.  Prisoners (persons charged with or convicted of a crime) under escort of law enforcement personnel; other persons in the custody of law enforcement personnel who are being transported while wearing manacles or other forms of restraint; persons brought into the airport in manacles or other forms of restraint; persons who have resisted escorts; or escorted persons who express to Carrier an objection to being transported on the flight.

b.   Refusal to Transport – Unruly/Disruptive Passenger

Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances described below.  A Passenger who is so refused or removed is without further recourse to Carrier for any damages claimed by Passenger, including the refund value of any unused portion of his/her Ticket, and may be liable to Carrier for costs and damages as set forth in this Section 6b.

(1)   The Passenger, at all times, agrees to conduct himself or herself in a manner that is not disruptive, unruly or in contravention of any laws of any state which has jurisdiction over the aircraft.

Conduct is considered to be disruptive or unruly when a Passenger fails to adhere to orderly rules of conduct while embarking upon or being carried onboard Carrier's aircraft or fails to follow the instructions of the Crew and thereby disturbs the good order and discipline onboard the aircraft.  (In this Section, the term "Crew" shall mean flight crew, cabin crew, or any other employee of Carrier.)  Disruptive or unruly conduct includes, but is not limited to:

(i)   Interfering in any way with or disrupting the operation of the aircraft or any of its components or parts;

(ii)   Interfering in any way with or disrupting the Crew, including, but not limited to: failing to cooperate or interfering with the Crew's duties, refusing to follow instructions to board or leave the aircraft, using portable electronic devices in contravention of instructions from the Crew;

(iii)   Refusing to comply with safety instructions (e.g., instructions to fasten a seat belt, not to smoke, turn off a portable electronic device or disrupting a safety announcement);

(iv)   Verbal confrontation with Crew members or other passengers;

(v)   Physical confrontation with Crew members or other passengers;

(vi)   Refusing to permit the search of his/her person or property by Carrier, Crew or an authorized government agency for explosives, hazardous materials, contraband, or concealed, deadly, or dangerous weapons or articles;

SWA 00021

(vii) Refusing to produce positive identification acceptable to the Carrier upon request. For international travel, any Passenger that has not obtained and completed all documentation required for entry into and exit from each country, as well as compliance with the laws, requirements or procedures of each country listed on such itinerary;

(viii) Making an intentional misrepresentation in response to a question or inquiry by the Carrier or Crew, or otherwise attempting to commit, or committing, a fraudulent act against the Carrier;

(ix) Making threats against the safety of the Crew, passengers and aircraft (includes all types of threats, whether directed against a person, e.g., threat to injure someone, or intended to cause confusion and chaos, such as statements referring to a bomb threat, or simply any threatening behavior that could affect the safety of the Crew, passengers and aircraft);

(x) Boarding or attempting to board an aircraft when the passenger has an infectious disease or infection that poses a direct threat (as defined in 14 CFR § 382.3) to the health or safety of passengers and/or Crew;

(xi) Boarding or attempting to board an aircraft with a weapon (Carrier will carry Passengers who meet the qualifications and conditions established in 49 CFR § 1544.219);

(xii) Being or appearing to be intoxicated or under the influence of drugs or alcohol;

(xiii) Engaging in, or threatening, sexual abuse or harassment;

(xiv) Engaging in lewd, obscene or patently offensive behavior, including wearing clothes that are lewd, obscene or patently offensive;

(xv) Refusing to comply with instructions given by Carrier or Crew prohibiting the solicitation of items for sale or purchase, including airline Tickets, reduced-rate travel passes, or travel award certificates;

(xvi) Smoking or attempting to smoke onboard the aircraft;

(xvii) Other types of riotous, disorderly, offensive, threatening, intimidating, violent or belligerent behavior (e.g., screaming; annoying behavior; kicking and/or banging seat backs/tray tables; harassment related to race, color, gender, religion, national origin, disability, age, ethnicity, or sexual orientation).

SWA 00022

(2)   Carrier Action

If the Carrier determines, in its sole discretion, that a Passenger has failed or is failing to comply with any of the requirements of this Section 6.b, the Carrier may take any of the following actions that it considers necessary to prevent the continued disruptive or unruly conduct, protect aircraft passengers and/or Crew, and/or protect the good order, safety and discipline onboard the aircraft.

- Physical restraint of that Passenger
- Diversion of the aircraft
- Removal of that Passenger from the aircraft and termination of carriage of that Passenger
- Refusal to carry that Passenger on ticketed and/or future flights
- Reporting of that Passenger to law enforcement authorities

(3)   Exoneration of Liability

That Passenger is without recourse against the Carrier for any actions described in Section 6b(2)

In any action for damages, however founded, if the Carrier proves that the loss or damage was caused or contributed to by the disruptive or unruly conduct of the Passenger claiming compensation, the Carrier shall be exonerated from liability to the extent the conduct caused or contributed to the damage.

When the loss or damage is claimed by a person other than that Passenger, the Carrier, to the extent permitted by applicable law, shall likewise be exonerated from its liability to the extent it proves that the damage was caused or contributed to by the unruly or disruptive conduct of that Passenger.

In the case of damage occasioned by delay the Carrier shall not be liable if it proves that: (a) the delay was caused by the disruptive or unruly conduct of that Passenger; or (b) in the case of International Travel, it and its servants and agents took all measures that could reasonably be required to avoid the damage caused wholly or partly by that Passenger's unruly or disruptive conduct, or that it was impossible for it or them to take such measures.

SWA 00023

(4)    Carrier's Right of Recourse Against that Passenger

Passenger agrees that he or she shall be liable, upon demand by the Carrier, for all of the Carrier's costs and damages incurred as a result of that Passenger's disruptive or unruly conduct within the meaning of <u>Section 6b</u> including, but not limited to:

- Repair or replacement of property, including baggage, that was damaged or destroyed by the disruptive or unruly conduct of that Passenger or that resulted from efforts to subdue, restrain, or remove that disruptive or unruly Passenger;
- Any damage, including death or bodily injury, of any passenger or Crew member caused or contributed to by the disruptive or unruly conduct of that Passenger;
- Compensation for delay to passengers, Crew members, and Carrier caused by the disruptive or unruly conduct of that Passenger; and
- The costs incurred by Carrier attributable to any diversion or delay or other interference with the operation of the aircraft due to the disruptive or unruly conduct of that Passenger, including landing and parking fees, fuel purchases, and payments for food and lodging made available to passengers as a result of the diversion.

The Carrier expressly preserves, any other right of recourse or remedy it may have under applicable law against any Passenger engaged in disruptive or unruly conduct, including without limitation, all rights of contribution and indemnity.

c.  Carriage of Children

(1)    Accompanied Minor Children

(i)    Infants younger than 14 days of age.  Carrier will not provide transportation services to any infant younger than 14 days of age, unless a written statement is provided by an attending physician approving such infant for air travel. Infants must be accompanied by a Passenger 12 years old or older.

(ii)   Children 14 days old and younger than two years old.  One child 14 days up to two years old on the date of travel may be carried on the lap of an accompanying Passenger 12 years of age or older.  If an adjacent unoccupied seat is available, the child may be secured in an FAA-approved child restraint device without charge. However, if the child is traveling without a confirmed reservation and no adjacent unoccupied seats are available, the child restraint device may have to be transported as Checked Baggage.

(iii)  Children 14 days old and younger than two years old traveling on a confirmed reservation, with or without the use of an FAA-approved child restraint device, will be charged the published Infant Fare (see <u>Section 3</u>) or lowest available adult fare, whichever is less.

(iv)   See <u>Section 8</u> for additional requirements for the Carriage of Children for international travel.

(2)   Unaccompanied Minor Children

(i)   Children younger than five years old.  Carrier will not accept for Carriage any child less than five years old unless accompanied by a Passenger at least 12 years of age.

(ii)   Children five through 11 years old.  Unaccompanied children ages five through 11 years old will be required to use Carrier's unaccompanied minor service and will be accepted for Carriage by Carrier provided the child has a confirmed reservation and the flight on which he or she travels does not require a change of aircraft or flight number.  However, any unaccompanied child age five through 11 years old will not be accepted for Carriage if, because of operational disruptions, the Carrier determines, in its sole discretion, that the flight on which the child holds a reservation is anticipated to terminate short of or bypass the child's destination.  Carrier will not transport unaccompanied minor children on international itineraries.  See Section 8 for additional information.

(iii)   Child drop off and pick up.  The parent or guardian who brings an unaccompanied minor child to the departure airport will be required to remain at the departure gate until the flight is airborne.  Carrier must be furnished with documentation (duplicate of which must be in the child's possession) that the child will be met by another parent or guardian upon deplaning at his or her destination. The parent or guardian meeting the child at his or her destination will be required to present a valid government-issued photo ID and sign a release form designated by Carrier.

(iv)   Unaccompanied Minor Charge.  In addition to the applicable fare, children for whom unaccompanied minor Carriage is required must pay the applicable unaccompanied minor charge.   The unaccompanied minor charge may be refundable under the following circumstances:
- The reservation is canceled by the Customer.
- The Carrier cancels the flight, and the Customer elects to not rebook.
- The child does not travel unaccompanied (i.e., the fee was paid, but an accompanying adult ultimately travels with the child).

(3)   Child Restraint Devices

(i)   Unless unoccupied seats are available on a flight, Carrier requires a reservation and purchase of a Ticket for Carriage of a child restraint device on board the aircraft to ensure that a child restraint device may be used during flight.  Only federally approved child restraint devices are permitted for use aboard Carrier's aircraft.  Federal regulations prohibit the use of child booster seats and harness-or vest-type restraining devices, unless such devices have been specifically approved by the Federal Aviation Administration under a Type Certificate (TC), Supplemental Type Certificate (STC), or Technical Standard Order (TSO).  Customers are responsible for providing Carrier copies of TC, STC, or TSO documentation for review at the departure gate.  Child restraint devices will be considered as items of carryon Baggage counting toward the adult Passenger's carryon allowance, unless the child has been ticketed and a seat reserved for use of the CRD.

SWA 00025

d.   Carriage of Passengers with Disabilities

(1)   Carrier will transport Qualified Individuals with a Disability in accordance with the requirements of the U.S. Department of Transportation regulations, 14 CFR Part 382, unless the Carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 CFR § 382.113, the Carrier will not provide certain extensive inflight special services such as assistance in eating, assistance with elimination functions in the lavatory or at the Passenger's seat, or provision of medical services. Carrier may require, at its sole discretion, pursuant to 14 CFR § 382.29, that a Qualified Individual with a Disability be accompanied by a safety assistant as a condition of being provided air transportation in the following circumstances:

(i)   When the Passenger is unable to comprehend or respond appropriately to safety instructions from Carrier, including the safety briefing required by 14 CFR §§ 121.571(a)(3) and (a)(4) because of a mental disability;

(ii)   When the Passenger has a mobility impairment so severe that the Passenger is unable to physically assist in his or her own emergency evacuation of the aircraft; or

(iii)   When the Passenger has both severe hearing and severe vision impairments that prevent the Passenger from establishing a means of communication with Carrier in order to permit transmission of the safety briefing required by 14 CFR §§ 121.571 (a)(3) and (a)(4).

If Carrier determines, in its sole discretion, that an individual meeting the criteria above must travel with a safety assistant and the individual disagrees and believes he/she is capable of traveling independently, Carrier will not charge the individual for Carriage of a safety assistant of the Carrier's choosing.  If a seat is not available for the safety assistant and the individual with a disability is unable to travel on the flight, the individual will be eligible for denied boarding compensation.  For purposes of determining whether a seat is available, the safety assistant shall be deemed to have checked in at the same time as the individual with the disability.

(2)   Assistive Devices.  Mobility and other assistive devices used by a Qualified Individual with a Disability may be carried in the aircraft cabin in addition to the carryon Baggage allowance. If necessary due to the Passenger's disability, Carrier will provide assistance in loading, stowing, and retrieving carryon items, including assistive devices.  If the device cannot be carried in the Passenger cabin in accordance with FAA regulations, the device will be checked and carried free of charge in addition to the free Baggage allowance.  No oversize or excess weight charges will be assessed.  Assistive devices not for the personal use of the Passenger will be accepted subject to a limited release of liability, and may be subject to oversized or overweight charges as described in Section 7f.

(3)   Limitation of Liability.  Carrier's liability with respect to damage to or loss of mobility and other assistive devices shall not exceed the documented original purchase price of the assistive device pursuant to 14 CFR § 382.131. Carrier will also compensate the Passenger for other reasonable expenses incurred as a direct result of the loss of, damage to, or delayed delivery of the mobility or assistive device.

Southwest Airlines Co.                    23

SWA 00026

(4)   Trained Service Animals

(i)   Carrier permits fully trained service animals used by a Qualified Individual with a Disability, as that term is defined in this Contract of Carriage, to accompany the Passenger onboard the aircraft at no charge. For travel from the continental United States to Hawaii, only trained service dogs are permitted. See Section 8 for additional information for international travel.

(ii)   A Qualified Individual with a Disability must provide credible verbal assurance that an animal is a Trained Service Animal, as that term is defined in this Contract of Carriage.

(iii)   Carrier will permit a Trained Service Animal to accompany a Qualified Individual with a Disability, unless Carrier determines in its sole discretion that the animal obstructs an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation or the animal poses a safety risk to Passengers and/or the flight crew. Trained Service Animals may not occupy a seat.

(iv)   A Trained Service Animal accompanied by a trainer will be permitted to travel aboard Carrier's aircraft only if the animal is being delivered to the domicile of a Qualified Individual with a Disability who either owns or, upon delivery, will take immediate ownership of the animal for that individual's personal use. No charge will be assessed for Carriage of a Trained Service Animal being delivered to the domicile of the animal's owner under such circumstances.

(v)   Service animals in training will not be accepted by Carrier for transport.

(vi)   An animal must be trained to behave properly in a public setting and be under the control of the handler at all times. Carrier retains the right, in its sole discretion, to refuse to transport any animal exhibiting or known to have exhibited disruptive behavior or any other characteristics that appear incompatible with air travel.

(vii)   Local laws and regulations at a Qualified Individual with a Disability's final or intermediate destination(s) may apply and impose further requirements or restrictions.  Qualified Individuals with a Disability assume full responsibility for compliance with all governmental laws and regulations, including but not limited to, health certificates, permits and vaccinations required by the country, state, or territory from and/or to which the Trained Service Animal is being transported. Carrier is not liable for any assistance or information provided by the Carrier or any employee or agent thereof to any Qualified Individual with a Disability relating to compliance with such laws and regulations.  Subject to applicable laws and regulations, a Qualified Individual with a Disability is solely responsible for any expenses incurred or any consequences resulting from his or her failure to comply with applicable laws and regulations.  Carrier expressly reserves the right to seek reimbursement from a Qualified Individual with a Disability for any loss, damage, or expense suffered or incurred by Carrier resulting from such Qualified Individual with a Disability's failure to comply with applicable laws and regulations.

SWA 00027

(5)    Emotional Support Animals

   (i)    Carrier permits one emotional support animal used by a Qualified Individual with a Disability to accompany the Passenger onboard the aircraft at no charge. See Section 8 for additional information for international travel.

   (ii)    A Qualified Individual with a Disability traveling with an Emotional Support Animal must provide current documentation of the requested accommodation that is acceptable to the Carrier, as outlined 14 CFR § 382.117(e).

   (iii)    Carrier will permit an Emotional Support Animal to accompany a Qualified Individual with a Disability, unless Carrier determines in its sole discretion that the animal obstructs an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation or the animal poses a safety risk to Passengers and/or the flight crew. The Emotional Support Animal must be in a carrier that can be stowed under the aircraft seat or on a leash at all times while in the airport and onboard. An Emotional Support Animal may not occupy a seat or extend beyond the footprint of the Passenger's seat.

   (iv)    An animal must be trained to behave properly in a public setting and be under the control of the handler at all times. Carrier retains the right, in its sole discretion, to refuse to transport any animal exhibiting or known to have exhibited aggressive behavior or any other characteristics that appear incompatible with air travel.

   (v)    Local laws and regulations at a Qualified Individual with a Disability's final or intermediate destination(s) may apply and impose further requirements or restrictions. Qualified Individuals with a Disability assume full responsibility for compliance with all governmental laws and regulations, including but not limited to, health certificates, permits and vaccinations required by the country, state, or territory from and/or to which the Emotional Support Animal is being transported. Carrier is not liable for any assistance or information provided by the Carrier or any employee or agent thereof to any Qualified Individual with a Disability relating to compliance with such laws and regulations. Subject to applicable laws and regulations, a Qualified Individual with a Disability is solely responsible for any expenses incurred or any consequences resulting from his or her failure to comply with applicable laws and regulations. Carrier expressly reserves the right to seek reimbursement from a Qualified Individual with a Disability for any loss, damage, or expense suffered or incurred by Carrier resulting from such Qualified Individual with a Disability's failure to comply with applicable laws and regulations.

e.   Pets

   (1)    Pets Allowed in the Cabin.  Carrier accepts small vaccinated domestic cats and dogs at least eight weeks old contained in a pet carrier and traveling with a Passenger. One pet carrier is allowed per Passenger.  The carrier may contain up to two animals of the same species.  Unaccompanied Minors may not travel with a pet.  Carrier reserves the right to limit the number of pet carriers per flight to six, and pets will be accepted on a first-come, first-served basis.

SWA 00028

(2)  Pet Carriers. All pets in the cabin must be carried in an appropriate pet carrier and remain in the carrier at all times (including head and tail) while in the gate area, during boarding/deplaning, and while onboard the aircraft.  The carriers must be leak-proof and well-ventilated, and the pet(s) must be able to stand up and move around the carrier with ease.  The carrier must be of a size small enough to fit under the seat in front of the Passenger and must remain stowed under the seat in front of the Passenger during the entire duration of the flight.  Passengers traveling with a pet may not occupy an exit row seat or a seat with no forward under seat stowage.

(3)  Pet Fares. All occupied pet carriers are subject to the applicable pet fare.  Pet reservations can only be booked by calling Southwest Airlines.  The pet fare must be collected at the airport ticket counter and may not be applied toward future travel if unused.  Passenger traveling with a pet must check the pet in at the airport ticket counter and pay the pet fare before proceeding to the departure gate. The pet fare may be refundable under the following circumstances:
- The reservation is canceled by the Customer.
- The Carrier cancels the flight, and the Customer elects not to rebook.

(4)  Pets Incompatible with Air Travel. Carrier retains the right, at its sole discretion, to refuse to transport any pet that exhibits aggressive behavior or any other characteristics that appear to Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft.  The pet(s) must be healthy, harmless, inoffensive, odorless, and require no attention during the flight.  If the pet becomes ill during the flight, oxygen or other first aid procedures will not be administered.  In the event of an emergency, an oxygen mask will not be available for the pet.   Carrier assumes no liability for the heath or wellbeing of carryon pets.

(5)  No Pets Carried in Cargo Compartment. Carrier will not transport pets in the aircraft cargo compartments.

(6)  No Pets are accepted on international itineraries. See Section 8 for additional information.

(7)  In accordance with Section 4.(a).3, purchase of an additional seat may be required, at discretion of Carrier, to accommodate the pet of a Passenger with unique seating needs.

(8)  No pets are accepted on itineraries between the continental United States and Hawaii.

f.  Law Enforcement and Search and Rescue Dogs

(1)  Law Enforcement and Search and Rescue Dogs Allowed in the Cabin. Carrier accepts fully-trained law enforcement service dogs trained in explosives or drug detection (or other specific functions) and search and rescue dogs for transportation, without charge, when accompanied by their respective handlers on official business. See Section 8 for additional information for international travel.

(2)  Documentation. Each Customer traveling with a law enforcement or search and rescue dog must present a letter of mission and a copy of the animal's certification.

(3)  Law enforcement and search and rescue animals in training will not be accepted by Carrier for transport.

SWA 00029

(4) Law Enforcement and Search and Rescue Dogs Incompatible with Air Travel. Carrier retains the right, at its sole discretion, to refuse to transport any dog that exhibits aggressive behavior or any other characteristics that appear to Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft.

(5) No Law Enforcement or Search and Rescue Dogs Carried in Cargo Compartment. Carrier will not transport law enforcement or search and rescue dogs in the aircraft cargo compartments.

SWA 00030

## 7. Baggage

a. Carryon Baggage

(1)    General.  Carrier, in its sole discretion, will determine whether or not any Baggage, because of its weight, size, contents, or character, may be carried in the Passenger cabin of the aircraft.  All carryon Baggage must be stowed underneath a seat or in an overhead bin.

(2)    Responsibility of Passenger.  Carryon Baggage is the sole responsibility of the Passenger.

(3)    Allowable Carryon Baggage.  Passengers are restricted to one item of carryon Baggage (e.g., roller bag, garment bag, tote bag) that does not exceed external dimensions of 10" x 16" x 24" plus one smaller personal type item (e.g., purse, briefcase, laptop computer case, backpack, small camera), provided that such items are capable of being carried onboard the aircraft by one Passenger without additional assistance, unless the Passenger requires assistance due to a disability, and are capable of being stowed under a seat or in an overhead compartment. Sizing boxes or charts with 10" x 16" x 24" dimensions are located at many of Carrier's curbside check-in locations (where available), ticket counters, departure gates, boarding locations, and on many jetbridges.  Carrier reserves the right to further restrict the number of carryon items.

(i)    A roller bag that otherwise would meet the 10" x 16" x 24" dimensions if the wheels were removed will be accepted.

(ii)    Oversized articles of reasonable carryon size that protrude from only one side of the sizing box or chart and, because of their fragile nature, would be at greater than normal risk of damage if carried in the cargo hold (e.g.,  blueprints, map tubes, fishing poles, artwork, media cameras/video equipment) are considered personal type items and may be carried in the passenger cabin if remaining onboard space permits and the item fits in an overhead bin without depriving other Passengers of sufficient overhead bin space.

(iii)    A small musical instrument is considered a personal-type item and may be carried in the passenger cabin regardless of whether it meets the 10" x 16" x 24" dimensions if the instrument can be stowed safely in a suitable baggage compartment in the aircraft cabin or under a passenger seat, and there is space for such stowage at the time the Passenger boards the aircraft.

(iv)    Other medical assistance items (e.g., breast pumps, breast milk) may be carried in the aircraft cabin in addition to the carryon baggage allowance when they can be stowed in accordance with FAA regulations. For assistive devices for qualified Customers with disabilities, reference 6.d(2).

(4)    Outerwear.  In addition to the carryon Baggage allowance provided herein, a coat, jacket, wrap, or similar outer garment may be carried onboard the aircraft.

SWA 00031

(5)    Instruments and Equipment.  The following conditions apply to acceptance for Carriage in the cabin of large musical instruments and electronic, computer, audio/video, or other equipment and parts thereof, the size or shape of which prevents such instruments or equipment from being handled as normal carryon Baggage.

   (i)    The instrument or equipment must be contained in a case or covered so as to avoid injury to other Passengers.

   (ii)   A reservation must be made for the instrument or equipment at a charge no greater than the Child Fare for each seat used.

   (iii)  The instrument or equipment must be stowed in accordance with FAA requirements for carriage of carryon baggage.

(6)    Carrier, at its sole discretion, will not transport items of carryon Baggage that it determines may be harmful or dangerous to a Passenger(s), the flight crew, or the aircraft.

## b.  Acceptance of Checked Baggage

(1)    General. Carrier, in its sole discretion, will accept personal property of the Passenger as Baggage subject to the following conditions:

   (i)    Carrier will only accept Baggage for transportation on a flight on which the Passenger is transported.

   (ii)   Carrier will only accept Baggage for transportation if it and its contents can withstand ordinary handling, and if its weight, size, and character render it suitable for transportation on the particular aircraft on which it is to be carried, unless the Passenger agrees to assume the risk of checking the Baggage and the Carrier accepts the Baggage subject to a limited release of liability, as outlined in Section 7h.

   (iii)  Each piece of Baggage tendered to Carrier must have a current identification tag or label with the Passenger's name, address, and telephone number.

   (iv)   With the exception of musical instruments and wheelchairs, mobility aids, and other assistive devices used by a Qualified Individual with a Disability, Carrier will not accept as Baggage any item having outside measurements (i.e., the sum of the greatest outside length plus height plus width) that exceed 80 inches or that weigh more than 100 pounds. Carrier will not accept as Baggage any musical instrument if the sum of the length, height, and width of the outside linear dimensions of the instrument (including case or covering) exceeds 150 inches, or the weight of the musical instrument exceeds 165 pounds (including case or covering).

   (v)    Carrier will not accept Baggage to an intermediate stop or connection point on the Passenger's Ticket or to a point beyond the Passenger's final ticketed destination.

   (vi)   Carrier will not accept Baggage that, because of its nature, contents, or characteristics (e.g., sharp objects, paint, corrosives, or other prohibited hazardous materials), might cause injury to Passengers or Carrier, damage to aircraft or other equipment, or damage to other Baggage.

Southwest Airlines Co.                              29

(vii) Carrier will not accept Baggage that it determines cannot safely be carried in the Baggage compartment of the aircraft for any reason.

c.  Surveillance and Inspection of Baggage

(1)  All Baggage tendered to Carrier for transportation is subject to surveillance and inspection by electronic and/or physical means with or without the Passenger's consent or knowledge by Carrier and/or authorized government agencies.

d.  Checking of Baggage

(1)  Carrier will not accept or hold Baggage from a Passenger on day of travel at Carrier's airport ticket counter or curbside check-in locations (where available) if tendered to Carrier earlier than four hours in advance of flight departure time.

(2)  Where available, Baggage may be accepted at an earlier time at authorized offsite Baggage check-in facilities.

(3)  Baggage must be checked at Carrier's airport ticket counter or curbside check-in locations (where available) at least 45 minutes prior to the flight's scheduled departure time, See Section 8 for additional requirements for international travel.

(4)  Baggage checked in less than 45 minutes prior to a flight's scheduled departure time is subject to Section 7h(8).

(5)  Baggage for international flights will not be accepted if presented to Carrier less than 60 minutes (less than 75 minutes for flights departing from Aruba) prior to scheduled departure.  Passengers cannot voluntarily separate from luggage on international flights.

e.  Free Checked Baggage Allowance

(1)  General. Upon presentation by a Passenger of a valid Ticket, Carrier will transport two pieces of Baggage without charge, each piece of which has outside measurements (i.e., the sum of the greatest outside length plus width plus height) not exceeding 62 inches, does not weigh more than 50 pounds per piece, and provided such Baggage is suitable to be checked for Carriage in the cargo hold of the aircraft.

(2)  Military Baggage Allowance. Military Passengers traveling on active duty or permanent change of station (PCS) orders will be exempt from the two-piece Baggage limit and will not be subject to excess, oversize, or overweight Baggage charges, provided that none of the pieces of Baggage exceeds 100 pounds in weight and 80 inches in size (outside length plus height plus width).

(3)  Travel Equipment for Infants and Small Children. One stroller and one Child Restraint Device (car seat) per fare-paying Passenger will be accepted subject to a limited release of liability, as outlined in Section 7h. Carrier will accept the items without charge and will not count toward a Passenger's free Checked Baggage allowance.

(4)  Firearms. Carrier will not accept assembled firearms and ammunition for transportation, except as provided below and subject to the size and weight specifications contained below and in Section 7f.  Carrier will not accept firearms or ammunition for international travel.  See Section 8 for additional information.

SWA 00033

(i) General. Firearms (e.g., sport rifles, shotguns, and handguns) may be transported as Checked Baggage, so long as they are unloaded and encased in a hard sided, locked container acceptable to Carrier for withstanding normal Checked Baggage handling without sustaining damage to the firearm, with the Passenger retaining possession of the key or combination to the container lock.

(ii) Ammunition. Small arms ammunition intended for sport or hunting will be accepted only if carried within sturdy Checked Baggage and in the manufacturer's original container or an equivalent fiber, wood, or metal container specifically designed to carry ammunition and providing for sufficient cartridge separation.  Magazines and clips containing ammunition must be securely packaged so as to protect the cartridge primers.  Carrier will accept no more than 300 rounds of pistol (rim fire) ammunition, 120 rounds of rifle (center fire) ammunition, or 150 shotgun shells per Passenger, with a total gross weight of the ammunition plus containers not to exceed 11 total pounds per Passenger.

(iii) Gun Boxes. Gun boxes designed to hold no more than two sporting rifles, shotguns or handguns are exempt from oversize Baggage charges; however, they will be subject to excess Baggage and weight charges if applicable.

(5) Sporting Equipment.  Any of the items listed below may be checked in substitution of one piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis.  If the item of sporting equipment exceeds 50 pounds in weight or 62 inches in size (outside length plus height plus width), excess weight and size charges may apply in accordance with Section 7f.

(i) Archery equipment, including a bow, arrows, and an average size target (large target stands cannot be accepted), so long as the bow and arrows are encased in a container acceptable to Carrier for withstanding normal Baggage handling without sustaining damage to the equipment.

(ii) Baseball/Softball equipment, including one bag generally consisting of four bats, one helmet, one pair of cleats, one uniform, one glove, and one pair of batting gloves. The catcher may have additional equipment.

(iii) Bicycles (defined as nonmotorized and having a single seat) properly packed in a hard-sided bicycle box that fall within the dimensions and weight limits established for normal Checked Baggage, (i.e., 62 inches or less in overall dimensions and less than 50 pounds in weight).  Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage.  Bicycles packaged in cardboard or soft-sided cases will be accepted subject to a limited release of liability, as outlined in Section 7h.

(iv) Boogieboard, kneeboard or wakeboard.

(v) Bowling bag, including ball(s) and shoes.

(vi) Fishing tackle box and fishing rod, so long as the rod is encased in a cylindrical fishing rod container suitable to Carrier for withstanding normal Checked Baggage handling without sustaining damage to the rod.

SWA 00034

(vii) Golf bag in hard-sided golf bag carrying case provided by Passenger, including clubs, balls, and shoes.  (Hooded golf bags or golf bags in a soft-sided carrying case provided by the Passenger will be accepted subject to a limited release of liability, as outlined in Section 7h).

(viii) Hockey and/or lacrosse stick(s), two hockey or lacrosse sticks taped together and one equipment bag generally consisting of pads, helmets, pants, jersey, gloves, and skates.

(ix) SCUBA equipment, provided air tanks are empty and all accompanying equipment (e.g., BCD, weight belt, one regulator, one tank harness, one tank pressure gauge, one mask, two fins, one snorkel, one knife, and one safety vest) are encased together in a container acceptable to Carrier.

(x) Skateboard.

(xi) Snow ski equipment, including skis or snowboards, ski boots, and ski poles, including one pair of skis or one snowboard, one set of poles, and one pair of ski/snowboard boots encased in a container(s) acceptable to Carrier.

(xii) Water ski equipment encased in a container(s) acceptable to Carrier and including no more than one pair of water skis and one life preserver.

(6) Musical Instruments. Musical instruments may be checked in substitution of one piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis.  If the musical instruments exceed 50 pounds (including case or covering) in weight or 62 inches in size (outside length plus height plus width, including case or covering), excess weight and size charges may apply in accordance with Section 7f.

f.  Excess, Oversize, and Overweight Baggage Charges

(1) Excess Baggage. Each piece of Baggage in excess of the free Baggage allowance specified above that is not in excess of 62 inches (outside length plus height plus width) and 50 pounds or less will be accepted for a charge of $75.00 per item One-way.

(2) Oversize Baggage. Subject to Section 7f(4), Baggage in excess of 62 inches but not more than 80 inches (outside length plus height plus width) and musical instruments in excess of 62 inches but not more than 150 inches (outside length plus height plus width, including case or covering) will incur an oversize charge of $75.00 per item One-way.

(3) Overweight Baggage.  Subject to Section 7f(4), Baggage weighing between 51 and 100 pounds and musical instruments weighing between 51 and 165 pounds (including case or covering)will be accepted as Checked Baggage for an excess weight charge of $75.00 per item One-way.

(4) Excess, Oversize and/or Overweight Baggage Embargos. Excess, oversize and/or overweight Baggage may not be accepted on flights to/from certain cities during certain specified dates. Contact Southwest Airlines Reservations or Southwest.com® Baggage Policies for a list of cities and effective dates.

SWA 00035

(5)     Prohibited Baggage. Baggage in excess of 80 inches (outside length plus height plus width) and/or Baggage weighing more than 100 pounds will not be accepted for Carriage, except if mobility or other assistive devices, hanging garment sample bags with outside length, width, and height measurements up to a maximum of 110 inches, if flexible, or as provided in Section 7e.

g.  Special Items

The items listed below shall be acceptable for Carriage as Checked Baggage upon the Passenger's compliance with the special packing requirements and payment of the applicable One-way charge as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(1)     Bicycle (defined as nonmotorized and having a single seat) properly packed in a bicycle box or hard sided case larger than 62 inches in total dimensions will be accepted as Checked Baggage.  Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage.  Bicycles packaged in cardboard or soft sided cases will be accepted subject to a limited release of liability, as outlined in Section 7h.

(2)     Camera, film, video, lighting, and sound equipment will be accepted when tendered by representatives of network or local television broadcasting companies or commercial film-making companies.  A charge will be applied for each item in excess of the free Baggage allowance.

(3)     Javelins in a single bag, regardless of the number of javelins encased together, will be accepted.

(4)     Kayak (other than a sea kayak).  Paddle(s) must be secured.

(5)     Life Raft

(6)     Surfboard and Kiteboards

    (i)     Surfboards and Kiteboards may be subject to a limited release of liability, as outlined in Section 7h.

    (ii)    Intrastate Hawaii Travel: Surfboards checked on an itinerary that is for wholly intrastate Hawaii travel (tickets that have an origin and destination solely in the state of Hawaii) are not subject to applicable One-way charges as long as they meet weight restrictions as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(7)     Vaulting poles will be accepted in a single bag, regardless of the number of poles in the bag.

(8)     Wind surfing board, sail, boom.

h.  Unsuitable Baggage Subject to Limited Release of Liability

Carrier may, at its sole discretion, but is not obligated to, accept Baggage unsuitable for Carriage as Checked Baggage, subject to a Limited Release of Liability, as provided below:

(1)     Voluntary Separation for which Carrier is not liable for delay;

SWA 00036

(2)   Fragile and unsuitably packed items for which Carrier is not liable for damage and
loss of contents;

(3)   Previously damaged items for which Carrier is not liable for damage and loss of
contents;

(4)   Inadequately packaged or over-packed items for which Carrier is not liable for
damage and loss of contents;

(5)   Perishable items for which Carrier is not liable for spoilage, damage, or delay;

(6)   Soft-sided cases or unprotected/unpacked items, for which Carrier is not liable for
damage and loss of contents;

(7)   High-Value Items described in paragraph (i) of this Section, for which Carrier
assumes no responsibility for loss, damage, or delay;

(8)   Late-tendered Baggage for which Carrier is not liable for delay; and

(9)   Items where specific requirements under this Section are not met, for which Carrier is
not liable for loss, damage, or delay.

Passenger's tender of unsuitable baggage for check-in constitutes Passenger's agreement
to the Limited Release of Liability specified in this paragraph. Carrier, in its sole discretion,
may require Passenger to sign a Limited Release of Liability form, but it is not necessary.

i.   Limitations of Liability

(1)   General. The liability, if any, of Carrier for loss of, damage to, or delay in the delivery
of Checked or carryon Baggage and/or its contents, with the exception of
wheelchairs, mobility aids, and assistive devices used by a Qualified Individual with a
Disability, is limited to the proven amount of damage or loss, but in no event shall be
greater than $3,500.00 per fare paying Passenger pursuant to 14 CFR § 254.4
unless the Passenger at time of check-in has declared the value of the baggage to be
in excess of Three Thousand Five Hundred Dollars ($3,500.00) ("excess valuation")
and has paid an additional charge of One Dollar ($1.00) for each One Hundred
Dollars ($100.00) of excess valuation.  See Paragraph (2) below for excess valuation
limitations and Section 8 for information regarding international travel.

(i)   Carrier will compensate the Passenger for reasonable, documented damages
incurred as a direct result of the loss of, damage to, or substantially delayed
delivery of such Baggage up to the limit of liability, provided the Passenger has
exercised reasonable efforts and good judgment to minimize the amount of
damage.  Actual value for reimbursement of lost or damaged property shall be
determined by the documented original purchase price less depreciation for prior
usage.

(ii)   Southwest does not assume liability for claims of missing or damaged articles if a
Passenger's Checked Baggage is not damaged, delayed, or lost.

SWA 00037

(2)   Excess Valuation

    (i)   The declared excess valuation for baggage shall not exceed One Thousand Two Hundred and Fifty Dollars ($1,250.00) above the Three Thousand Five Hundred Dollar ($3,500.00) limitation of Carrier's liability established by this *Contract of Carriage*, for a total maximum declared valuation of Four Thousand Seven Hundred and Fifty Dollars ($4,750.00).  Excess valuation coverage is not available for money; jewelry; photographic, video, and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable papers; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables.

    (ii)   When excess value is declared, the Passenger's baggage and its contents may be inspected by Carrier's Employees.  Such baggage must be checked, and excess valuation coverage will apply only to the point to which it is checked by Carrier and claimed by the Passenger.

(3)   Baggage Delivery

    (i)   General. Carrier will pay delayed Checked Baggage delivery charges only so long as such Baggage was tendered to Carrier by the Passenger at least 45 minutes prior to the scheduled departure time of the Passenger's first flight.  If a Passenger's Baggage is tendered to Carrier less than 45 minutes prior to the scheduled departure of the Passenger's first flight, Carrier will make reasonable efforts, but cannot guarantee, to transport such Baggage on the Passenger's flights, and Carrier will not assume responsibility for delivery charges if such Baggage arrives at the Passenger's destination on a subsequent flight.  See Section 8 for conditions applicable to international travel.

(4)   Personal Property Carried Onboard Aircraft.  Except as otherwise provided in Section 8, Carrier assumes no responsibility and will not be liable for loss of or damage to personal property carried onboard an aircraft by a Passenger.

(5)   High-Value Items Unsuitable for Checked Baggage. Carrier assumes no responsibility for and will not be liable for money; jewelry; photographic, video, and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable instruments; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables contained in carryon or Checked Baggage.  For the Passenger's protection, these items should not be transported in or as Checked Baggage.  See Section 8 for information about coverage for international travel.

(6)   Normal Wear and Defects. Carrier assumes no responsibility and will not be liable for loss or damage arising from normal wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt. Furthermore, Carrier assumes no liability for defects in Baggage manufacture.

SWA 00038

(7)    Previously Damaged Items. Carrier assumes no responsibility and will not be liable for further damage to previously damaged items. Carrier may, but is not obligated to, accept previously damaged items subject to a limited release of liability, as outlined in in Section 7h.

(8)    Claims. In the case of loss of, damage to, or substantial delay in delivery of Checked Baggage, a claim will not be entertained by Carrier unless the following steps are completed by Passenger:

    (i)    In all cases, Passenger must notify Carrier of the claim and receive a Baggage report number not later than four hours after either: (1) arrival of the flight on which the loss, damage, or delay is alleged to have occurred or (2) receipt of the Baggage, whichever is applicable to the claim; and

    (ii)    In all cases, Passenger must submit either: (1) the completed Lost/Delayed Report Receipt form provided by Carrier or (2) a written correspondence that includes the Baggage report number to the Carrier not later than 21 days after the occurrence of the event giving rise to the claim; and

    (iii)    In the case of lost Baggage, Passenger must also submit a completed Property Loss Claim form to Carrier.  The form will be mailed to the Passenger upon receipt of written notice of the claim as stated in 7i(8)(ii).  The form must be completed and postmarked within 30 days of date of issue by the Carrier.

SWA 00039

## 8. International Travel

a. Application of Montreal or Warsaw Convention

(1)   For the purposes of international carriage governed by the Montreal Convention or the Warsaw Convention, whichever may apply, the liability rules set out in the applicable Convention as implemented by this Section are fully incorporated by reference in this *Contract of Carriage* and shall supersede any other provisions of this contract which may be inconsistent with those rules.

b. Death or Injury of Passengers

(1)   The Carrier shall be liable under Article 17 of the Montreal Convention or Warsaw Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a Passenger, as provided in the following paragraphs:

(i)   The Carrier shall not be able to exclude or limit its liability for damages not exceeding 128,821 Special Drawing Rights for each Passenger.

(ii)   The Carrier shall not be liable for damages to the extent that they exceed 128,821 Special Drawing Rights for each Passenger if the Carrier proves that:  (a) such damage was not due to the negligence or other wrongful act or omission of the Carrier or its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

(iii)   The Carrier reserves all other defenses and limitations available under the Montreal Convention or Warsaw Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (i) and (ii) hereof.

(iv)   With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

(v)   The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the Passenger.

(2)   In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger as provided in the following paragraphs:

(i)   Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

SWA 00040

(ii)  The Carrier shall make the advance payment as an advance against the Carrier's liability under the Montreal Convention or the Warsaw Convention, whichever may apply.  An advance payment shall not constitute recognition of liability.  An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the Passenger.

(iii)  The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

(iv)  The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

(v)  The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the Passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

c.  Delay of Passengers

(1)  Carrier shall be liable for damage occasioned by delay in the carriage of Passengers by air, as provided in the following paragraphs or in accordance with local law for flights departing from an international location:

(i)  The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

(ii)  Airport, Air Traffic Control, security, and other facilities or personnel, whether public or private, not under the control and direction of the Carrier are not servants or agents of the Carrier, and the Carrier is not liable to the extent the delay is caused by these kinds of facilities or personnel.

(iii)  Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Montreal Convention and the Warsaw Convention, whichever may apply. They include foreseeable compensatory damages sustained by a Passenger and do not include mental injury damages.

(iv)  The Carrier reserves all defenses and limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 Special Drawing Rights per Passenger. The limits of liability shall not apply in cases described in Article 22 (5) of the Montreal Convention or Article 25 of the Warsaw Convention, whichever may apply.

d.  Destruction, Loss, or Delay of Baggage

(1)  The Carrier is liable for damages sustained in the case of destruction or loss of,
damage to, or delay of checked and unchecked Baggage, as provided in the
following paragraphs:

(i)  Except as provided below, the liability of the Carrier is limited to 1,288 Special
Drawing Rights for each passenger in the case of destruction, loss, damage, or
delay of Baggage, whether checked or unchecked, under the Montreal Convention
or the Warsaw Convention, whichever may apply. Unless the Passenger proves
otherwise:  (a) all Baggage checked by a Passenger shall be considered to be the
property of that Passenger; (b) a particular piece of Baggage, checked or
unchecked, shall not be considered to be the property of more than one
Passenger; (c) unchecked Baggage, including personal items, shall be considered
to be the property of the Passenger in possession of the Baggage at the time of
embarkation.

(ii)  If a Passenger makes, at the time checked Baggage is handed to the Carrier, a
special declaration of interest and has paid a supplementary sum, if applicable, the
Carrier will be liable for destruction, loss, damage, or delay of such checked
Baggage in an amount not exceeding the declared amount, unless the Carrier
proves that the declared amount is greater than the Passenger's actual interest in
delivery at destination. The declared amount, and the Carrier's liability, shall not
exceed the total amount of declaration permissible under the Carrier's regulations,
inclusive of the limitation of paragraph (1)(i) hereof. In the case of transportation
under the Warsaw Convention, no supplementary sum shall apply unless the
declared amount exceeds 22 Special Drawing Rights per kilogram of the total
recorded weight of the checked Baggage at the time the Baggage is handed to the
Carrier. Nevertheless, the Carrier may impose charges for pieces of Baggage in
excess of any free allowance the Carrier may provide.

(iii)  In the case of unchecked Baggage, the Carrier is liable only to the extent the
damage resulted from its fault, or that of its servants or agents.

(iv)  The Carrier is not liable for destruction, loss, damage, or delay of baggage not in
the charge of the Carrier, including Baggage undergoing security inspections or
measures not under the control and direction of the Carrier.

(v)  The Carrier reserves all defenses and limitations available under the Montreal
Convention and the Warsaw Convention, whichever may apply, to such claims
including, but not limited to, the defense of Article 20 of the Warsaw Convention
and Article 19 of the Montreal Convention, and the exoneration defense of Article
21 of the Warsaw Convention and Article 20 of the Montreal Convention, except
that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a
manner inconsistent with paragraph (i) hereof.  The limits of liability shall not apply
in cases described in Article 25 of the Warsaw Convention or Article 22 (5) of the
Montreal Convention, whichever may apply.

SWA 00042

e.  Time Limitations on Claims and Actions

(1)  Under the Montreal Convention and the Warsaw Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the Carrier no later than seven calendar days in the case of damage to baggage, and 21 calendar days in the case of delay thereof.

f.  International Travel Documents

(1)  Each Passenger traveling on an international itinerary is solely responsible for obtaining and completing all documentation required for entry into and exit from each country, as well as for complying with the laws, requirements or procedures of each country listed on such itinerary. Carrier is not liable for any assistance or information provided by any employee or agent of Carrier to any Passenger relating to such documents or compliance with such laws.

(2)  Parents/guardians of minor children are responsible for compliance with all requirements and procedures for minor children traveling internationally, which may include, but may not be limited to, documentary evidence, such as a notarized letter of relationship and permission for the child's travel from the birth parent(s) or legal guardian(s) not present.

(3)  Carrier reserves the right, in its sole discretion, to deny boarding to any Passenger whose documentation is deemed by either Southwest or a governmental agency to be insufficient for travel or who otherwise does not comply with laws, requirements or procedures of the specific country the Passenger is traveling to, departing from, transiting through, or returning to.

(4)  Subject to applicable laws and regulations, the Passenger is solely responsible for any expenses incurred or any consequences resulting from his or her failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations.  Carrier expressly reserves the right to seek reimbursement from the Passenger for any loss, damage, or expense suffered or incurred by Carrier resulting from Passenger's failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations.

g.  Foreign Currency

(1)  To the extent permitted by local law, Passenger agrees to contract exclusively in U.S. dollars.

(2)  All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made.

(3)  Refunds will be made in the currency in which the fare was paid, or, at Carrier's election where legally permissible, in U.S. dollars in the amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected.

SWA 00043

h.  Partial Tax Refunds in Limited Circumstances

   (1)  Customers traveling on an international itinerary may be exempt from certain taxes or charges if applicable criteria are met. The Carrier will refund taxes or other charges collected for international transportation only where required by law or where such taxes or other charges were collected in error and the passenger submits evidence of exemption from the taxes or other charges to: Southwest Airlines Refunds Department, P.O. Box 36649, Dallas, Texas 75235-1649.

i.  Check-in Times for International Flights

   (1)  Minimum check-in time for Passengers (with or without checked baggage) is at least 60 minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight.  For flights departing Aruba, the minimum check-in time for Passengers (with or without checked baggage) is at least 75 minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight.

   (2)  Passengers must arrive at the gate and be ready to board at least 10 minutes prior to scheduled departure.  See Section 2a(2) for complete information on check-in requirements.

j.  Travel by Minors

   (1)  Unaccompanied Minor Travel.  Carrier will not transport unaccompanied minor children on international itineraries.  No person under the age of 18 is permitted to travel on an international flight unless accompanied by a parent or companion at least 18 years of age or older.

   (2)  Minors Accompanied by One Parent or Someone who is not a Parent.  Special documentation may be required for admission to or departure from certain countries when a minor child is accompanied by only one parent or a person who is not the minor's legal guardian.  See Section 8(f) International Travel Documents herein.

k.  Carriage of Animals

   (1)  Pets. No pets are accepted on international itineraries.

   (2)  Law Enforcement and Search and Rescue Dogs.  Law enforcement and search and rescue dogs are allowed subject to the requirements contained in Section 6f, except where prohibited due to a conflict of law.

   (3)  Trained Service and Emotional Support Animals.  Trained Service and Emotional Support animals for Qualified Individuals with a Disability are accepted as required by 14 CFR § 382, except where prohibited due to a conflict of law. See Sections 6.c.(4) Trained Service Animals and 6.c.(5) Emotional Support Animals for more information.

l.  Firearms

   (1)  Carrier will not accept firearms or ammunition for international travel.

## 9. Service Interruptions

Refer to Section 8 for conditions applicable to international travel.

a.  Failure to Operate as Scheduled

(1)  Canceled Flights or Irregular Operations. In the event Carrier cancels or fails to operate any flight according to Carrier's published schedule, or changes the schedule of any flight, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:

(i)  Transport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination, in accordance with Carrier's established reaccommodation practices; or

(ii)  Refund the unused portion of the Passenger's fare in accordance with Section 4c.

(2)  Diverted Flights.  In the event Carrier diverts any flight, Carrier, at its sole discretion, will take reasonable steps to transport Passenger to his/her final destination or to provide reasonable accommodations.

(3)  Flight Schedule Changes.  Flight schedules are subject to change without notice, and the times shown on Carrier's published schedules, Tickets, and advertising are not guaranteed.  At times, without prior notice to Passengers, Carrier may need to substitute other aircraft and may change, add, or omit intermediate stops.  Carrier cannot guarantee that Passengers will make connections to other flights by the Carrier or by other airlines.  In the event of flight schedule changes or service withdrawals, Carrier will attempt to notify affected Passengers as early as possible.

(4)  Limitation of Liability.  Except to the extent provided in Section 9a, Carrier shall not be liable for any failure or delay in operating any flight, with or without notice for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events, including, without limitation, acts of God, meteorological events, such as storms, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption.  It also includes, without limitation, government action, disturbances or potentially volatile international conditions, civil commotions, riots, embargoes, wars, or hostilities, whether actual, threatened, or reported, strikes, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, the inability to obtain fuel, airport gates, labor, or landing facilities for the flight in question or any fact not reasonably foreseen, anticipated or predicted by Carrier.

b.  Denied Boarding Procedures

(1)  The following definitions, as prescribed in 14 CFR § 250.1, pertain solely to the denied boarding compensation provisions of this Section:

**Airport** means the airport at which the direct or connecting flight on which the Passenger holds confirmed reserved space is planned to arrive, or some other airport serving the same metropolitan area, provided that the transportation to the other airport is accepted (i.e., used) by the Passenger.

SWA 00045

**Alternate transportation** means air transportation with a confirmed reservation at no additional charge, operated by a Carrier as defined below, or other transportation accepted and used by the Passenger in the case of denied boarding.

**Class of service** means seating in the same cabin class such as First, Business, or Economy class, or in the same seating zone if the Carrier has more than one seating product in the same cabin such as Economy and Premium Economy class.

**Confirmed reserved space** means space on a specific date and on a specific flight and class of service of a Carrier which has been requested by a Passenger, including a Passenger with a "zero fare ticket," and which the Carrier or its agent has verified, by appropriate notation on the ticket or in any other manner provided therefore by the Carrier, as being reserved for the accommodation of the Passenger.

**Fare** means the price paid for air transportation including all mandatory taxes and fees. It does not include ancillary fees for optional services.

**Stopover** means a deliberate interruption of a journey by the Passenger, scheduled to exceed four hours, at a point between the place of departure and the place of final destination.

**Zero fare ticket** means a ticket acquired without a substantial monetary payment such as by using frequent flyer points or vouchers, or a consolidator ticket obtained after a monetary payment that does not show a fare amount on the ticket. A zero fare ticket does not include free or reduced rate air transportation provided to airline employees and guests.

(2)   Request for Volunteers.

   (i)   In the event of an oversold flight, Carrier shall request volunteers for denied boarding before using any other boarding priority in accordance with 14 CFR § 250.2b.  A "volunteer" is a person, including the holder of a zero fare ticket, who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation, in any amount, in exchange for relinquishing his/her confirmed reserved space.  Any other Passenger denied boarding is considered to have been denied boarding involuntarily, even if that Passenger accepts denied boarding compensation.

   (ii)   Carrier will advise each Passenger solicited to volunteer for denied boarding, no later than the time the Carrier solicits that Passenger to volunteer, whether he or she is in danger of being involuntarily denied boarding and, if so, the compensation the Carrier is obligated to pay if the Passenger is involuntarily denied boarding.  If an insufficient number of volunteers come forward, Carrier may deny boarding to other Passengers in accordance with Carrier's boarding priority rules as specified in Section 6.

Southwest Airlines Co.                                    43

SWA 00046

(3)    Conditions for Payment of Compensation to Passengers Involuntarily Denied Boarding due to an Oversale. Subject to the exception in Section 4, Carrier will tender to a Passenger the amount of compensation specified in Section 5, provided that:

(i)    The Passenger holds a Ticket, including a Zero Fare Ticket, for confirmed reserved space and presents himself for Carriage at the appropriate time and place, having complied fully with Carrier's requirements as to ticketing, check-in, and acceptability for transportation in accordance with this *Contract of Carriage*; and

(ii)   Other than for reasons set forth in Section 6, or when resulting from substitution, for operational or safety reasons, of an aircraft having a lesser seating capacity than the aircraft originally scheduled, Carrier is unable to accommodate the Passenger on the flight for which the Passenger holds confirmed reserved space, and such flight departs without the Passenger.

(4)    Comparable Transportation. The Passenger will not be eligible for compensation if Carrier offers comparable air transportation, or other transportation used by the Passenger at no extra cost, that, at the time such arrangements are made, is planned to arrive at the airport of the Passenger's next stopover or, if none, at the airport of the Passenger's final destination no later than one hour after the planned arrival time of the Passenger's original flight or flights.

(5)    Involuntarily Denied Boarding Compensation for an Oversale in Accordance with 14 CFR Part 250(c).

(i)    Compensation shall be 200% of the fare to the Passenger's destination or first stopover, with a maximum of $675, if the Carrier offers alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's first stopover, or if none, the airport of the Passenger's final destination more than one hour but less than two hours after the planned arrival time of the Passenger's original flight on a domestic itinerary and more than one hour but less than four hours after the planned arrival time of the Passenger's original flight on an international itinerary; and

(ii)   Compensation shall be 400% of the fare to the Passenger's destination or first stopover, with a maximum of $1,350, if the Carrier does not offer alternate transportation that, at the time the arrangement is made, is planned to arrive at the airport of the Passenger's first stopover, of if none, the airport of the Passenger's final destination less than two hours after the planned arrival time of the Passenger's original flight on a domestic itinerary and less than four hours after the planned arrival time of the Passenger's original flight on an international itinerary.

(iii)  Compensation will be paid by Carrier on the day and at the place where the denied boarding occurs, except that if Carrier arranges, for the Passenger's convenience, alternate means of transportation that departs before the payment can be made, payment will be sent by mail or other means within 24 hours after the time the denied boarding occurs.

(iv)   Compensation will initially be provided in the form of a draft payable to the Passenger.  With the Passenger's consent, Carrier may also offer travel credit to be applied toward future travel in lieu of the draft.  The Passenger may refuse Carrier's offer of travel credit and insist on receiving compensation by draft in the amount specified in Section 5.

SWA 00047

(v)   Acceptance of compensation by the Passenger relieves Carrier from any further liability to the Passenger caused by Carrier's failure to honor the confirmed reservation.

(6)   Denied Boarding Priority Rules. Carrier's boarding priority is established on a first-come, first served basis in the order boarding positions are secured.  In determining which Passengers holding confirmed reserved space shall be denied boarding involuntarily, Carrier shall deny boarding in reverse order from the order in which the Passengers' boarding positions were secured (i.e., the last Passenger who receives a boarding position will be the first Passenger denied boarding involuntarily in an oversale situation), with no preference given to any particular person or category of fares.

(7)   Written Explanation of Denied Boarding Compensation and Boarding Priority Rules. When a denied boarding occurs, Carrier will give Passengers who are denied boarding involuntarily a written explanatory statement describing the terms and conditions of denied boarding compensation and Carrier's boarding priority rules.

(8)   In addition to the denied boarding compensation specified herein Carrier shall refund all unused ancillary fees for optional services paid by a Passenger who is voluntarily or involuntarily denied boarding. Carrier is not required to refund the ancillary fees for services that are provided with respect to the Passenger's alternate transportation.

c.   Ground Transportation

(1)   Unless provided at the direction of Carrier, Carrier does not assume responsibility for the ground transportation of any Passenger or his/her Baggage between any airport used by Carrier and any other location.  Ground Transportation is at the Passenger's expense.

SWA 00048

## 10.   Miscellaneous

a. Claims

(1)   No claim for personal injury or death of a Passenger will be entertained by Carrier unless written notice of such claim is received by Carrier within 21 days after the occurrence of the event giving rise to the claim.

(2)   No legal action on any claim described above may be maintained against Carrier unless commenced within one year of the Carrier's written denial of a claim, in whole or in part.

(3)   See Section 8 for additional information for international travel.

b. Customer Service Commitment

(1)   The *Southwest Airlines Customer Service Commitment (CSC)* is incorporated by reference in this *Contract of Carriage*.  Carrier's CSC further explains, augments, and expands upon Carrier's policies, procedures, methods of operation, obligations, and dedication to Customer safety, service, and satisfaction in accordance with 14 CFR § 259.5.

c. Choice of Law, Entire Agreement

(1)   Any and all matters arising out of or relating to this *Contract of Carriage* and/or the subject matter hereof shall be governed by, construed, and enforced in accordance with the laws of the United States of America and, to the extent not preempted by Federal law, the laws of the State of Texas without regard to conflict of law principles, regardless of the legal theory upon which such matter is asserted.  This *Contract of Carriage* represents the entire, integrated agreement between the parties relating to transportation by Carrier, and shall supersede all prior representations, understandings or agreements pertaining thereto, either oral or written.  No other covenants, warranties, undertakings or understandings may be implied, in law or in equity.

SWA 00049