EXHIBIT 38

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ADELENE SANDERS, an individual,      )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  ) Case No.
                                     ) 2:21-CV-00451-DDP-MRW
SOUTHWEST AIRLINES CO., a            )
business entity of unknown form;     )
and DOES 1 through 100,              )
inclusive,                           )
                                     )
        Defendants.                  )
_____)

VIDEOCONFERENCE DEPOSITION OF
ELENA KARENEV

Wednesday, February 23, 2022

10:09 A.M.

Stenographically Reported By:
Helena Flores, CSR No. 13313, RPR

```
 1    e-mails be produced.

 2            (Reporter clarification.)

 3            MR. LAZENBY:  I'm sorry.  I do not know that

 4    they exist.

 5    BY MS. SEDAGHATFAR:

 6        Q.    Okay.  How many e-mails -- I'm sorry.  Were you

 7    finished?  Was somebody talking?

 8            How many e-mail exchanges would you estimate

 9    that you had with Mr. Mueller?

10        A.    After the incident, he e-mailed the letter to

11    me.

12        Q.    Mm-hmm.

13        A.    And I may have e-mailed him back "Thank you.  I

14    got the e-mail."  And then recently, with his concern,

15    he e-mailed me again.  But I believe that's it.

16        Q.    Okay.  So he e-mailed you again recently, and

17    that was about a week ago?

18        A.    Yes.

19        Q.    And was that e-mail a precursor to your phone

20    conversation with him?

21        A.    Yes.

22        Q.    Okay.  And -- and did he e-mail you that to

23    your personal e-mail or your work e-mail?

24        A.    He doesn't have my personal e-mail.

25            My work e-mail.
```

```
 1              MS. SEDAGHATFAR:  Okay.  Can you please read

 2    back the question, Helena.

 3              (Whereupon, the record was read back by the

 4              court reporter as follows:

 5              "Q.  But did he explain to you why he waited so

 6              long to contact you or what might have prompted

 7              the e-mail that he sent you last week?  Was

 8              there something that he mentioned triggered that

 9              thought in his mind?")

10              THE WITNESS:  No.

11    BY MS. SEDAGHATFAR:

12         Q.   Did you discuss your deposition with him during

13    that phone conversation?

14         A.   No.

15         Q.   You didn't mention to him that you would be

16    giving a deposition in this case?

17         A.   No.

18         Q.   And what did you, if anything, say about the

19    lawsuit?

20         A.   Nothing.

21         Q.   Okay.  But you had discussed with him that you

22    were being sued; right?

23         A.   No.

24         Q.   Is it your testimony that you never told

25    Mr. Mueller that you were actually being sued in this
```

1    case?

2        A.    Correct.

3        Q.    Okay.  Did you have any discussions with him

4    about the fact that Ms. Sanders has filed a lawsuit in

5    this case?

6        A.    I can't recall.

7        Q.    You can't recall if you ever told him that

8    Ms. Sanders filed a lawsuit and is suing Southwest for

9    discrimination?

10       A.    Correct.

11       Q.    Okay.  Did he mention the lawsuit to you during

12   your phone conversation or e-mail?

13       A.    I -- I don't think so, but I'm not sure.

14       Q.    And you never expressed to him your feelings

15   about the lawsuit and what you thought about it?

16       A.    No.  That wasn't the basis of our conversation.

17       Q.    So at any point in time, not just the

18   conversation you had last week, did you ever express to

19   him your thoughts about the lawsuit that Adelene Sanders

20   has filed?

21       A.    No.

22       Q.    So do you know one way or another if he knows

23   if there's a lawsuit that's been filed in this case?

24       A.    I --

25            MR. LAZENBY:  Objection.  Calls for

1          A.    Roughly a year and a half.

2          Q.    Okay.  And then were you transferred to another

3     position after that?

4          A.    Then I got the position as a flight attendant.

5          Q.    And is a flight attendant a promotion from

6     customer relations, or is it just, like, a lateral --

7               MR. LAZENBY:  Objection.  Vague.

8     BY MS. SEDAGHATFAR:

9          Q.    -- term?

10         A.    They're not related.

11         Q.    And so can you tell me -- so was it about 2015

12    that you began working as a flight attendant?

13         A.    '14.

14         Q.    Okay.  And at that particular time, were you

15    assigned to a physical location or an office or a base?

16               I don't know what they call it.

17         A.    Yes.  When I started flying in 2014, I was

18    based in Chicago.

19         Q.    And then how long were you based in Chicago?

20    For how long?

21         A.    One month.

22         Q.    And then where were you next?

23         A.    I was based in Houston for five months.

24         Q.    And then where were you next?

25         A.    There are a lot of bases, and I don't recall

1          Are you ranked -- is there any type of ranking

2    system in the check ride evaluation, like "Good," "Needs

3    improvement," "Better"?  Or 1 is good; 10 is horrible?

4    Any type of ranking system?

5         A.   I don't remember the specifics at this time.

6         Q.   Did you --

7         A.   But I'm sure -- I'm sure it's good/bad,

8    acceptable/not acceptable -- something with that.

9         Q.   Fair enough.

10         And did you have any -- any performance

11   evaluations that were not good?

12        A.   No.

13        Q.   All of them have been acceptable or good, as

14   you've termed it?

15        A.   Yes.

16        Q.   Do you ever have one-on-one meetings with any

17   supervisors or managers where you discussed your work

18   performance?

19             MR. LAZENBY:  Objection.  Vague.

20             You can answer.

21             THE WITNESS:  I'm sorry.  What kind of meeting?

22   BY MS. SEDAGHATFAR:

23        Q.   In other words, do you ever -- are you ever

24   required to meet with a supervisor or a manager to go

25   over your work performance or any issues that might

1    arise with respect to your work performance?

2        A.   Yes.   But usually it's bad, not good, if you

3    have a meeting.   It's a bad thing.

4        Q.   And have you had any of those meetings to

5    discuss any bad work performance?

6        A.   Usually they're not -- let me clarify.   They're

7    not to discuss bad.   They are to clarify a situation.

8    And they call them fact-findings.   They want to know

9    what happened.

10       Q.   Sure.   Sure.   That makes sense.

11            And have you participated in any of the

12   fact-findings?

13       A.   I have.

14       Q.   Okay.   And how many?

15       A.   I don't recall.

16       Q.   Is it more than five?

17       A.   I don't think so.

18       Q.   Would it be less than five?

19       A.   I would say it's less than five.

20       Q.   And can you tell me what the subject matter of

21   those fact-findings were, the ones you can recall?

22       A.   There was one that was a complaint from a

23   customer that -- I'd asked if he was -- I questioned an

24   area of customers because I smelt something irregular in

25   the cabin during -- during flight.   And I thought it was

1    an e-cigarette; so I questioned all the passengers in

2    the area.  And one of the passengers wrote a letter

3    saying that he felt personally singled out by me asking

4    about the e-cigarette smell.

5         Q.   And do you recall what year that was?

6         A.   I don't.

7         Q.   Was it prior to July of 2020?  Was it prior to

8    the incident with Ms. Sanders?

9         A.   I believe so.

10        Q.   And with that particular complaint, was the

11   nature of the complaint that this passenger believed he

12   was singled out based on race?

13        A.   No.

14        Q.   What was the -- the complaint based on, the

15   singled-out part of the complaint?

16        A.   He had a hand sanitizer that smelled like

17   vanilla or cookies.  And that vanilla cookie smell --

18   they have flavored e-cigarettes that emit that smell.

19   So he just took it personally.

20        Q.   Okay.  And was he African American?

21        A.   He was not.

22        Q.   Do you recall what ethnicity he was?

23        A.   He was white.  Caucasian.

24        Q.   And did you -- with respect to that particular

25   fact-finding, were you reprimanded, or did you get in

1    trouble in any way?

2         A.    I did not.

3         Q.    And did your employer find that you didn't do

4    anything wrong?

5         A.    That's correct.

6         Q.    Okay.

7         A.    I was strictly following safety procedures.

8         Q.    Okay.   And did you ever have an opportunity to

9    look at that letter that this customer wrote?

10        A.    Yes.

11        Q.    Do you have a copy of it?

12        A.    I -- I don't.

13        Q.    Okay.   And then the second fact-finding -- what

14   do you recall about that one?

15        A.    I -- that's too far back.   I can't remember.

16        Q.    Okay.   So as you sit here today, the only

17   fact-finding that you recall is the one that you just

18   testified about?

19        A.    That's correct.

20        Q.    Okay.   And has any customer -- do you call them

21   customers or passengers?

22        A.    Both.   But we can -- we can use whatever you --

23   whatever you'd like.

24        Q.    Okay.   I've seen the words used interchangeably

25   in the documents.   So -- okay.

1   BY MS. SEDAGHATFAR:

2       Q.   Okay.   Well, why don't you tell me the other

3   ways that you can accurately testify about how you're

4   evaluated at work.

5               MR. LAZENBY:   Same objections.

6               THE WITNESS:   I mean, we -- we check in

7   sometimes with our supervisors, and we -- we stop --

8   voluntarily stop by their offices to say "Hi" and tell

9   them how we're doing, ask any questions if we need

10   clarification on a new policy or something.   So I

11   don't -- I don't know if that answers your question.

12   BY MS. SEDAGHATFAR:

13       Q.   Okay.   And are you required to complete any

14   self-evaluations?

15       A.   I don't think so.

16       Q.   Did you ever get any comments on your work

17   performance on areas of improvement?

18               MR. LAZENBY:   Objection.   Vague.   Overbroad.

19               THE WITNESS:   Not that I can recall at this

20   time.

21   BY MS. SEDAGHATFAR:

22       Q.   Now, during your employment at Southwest, have

23   there been any workplace complaints lodged against you?

24       A.   No.

25       Q.   Like, by coworkers or individuals that you work

1    with?

2        A.   I did have one complaint filed against me

3    against [sic] a customer service agent in Denver.

4    That -- that was some time ago, before the incident.

5    But nothing became of it.

6        Q.   Okay.   And what was the nature of the complaint

7    that the agent lodged against you?

8        A.   They said that I was rude.

9        Q.   And can you tell me a little bit more

10   specifically what -- what that complaint was?

11       A.   I was traveling out of uniform, and I had -- I

12   had rushed to a gate to catch a flight.   And the agent

13   sort of ignored me at first, and then I was very

14   hesitant to -- I'm sorry.   I was eager to get on the

15   flight, and they -- there were two agents, but the

16   complaint was only from one.

17            They sort of didn't want to help me.   And this

18   was before they knew that I was internal and that I

19   worked for the airline.   And they were kind of refusing

20   to help me.   And then once I showed my badge, I feel

21   like they had an "uh-oh" moment.   And I kind of really

22   felt that they proactively wrote me up, thinking that I

23   would write them up.   But I've never written up another

24   employee.

25            So anyway, I think it was an issue of

1    miscommunication.  And, you know, I missed that flight.

2    It's not a big deal.  But nothing came of it because my

3    superiors know my reputation and they know that I don't

4    have a habit of being rude.  So it was just a

5    misunderstanding.

6        Q.   And did you have to meet with any supervisor

7    regarding this particular complaint?

8        A.   No.

9        Q.   So how did you communicate with your supervisor

10   about the complaint?

11       A.   They called me to respond to the irregularity

12   report.  And I wrote up my own irregularity report.

13       Q.   And so you were not found to have done anything

14   wrong in that --

15       A.   Right.

16       Q.   -- in that incident?

17       A.   Correct.

18            MR. LAZENBY:  You've got to let her finish the

19   question before you answer so we have a clean record.

20            THE WITNESS:  Sorry.

21            MS. SEDAGHATFAR:  And let's just let the record

22   reflect that Ms. Carroll seems to have logged off the

23   video.  Is she not in the room anymore?

24            MR. LAZENBY:  She's starting her video over.

25            MS. SEDAGHATFAR:  Okay.  I would ask that, if

1               MR. LAZENBY:  So turn it on.

2               MS. SEDAGHATFAR:  Can you please go back and

3     read the last question and answer, please, Helena.

4               (Whereupon, the record was read back by the

5               court reporter as follows:

6               "Q.  And so you were not found to have done

7               anything wrong in that --

8               "A.  Right.

9               "Q.  -- in that incident?

10              "A.  Correct.")

11    BY MS. SEDAGHATFAR:

12         Q.   Were the two particular agents that lodged the

13    complaint against you -- were any of them

14    African American?

15         A.   It was only one agent that filed the complaint.

16    And, no, they were not African American.

17         Q.   Neither of them?

18         A.   Neither of them.

19         Q.   Okay.  And you also testified that you wrote

20    your own IR regarding that incident?

21         A.   Correct.  In response.  Yes.

22         Q.   Are there any other workplace complaints that

23    have been made against you during your employment at

24    Southwest?

25         A.   Not that I'm aware of.

1    agents that were working with you that day?

2         A.    No.

3         Q.    Was Dell Jackson?

4         A.    Dell Jackson is the supervisor that was

5    requested.  But she was not there during check-in.

6         Q.    Okay.  Do you recall the names of the pilot --

7    the pilots?

8         A.    I may be familiar with them within the context

9    of this case.  But I don't know them personally, and I

10   wouldn't -- I don't know their names exactly.

11        Q.    And so -- so tell me what you did after you

12   arrived at the gate.

13        A.    I don't specifically remember the specific

14   incident.  But typically we show our badges, which is

15   like a check-in, if you will.  And then we go onto the

16   aircraft.  We perform preflight, safety-related duties

17   in our positions.  We put away our luggage, make sure

18   the cabin is ready.  And then we -- usually the "A"

19   flight attendant lets the ops -- operations agent know

20   that we are ready to board.  And then we start

21   boarding -- we start preboarding.  Excuse me.

22        Q.    And you were the "A" flight attendant that day?

23        A.    That's correct.

24        Q.    And so, at the time that the boarding started,

25   were you positioned at the threshold of the entrance to

1      the aircraft?

2          A.    I'm not sure what you mean by "threshold."

3          Q.    The entrance to the aircraft.

4          A.    I was inside the aircraft, at the front of the

5      aircraft.

6          Q.    Okay.  Got it.

7                And was anyone standing there with you at that

8      time?

9          A.    Well, that -- what time?

10         Q.    Okay.  So --

11               MR. LAZENBY:   Vague.

12     BY MS. SEDAGHATFAR:

13         Q.    -- initially, when the boarding is about to

14     begin, were you positioned at the entrance of the

15     aircraft?

16         A.    When we were ready to board, yes, I was

17     positioned at front of the aircraft, near the entrance.

18         Q.    And was any other Southwest employee positioned

19     at that location with you?

20         A.    We -- we all move around; so I can't tell you

21     if the other flight attendants came in to check on

22     something or if the pilots did.

23         Q.    And when was the first time that you saw

24     Ms. Adelene Sanders and Ms. Shelly Phillips?

25         A.    I believe they were the last two passengers to

 1   point in time?

 2        A.    Yes.   So Ms. Sanders and her traveling

 3   companion behind her were about to enter the aircraft.

 4   But I had stopped her companion because she was without

 5   a mask.   And she was also holding a clear cup that

 6   looked like it may have been an alcoholic beverage from

 7   the bar upstairs at the airport.

 8        Q.    Okay.   And what did you say to her?

 9        A.    So I asked Ms. Sanders's companion whether the

10   content of her clear cup was alcohol, to which she

11   responded, "No."

12            And then I said, "Okay."   Before I said,

13   "Okay," Ms. Sanders had kind of jokingly said, "But

14   we've been drinking," in a very friendly manner.

15            And then I asked Ms. Sanders's companion -- "No

16   problem.   You just" -- "You have to have a mask on to

17   board the flight."

18            This was in the middle of COVID -- proceeding

19   [sic] COVID.   But this is a procedure and policy

20   implemented by the FAA.   So every single person that

21   boards an aircraft has to have a mask on.

22            And I asked her -- if Ms. Sanders's companion

23   had a mask on her.   If not, one can be provided for her

24   by the airline.   She asked me to hold her drink.   I held

25   her drink.   She dug into her purse, and she put on a

1    black mask.

2        Q.   Okay.   And what happened next?

3        A.   So she had -- her mask had the words "Black

4    Lives Matter" on it.   But she had put it on upside down

5    unknowingly; so I had let her know, "Your mask is upside

6    down."

7             And she said, "It doesn't matter.   The message

8    is still the same."

9        Q.   And what was -- where was the cup at that

10   point?   Did you give it back to Ms. Phillips?

11       A.   Yes, ma'am.

12       Q.   Okay.   And isn't it true that the cup that

13   you're referencing was a clear plastic cup?

14       A.   Yes, ma'am.

15       Q.   Okay.   And what makes you state that it was a

16   cup from the bar?

17             MR. LAZENBY:   Objection.   Misstates her

18   testimony.

19             But you can answer.

20             THE WITNESS:   So during the -- the -- this

21   COVID time -- and still probably until this day, but

22   especially at that time, the -- the -- the pandemic

23   affected the staffing at the airport.   So there were a

24   lot of places that closed down.   The places that did

25   remain open didn't really have the staff -- the

1    dishwashers, the bartenders, et cetera.

2             So to make things easier, they were handing out

3    every drink in either a disposable bottle, like a beer

4    bottle, or a clear glass if it was wine or vodka or what

5    have you.  So it was not uncommon for passengers to be

6    walking around the airport with clear plastic cups or to

7    try to board our aircrafts with clear plastic cups.

8    Most of them don't know that you can't board an aircraft

9    with open liquor or alcohol.

10   BY MS. SEDAGHATFAR:

11       Q.   The cup was not glass; correct?

12       A.   It was plastic.  It was a clear plastic glass.

13   Yes.  Everything was -- at the bars was -- was served in

14   disposable plastic glasses.

15       Q.   Okay.  Because during your testimony, you

16   mentioned "glass."

17             So did you mean to say a plastic cup?

18       A.   I'm sorry.  Yes.  I mean to say plastic cup.

19       Q.   So is it your testimony that, in July of 2020,

20   the restaurants at the Ontario airport only served

21   beverages in plastic cups and no glasses?

22             MR. LAZENBY:  Objection.  Misstates her

23   testimony.

24             THE WITNESS:  No.  That's not what I'm saying.

25   What I'm saying is it was not uncommon for

1   restaurants and bars at that time to use clear plastic

2   cups to serve all beverages in.

3   BY MS. SEDAGHATFAR:

4        Q.   Okay.   And was there any writing on that

5   particular plastic cup?

6        A.   There was not.

7        Q.   Okay.   And there was a straw in the cup;

8   correct?

9        A.   I don't recall.

10       Q.   You don't recall seeing a plastic straw in the

11   cup?

12       A.   I really don't.

13       Q.   And what made you believe that there -- the cup

14   could have contained alcohol?

15            MR. LAZENBY:   Objection.   Asked and answered.

16            THE WITNESS:   I think I -- I already explained

17   that.

18   BY MS. SEDAGHATFAR:

19       Q.   So other than what you testified about, you had

20   no other reason to come to the conclusion that possibly

21   the cup contained alcohol?

22       A.   That's correct.

23       Q.   Did Ms. Phillips or Ms. Sanders engage in any

24   behavior that might lead you to believe that they were

25   intoxicated at that time?

1        A.    I don't recall.

2              But she did say that they had been drinking and

3    she was excited to go to Vegas.

4        Q.    Okay.  But I'm just asking you regarding

5    whether or not you had any reason to believe that they

6    were intoxicated at that particular point in time.

7              MR. LAZENBY:  Asked and answered.

8              THE WITNESS:  I don't recall.  No.  I don't

9    think so.

10   BY MS. SEDAGHATFAR:

11       Q.    And isn't it true that -- strike that.

12             Were you wearing a mask at that time?

13       A.    Yes, ma'am.

14       Q.    And at any point in time, did you stick your

15   nose inside the plastic cup and smell it?

16       A.    I -- I -- I was wearing a mask.  And I did

17   smell the contents of the cup.

18       Q.    Okay.  And can you tell me how that took place?

19             Tell me what you did.

20       A.    I just brought it closer to me.

21             Alcohol has a very strong smell; so you don't

22   need to get too close to it to know that it's alcohol.

23       Q.    Okay.  And did -- and did you -- and is it your

24   testimony that Ms. Phillips voluntarily handed you the

25   cup?

1      A.   That's correct.

2      Q.   You didn't ask her for it?

3      A.   I did not.

4           She needed her hands free for getting --

5   retrieval of her mask from her purse.

6      Q.   And you didn't snatch the cup out of her hand

7   either?

8      A.   That's correct.

9      Q.   Okay.  And did you remove the plastic lid to

10  the glass -- to the -- did you remove the plastic lid to

11  the cup at any point in time?

12     A.   The cup, as I remember it, did not have a lid.

13     Q.   It did not have a lid?

14     A.   Yes, ma'am.

15     Q.   And how do you recollect that?

16     A.   I -- I can't remember if there was a straw, but

17  I know it didn't have a lid on it.

18     Q.   Okay.  And you do recall smelling the contents

19  of the cup?

20     A.   I remember bringing the cup close to my face so

21  that I could see if it was alcohol.

22     Q.   And did you determine one way or another if

23  that was alcohol?

24     A.   I did not smell alcohol in the cup.

25     Q.   Okay.  And did Ms. Phillips get upset that you

1    to believe that Ms. Shelly Phillips was lying?

2        A.   No.  I -- I -- I verified -- I would have

3    verified that cup with anybody because I've had

4    customers lie to my face that they -- with a cup of red

5    wine in their hand.  So...

6        Q.   And what you observed in that clear plastic cup

7    was what color?

8        A.   It was clear.

9        Q.   And can you tell me how many other passengers

10   on that particular flight that you took -- that were

11   boarding on with any cups or beverages that you

12   similarly smelled to determine if there was alcohol in

13   them?

14       A.   I can't recall how many passengers.  But this

15   is not a single occurrence.

16           MS. SEDAGHATFAR:  Okay.  Move to strike as

17   nonresponsive.

18   BY MS. SEDAGHATFAR:

19       Q.   I'm just asking you how many passengers on that

20   particular flight that boarded with beverages did you

21   similarly smell.

22       A.   I can't recall how many passengers had similar

23   cups.

24       Q.   Right.  I'm just asking about how many you

25   smelled, if any.

1          A.    If there were other passengers with open cups
2     that I thought were from the bar, I would have handled
3     it exactly the same.

4              MS. SEDAGHATFAR:  Okay.  Move to strike as
5     nonresponsive.

6              Can you please read back the question.

7              (Whereupon, the record was read back by the

8              court reporter as follows:

9              "Q.  I'm just asking about how many you smelled,

10             if any.")

11             MR. LAZENBY:  Same -- asked and answered.

12    BY MS. SEDAGHATFAR:

13        Q.    How many?

14        A.    I don't recall how many there were.

15        Q.    Well, isn't it true that you didn't similarly
16    smell any other cups that particular day?

17             MR. LAZENBY:  Objection.  (Unintelligible.)

18             (Reporter clarification.)

19             MR. LAZENBY:  To the form of the question.

20             THE WITNESS:  As I stated, this is a regular
21    occurrence, especially during COVID.

22             MS. SEDAGHATFAR:  Move to strike as
23    nonresponsive.

24    BY MS. SEDAGHATFAR:

25        Q.    Okay.  I'm just -- I'm just going to ask you

1    again.  And I would please ask you for a direct

2    response.  And if you don't recall, that's fine.

3            But I'm asking you, on that particular day, on

4    that particular flight, how many other cups did you take

5    from passengers and similarly smell to determine if

6    there was alcohol in the cup?

7            MR. LAZENBY:  Objection.  Asked and answered

8    right before.

9            THE WITNESS:  I don't remember how many

10   passengers tried to board -- how many other passengers

11   tried to board with an open clear plastic cup.

12           MS. SEDAGHATFAR:  Move to strike as

13   nonresponsive.

14           Let's mark this portion of the deposition

15   transcript, please.

16   BY MS. SEDAGHATFAR:

17       Q.   And so if we were to interview the passengers

18   that were on that plane and boarded that flight, would

19   any of them testify that you similarly smelled their

20   beverage to determine if there was alcohol contained

21   therein?

22           MR. LAZENBY:  Objection.  Lacks foundation.

23   Calls for speculation.

24           THE WITNESS:  Yes.

25   / / /

1    BY MS. SEDAGHATFAR:

2        Q.    How many?

3        A.    I don't know how many.   But if you interviewed

4    them, they would say that I did exactly the same for

5    them.

6        Q.    And -- and by "exactly the same," can you

7    explain what you mean?

8        A.    I would ask them if it was alcohol, and then I

9    would get closer to the liquid to see if it was.

10       Q.    Okay.   So you're saying you would, or you did?

11       A.    You asked me, if you went and asked every

12   single passenger on that aircraft if I would handle

13   myself exactly the same.   And I said yes, I would.

14       Q.    And by that -- I'm just trying to get a clear

15   record.

16             By handling yourself exactly the same, I mean

17   that you smelled the cup or the beverage that that

18   particular passenger was boarding the plane with.

19       A.    That I would ask for the cup and its contents.

20   And if I could smell alcohol, yes, that would be taken

21   from that passenger.

22             MS. SEDAGHATFAR:   Okay.   Move to strike as

23   nonresponsive.   That's not the question.

24             Can you please read back the question.

25   / / /

1            Are you more comfortable standing?

2      A.    Yeah.  I just can't sit for very long.

3      Q.    Okay.  No, not a problem.  Okay.

4            And so what did you do next, after the last of

5   the passengers boarded?

6            MR. LAZENBY:  Objection.  Vague.

7            THE WITNESS:  It's very vague, your question.

8   BY MS. SEDAGHATFAR:

9      Q.    At some point, did all the passengers board the

10  plane, and was the door closed to the plane?

11     A.    No.

12     Q.    Okay.  What happened next?

13     A.    As I stated, I believe that Ms. Sanders and her

14  companion were the last passengers to board.  As soon as

15  Ms. Sanders entered the aircraft, I could see the side

16  and the back of her outfit.  And as I stated in my

17  irregularity report, the first officer was next to me,

18  and we were taken aback.  And there were two ladies in

19  the front row who were also taken aback.  And then

20  Ms. Sanders went to her seat with her companion.

21     Q.    Okay.  And when you said you -- the FO that was

22  next to you was taken aback, who was the FO?

23     A.    "FO" stands for first officer.

24     Q.    Do you recall his name?

25     A.    I don't.  Sorry.

1    Q.   And how do you know he was taken aback?

2    A.   By his facial expression.   And literally we

3  kind of stepped back.

4    Q.   And what -- and did he say anything to you at

5  that time?

6    A.   I honestly can't recall.

7    Q.   And why were you taken aback?

8    A.   Because half of her derriere was showing.

9    Q.   And -- half of her derriere was showing?

10        And you observed that only when you looked at

11  her from the back side?

12   A.   Correct.

13   Q.   Okay.   And -- and what else -- what other

14  reason, if any, were you taken aback?

15   A.   At her side, the sides of her outfit were kind

16  of crisscross strings.   So the material was not sewed

17  together.   There was -- I don't know how to describe the

18  design.

19        But that was not the main issue.   The main

20  issue was that her -- her butt was showing, and we could

21  see her underwear, the entirety of it.

22   Q.   How do you know that she was wearing underwear

23  that day?

24   A.   So with her -- I called it a romper.   I don't

25  know the proper terminology.   But it was hanging loose

1    in the back.  So her butt crack, if you will --

2        Q.   Okay.

3        A.   -- and the full -- like, the full back part of

4    her thong -- she had a lace, hot pink G-string -- was in

5    full view of everyone.  And -- it was in full view.

6    So...

7        Q.   And any other reason, other than the FO

8    stepping back, that you believed that he was taken

9    aback?

10       A.   I don't recall any conversations we had.

11       Q.   Okay.  Now tell me about the two ladies in the

12   front row that you said were also taken aback.  First of

13   all --

14            MR. LAZENBY:  Sorry to do this.  But she's kind

15   of hunched over.  I want to get something to prop the

16   camera up so she can be more comfortable.  I'm going to

17   take -- I'm just going to find something so I can put

18   the laptop on so she's not bent over.

19            Would that be more comfortable?

20            THE WITNESS:  Oh, yeah.

21            MR. LAZENBY:  Give me a second.

22            MS. CARROLL:  I'm going to log on and get on

23   Wi-Fi.  It's on the hotspot, and it wasn't working.

24            MS. SEDAGHATFAR:  Can we go off the record?

25            THE REPORTER:  Off the record, Counsel?

```
1                 MS. SEDAGHATFAR:   Yes, go off because we don't

2      want this time to be logged.

3                 (Brief recess.)

4                 THE REPORTER:   Back on the record.

5      BY MS. SEDAGHATFAR:

6          Q.   And the two ladies -- and the two ladies in the

7      front row, can you describe to me why you say they were

8      also taken aback?

9          A.   Well, they -- they looked at each other, and

10     they looked at me and the first officer.   And then the

11     one on the aisle came to me and said, "Bless your heart,

12     honey, on what you have to deal with."

13         Q.   What did you say?

14         A.   I don't -- I don't recall exactly what I -- I

15     don't think I said anything, actually.

16         Q.   Did you laugh at that comment?

17         A.   I don't recall.

18         Q.   And that woman that said, "Bless your heart in

19     [sic] what you have to deal with" was an

20     African-American woman; correct?

21         A.   Both women in the front row were

22     African-American women that preboarded that flight.

23         Q.   And can you tell me the names of those women,

24     please?

25         A.   I can't.   I don't have those names.
```

1        A.    I don't believe so.

2              I'm very tall.  I'm almost 6-2.

3        Q.    Oh, okay.  And would you be able to give what's

4    your best estimate of what her weight was on that

5    particular day?

6        A.    I would not.

7        Q.    Would you say that she was a slender woman?

8        A.    She seemed to have a similar body type as I do.

9        Q.    Would you describe her as curvy?

10       A.    I would because I consider myself curvy.

11       Q.    So you testified you then went to address her

12   discreetly and ask her if she had anything to cover up

13   with.

14             And how did you -- how did you -- how was this

15   done discreetly?

16       A.    So, again, there -- it's a sensitive issue.

17   It's a sensitive topic anytime, you know, a customer

18   might not realize of -- something.

19             So I -- I kept my voice low.  I stayed calm.  I

20   felt I was very nice and considerate.  And I -- I

21   didn't -- I didn't want to make a big deal out of it.

22   You know, it was just me addressing a situation.

23       Q.    And isn't it true that there was not a customer

24   complaint about plaintiff's wardrobe or sides?

25       A.    I'm not aware if there -- if there was, other

1   than the two ladies that first saw her board.

2        Q.   Okay.   But why did you tell Ms. Sanders that

3   there was a customer complaint about her sides?

4        A.   I did not.   I don't believe I told her that.

5        Q.   You never said that to Ms. Sanders and

6   Ms. Phillips?

7        A.   I don't recall saying that.   It could have been

8   somebody else.   It wasn't me.

9        Q.   And at that point in time, when you went to

10  address plaintiff discreetly -- by "plaintiff," I mean

11  Ms. Sanders -- she was seated at her seat; correct?

12       A.   Yes.   She was on the window seat.

13       Q.   And she was buckled up with her seat belt?

14       A.   I don't remember if she had her seatbelt on

15  yet.   But it wasn't required, due to the stage of

16  flight.

17       Q.   Okay.   And at that point in time, while she was

18  seated, you could no longer see her buttocks; correct?

19       A.   That's correct.

20       Q.   And what was Ms. Sanders's response to you when

21  you asked her if she had anything to cover up with?

22       A.   I believe she said she didn't have a sweater.

23  And then she asked if we had any blankets.

24       Q.   And what did you say?

25       A.   I said, "No."

1    see if she could purchase something?

2         A.   She said it was her constitutional right to

3    wear whatever she liked.

4         Q.   And then what happened next?

5         A.   And then Ms. Sanders and her companion

6    proceeded to escalate the situation by saying they had a

7    right to wear whatever they wanted.   And they were

8    trying to argue with me.

9         Q.   And were there any blankets on that aircraft?

10        A.   There are two medical blankets on that

11   aircraft.   But they are only supposed to be used due --

12   for a medical emergency.

13        Q.   Where were those stored?

14        A.   They're stored in the back of the aircraft.

15        Q.   Were there any pillows on that aircraft?

16        A.   No, ma'am.   We don't have any pillows on any of

17   our aircrafts.

18        Q.   So do you recall Ms. Sanders asking you more

19   than one time if you had anything that she could cover

20   up with?

21        A.   She may have asked me more than one time.

22        Q.   Okay.   And at all times, you told her "No";

23   isn't that correct?

24        A.   That's correct.

25        Q.   And so after this exchange took place and, as

1    has nothing to cover up with, and you advise her that

2    you have nothing to give her.

3              What would then have been the next step to

4    resolve this particular situation?

5              MR. LAZENBY:  Objection.  Form.

6              THE WITNESS:  So in -- in our interaction --

7    our interaction was based on the inappropriateness of

8    her attire, but she quickly turned our interaction about

9    race.  So at that point, it became another issue

10   altogether.  So at that point, I removed myself from the

11   situation to go get a supervisor so that maybe they

12   could ask her in a different way on how we could resolve

13   this issue.

14   BY MS. SEDAGHATFAR:

15        Q.   All right.  But I'm asking you, based on your

16   experience, what would be the best practice at that

17   point?

18             Because she's telling you she doesn't have

19   anything to cover up with, and you're telling her that

20   you don't have a blanket to give her.

21             What, then, are you trained to do in that

22   particular instance?

23             MR. LAZENBY:  Objection.  Incomplete

24   hypothetical.  Vague.

25             THE WITNESS:  I think I stated earlier that I

1        A.   I don't remember if I used those specific

2   words.  But I did tell her that it was inappropriate.

3        Q.   Okay.  And did you ever talk -- talk to the FO

4   or the pilot to ask if you could utilize one of the two

5   medical blankets to give to plaintiff Adelene Sanders to

6   cover up?

7        A.   I don't believe I did.

8             That is not standard procedure.

9        Q.   Can you explain what you mean by "That is not

10  standard procedure"?

11       A.   This was not a medical incident; therefore, I

12  would not reach for the medical blanket.

13       Q.   Right.  The question was did you ever ask the

14  FO or the pilot if you could utilize one of the two

15  medical blankets to give to plaintiff?

16       A.   I don't believe I did.

17       Q.   And did you, at any point in time, ask any of

18  the passengers if anyone had anything that they could

19  provide to Adelene Sanders to cover up with?

20       A.   With all due respect, that's not how the

21  procedure is.

22       Q.   Okay.  So what would have been the procedure at

23  that point?

24       A.   Once again, I asked her if she had any

25  clothing.  She said she did not.  Her aunt was not

1    assisting.  So then I offered for her to go back into

2    the terminal to see if she could purchase something.  If

3    she is not able to be appropriately dressed for the

4    flight, she's more than welcome to be put on the next

5    flight once she is appropriately dressed.

6         Q.    And that was the last flight of the day from

7    Ontario to Vegas, was it not?

8         A.    I don't believe it was.

9         Q.    Okay.  And you advised Ms. Sanders that her

10   option at that point was to leave the flight and to be

11   put on the next flight to Vegas?

12        A.    I didn't -- I do not recall advising her of

13   that.  I'm saying that would have been an option.

14   Because you asked me what her options would have been.

15        Q.    And I'm asking why you never presented

16   Ms. Sanders with that option.

17        A.    Because my intention was -- was never for her

18   to be put on a different flight.

19        Q.    What was your intention?

20        A.    My intention was for her to properly be

21   clothed.

22        Q.    And I -- I fully understand that.  I'm just --

23   what I'm trying to find out is, at the point in time

24   that you now have concluded there's no blanket to give

25   her, she has nothing to cover up with, she didn't go to

1    has to do with when I was speaking with her.

2        Q.   Okay.  And so just to be clear, the fight

3    details can be announced even though all the passengers

4    have not boarded?

5        A.   The captain or first officer can make an

6    announcement as soon as the first person boards.

7    Typically, they try to do the announcement after

8    everyone has boarded.  But they -- it depends.  There

9    could be a delay.  We were waiting for other passengers.

10   The pilots can do their -- their job -- you'll have to

11   question them on when they did it.  But they can do it

12   at any time while the door is open, after boarding has

13   started.

14       Q.   During your employment at Southwest, how many

15   passengers have you requested be removed from the

16   plane -- from the aircraft?

17       A.   Zero.

18       Q.   Did you not request that Ms. Sanders and

19   Ms. Phillips be removed?

20       A.   I didn't know we were considering this one.

21            So considering this one, it was -- me and my

22   crew made the decision to deplane Ms. Sanders and her

23   companion.  So two --

24       Q.   Okay.  Thank you.

25       A.   -- to answer your question.

1    Q.   And how many -- during your employment at

2    Southwest, how many passengers did you confront about

3    the appropriateness of their wardrobe?

4    A.   It's actually quite common in California, where

5    I'm based.  Because there's a lot of women who do yoga,

6    and a lot of the popular yoga outfits are usually tights

7    with a matching sports bra.  And I don't believe that a

8    sports bra or any type of female undergarment or male

9    undergarment alone is enough to be appropriate on an

10   aircraft that transports families with small children.

11        So it's not uncommon for me to say, you know,

12   "Could you put a sweater on, or do you have anything

13   else that you could put over to cover your midrift," or,

14   "to cover your boobs," or, "to cover your butt?"  It's

15   not uncommon.

16   Q.   And do you have any documentation that would

17   reflect those instances where you engaged in that

18   conduct by asking the customer to cover up?

19   A.   I don't believe so.  Because usually it's

20   not -- it's not an event.  Usually they just comply and

21   say, "Oh, yeah.  Sorry."

22   Q.   And you testified earlier that you -- at some

23   point, you became aware that another passenger was

24   recording your interaction with Ms. Sanders; correct?

25   A.   Correct.

1    Q.   And why did you tell her to stop recording the

2    interaction?

3    A.   I think because I felt it was detrimental to

4    the situation.

5    Q.   Why?

6    A.   Because it was -- it was escalating Ms. Sanders

7    and her companion.

8    Q.   But didn't you want to have some type of at

9    least evidence or some type of footage?  In this

10   particular instance, wouldn't you have wanted that to be

11   recorded?

12   A.   Do you like being recorded when you work?

13   Q.   Move to strike as nonresponsive.

14        I'm asking the questions; you're not.

15        MS. SEDAGHATFAR:  Can you please read back the

16   question?

17        (Whereupon, the record was read back by the

18        court reporter as follows:

19        "Q.  But didn't you want to have some type of at

20        least evidence or some type of footage?  In this

21        particular instance, wouldn't you have wanted

22        that to be recorded?")

23        THE WITNESS:  There was no reason for me to

24   need evidence for anything.

25   / / /

1    BY MS. SEDAGHATFAR:

2        Q.    And is there any type of policy that prohibits

3    cell phone recording on the flight?

4        A.    I'm sure there is.  I don't know the specifics.

5        Q.    And was --

6        A.    But if it interferes with the safety or me

7    doing my job properly, absolutely.

8        Q.    And was that young lady that was recording the

9    incident a Caucasian female?

10       A.    I honestly don't remember her race.

11       Q.    Do you remember her name, or did you ever come

12   to know her name?

13       A.    The only interaction we had was I asked her,

14   "Could you please put your video down.  You're not

15   helping the situation.  And could you remove your bare

16   feet off of the end of the seat rest."

17       Q.    Yeah.  So she had her bare foot placed on the

18   armrest of the passenger in front of her; correct?

19       A.    There was no passenger in front of her.  It was

20   just a seat -- which still is inappropriate.

21       Q.    Right.  And that's a violation of the Contract

22   of Carriage, is it not?

23       A.    I don't believe that's a violation of the

24   Contract of Carriage.  I just believe that's just

25   improper manners.

1        Q.    Are you aware of any provision in the Contract

2    of Carriage that states that bare feet are prohibited on

3    the aircraft?

4        A.    No.

5        Q.    But you didn't kick -- strike that.

6              You didn't ask this young lady to put on shoes

7    or socks, did you?

8        A.    She's able to take her shoes off.  I just asked

9    her to remove her feet from the end of the seat -- from

10   the armrest of the seat.

11       Q.    So she's allowed to be barefoot during the

12   flight?  That's not a violation of any policy?

13       A.    That's correct.

14       Q.    Are you sure about that?

15       A.    As far as my abilities go, I'm sure of that.

16       Q.    And you didn't ask her to put on socks or

17   shoes; is that correct?

18       A.    She has to board with socks and -- well, no.

19   Excuse me.  She has to board with shoes on.  But you may

20   remove your shoes during the flight if you'd like.

21             MS. SEDAGHATFAR:  Move to strike as

22   nonresponsive.

23             Can you read back the question, please.

24             (Whereupon, the record was read back by the

25             court reporter as follows:

1   dressed appropriately, and taken off.  That is a

2   decision that I would have made, to go to -- and I would

3   ask the captain and the first officer if that was okay.

4           Given my tenure at Southwest, I -- I don't

5   remember a time where a captain or a first officer

6   didn't back me up on something that was best for the

7   customer.

8   BY MS. SEDAGHATFAR:

9       Q.   And how long would you have been allowed to

10  hold up a plane?

11          MR. LAZENBY:  Objection.  Incomplete

12  hypothetical.  Calls for speculation.

13          THE WITNESS:  It -- Ontario is not that big of

14  an airport.  It wouldn't have taken her more than 15

15  minutes to go purchase a sweater.

16  BY MS. SEDAGHATFAR:

17      Q.   So is it your testimony that you could have

18  held up the plan for 15 minutes after the departure

19  time?

20      A.   Absolutely.

21      Q.   And did you tell Ms. Sanders that?

22      A.   No.  Because she had already escalated it about

23  race.  To me, she seemed unreasonable at that time.

24      Q.   And so when you had this discussion with the

25  "B" and "C" flight attendants and the captain, what did

1    they say to you in response to the statements that you

2    made?

3         A.    So I felt that Ms. Sanders and her companion

4    were becoming more hostile.   She mentioned the word

5    "Karen," which is a buzzword, if you will.   And it's

6    a -- it's a racially charged word against people of my

7    race and background.

8              So I no longer felt safe or comfortable talking

9    with her.   I felt that she was unreasonable and she no

10   longer wanted to have a productive conversation since

11   she had insulted me.   So I requested for a supervisor to

12   see if maybe she would be reasonable with them.

13        Q.    You also testified that, during that

14   conversation, you advised the "A" [sic] and "B" flight

15   attendants and the captain that she is getting other

16   people involved.

17             What do you mean by that?

18        A.    So this conflict was no longer just me and her.

19   It was me and her and her companion and the lady across

20   the aisle and her boyfriend and who knows who else.   She

21   was starting to engage other people when I was trying to

22   keep it discreet with just of two of us.

23        Q.    How did Ms. Sanders engage other people?

24        A.    She became louder and louder.

25        Q.    Right.   But how did she engage other people?

1    that point in time, that you could achieve your goal of

2    getting her to cover up her derriere at the point

3    Ms. Jackson arrived on the Jetway?

4              MR. LAZENBY:  Objection.  Vague.

5              THE WITNESS:  So maybe I should restate.

6              It's not my goal.  But as I stated earlier, our

7    goal as an airline is to get passengers from Point A to

8    Point B in a friendly manner and a safe manner.

9              So my intention in calling an African-American

10   supervisor was to have her come and have a more

11   productive conversation regarding Ms. Sanders's attire

12   and, at this point, deescalating the escalating

13   conversations that happened after I asked her to cover

14   up.

15   BY MS. SEDAGHATFAR:

16        Q.   And so, in your opinion, you believed that an

17   African-American supervisor would be better equipped to

18   deal with that situation than somebody of another race?

19        A.   No.

20        Q.   Okay.  Then why, then, did you then request an

21   African-American supervisor?

22        A.   Ms. Sanders had just called me a Karen.  That

23   indicates to me that we can no longer have a productive

24   conversation and she sees me for only my race.  I

25   figured she wouldn't see the -- the supervisor for her

1   race, as they are of the same race.

2       Q.   And do you still stand -- do you still maintain

3   that belief?

4       A.   Yes, ma'am.

5       Q.   And isn't it true that Ms. Sanders actually

6   never once uttered the word "Karen" to you during that

7   particular interaction?

8       A.   She absolutely called me a Karen in our

9   interaction together on the aircraft.

10      Q.   And you're sure that that was not

11  Ms. Shelly Phillips that made that statement?

12      A.   I am not sure if that -- I know that -- no.

13  No.  I'm actually sure that Ms. Sanders said, "These

14  Karens out here."

15           I -- I do not know what -- I don't remember if

16  Ms. Phillips called me a Karen.  But I'm absolutely,

17  100 percent sure that Ms. Sanders said, "These Karens

18  out here," and were referring to me.

19      Q.   Okay.  And -- and that's depicted on the video;

20  correct?

21           MR. LAZENBY:  Objection.  Calls for

22  speculation.  The video speaks for itself.

23           THE WITNESS:  I'm not sure what's depicted

24  on -- there's a number of videos.  But I know that that

25  happened.

1      to cover up?

2          A.   I don't believe that I stated that.  Once

3      again, because it's not policy.

4          Q.   And did you tell Ms. Dell Jackson that you had

5      offered to hold up the plane and allow Ms. Sanders to

6      deboard and go to the store at the -- at the terminal to

7      see if she could purchase something to cover up with?

8               MR. LAZENBY:   Objection.   Misstates the

9      testimony.

10              THE WITNESS:   No, I did not.

11     BY MS. SEDAGHATFAR:

12         Q.   And why not?

13         A.   Once again, it was because it became an issue

14     about race and being disturbed -- disruptive to the

15     other passengers.  So it was no longer about her attire

16     at this point.  We had -- we had another issue to

17     resolve.

18         Q.   And what was that issue?

19         A.   That she is disrupting the cabin.

20         Q.   Okay.  And did you tell Ms. Dell Jackson during

21     that discussion that Ms. Adelene Sanders called you a

22     Karen?

23         A.   I believe so, but I cannot recall.

24         Q.   So --

25         A.   I --

1          Q.     Mm-hmm?

2          A.     I did advise Ms. Jackson that I requested a --

3    an African-American sup specifically.  She was aware

4    that I specifically asked if one was available.  If one

5    wasn't available, any supervisor would have come to

6    assess the situation.  But I specifically -- she knew I

7    specifically requested one.

8          Q.     And what did she say in that regard to you?

9          A.     I believe she said something to the effect of

10   "I'll go try to handle it."

11         Q.     But when you mentioned to her that you

12   specifically requested an African American, did you

13   explain to her why?

14         A.     Yes.  I explained that these two women were

15   increasingly hostile and used my race against me.  Yes.

16         Q.     Oh, so you did mention the race thing to

17   Ms. Jackson during that discussion?

18         A.     I believe so.

19         Q.     But you just didn't use the word "Karen"?

20         A.     Correct.  I don't recall using the word

21   "Karen."  I don't remember.  But it was -- I absolutely

22   explained to her that race was the issue.

23         Q.     So your purpose, at that point, of calling

24   Ms. Jackson or a supervisor to come was to address

25   the -- the disruptiveness of Ms. Sanders and

1          MS. SEDAGHATFAR:   You're right.

2     BY MS. SEDAGHATFAR:

3          Q.   What was the purpose of you requesting the two

4     op agents to call an African-American supervisor?

5               MR. LAZENBY:   Asked and answered.

6               THE WITNESS:   I believe I already answered

7     this, but I'll say it again.

8               The -- the two women, Ms. Sanders -- okay.

9     Forget the two women.

10              Ms. Sanders was not dressed appropriately for

11    our flight.  When I went to go and address this issue,

12    she made it about race, and I felt we could no longer

13    have a productive conversation.  So I called for a

14    ground supervisor of the same race so that race would be

15    taken out of the conversation.

16    BY MS. SEDAGHATFAR:

17         Q.   And you believed, by calling a supervisor of

18    the same race, that, somehow, race would be taken out of

19    the equation?

20         A.   Yes.

21         Q.   So what else did you and Miss Dell Jackson

22    discuss at that point, if anything?

23         A.   I don't recall any other details.

24         Q.   Okay.  And what happened next?

25         A.   So Ms. Jackson went to speak with Ms. Sanders

1    and her companion, and I stayed up in the front of the

2    aircraft.

3        Q.   And could you hear the interaction that was

4    taking place between Ms. Dell Jackson, Ms. Sanders, and

5    Ms. Phillips?

6        A.   I could hear some of it because they were

7    getting louder and louder -- the two women, not

8    Ms. Jackson.

9        Q.   Sure.   And what happened -- so did you remain

10   at the front of the aircraft during this entire exchange

11   between Ms. Jackson and these ladies?

12       A.   I did.   I felt the need to, for my safety.

13       Q.   And what do you mean by that?

14       A.   I was -- I felt that they were very hostile

15   towards me; so I stayed in the front of the aircraft

16   for my own protection.

17       Q.   Okay.   Did you feel that you were going to be

18   physically harmed?

19       A.   Yes.

20       Q.   By whom?

21       A.   By Ms. Sanders or her companion.

22       Q.   And how tall are you again?   You said you're

23   about 6-2?

24       A.   I'm almost 6-2.   Yes.

25       Q.   Okay.   And do you know how old

1      Ms. Shelly Phillips is?

2          A.   I don't.

3          Q.   Do you know how old Ms. Sanders is?

4          A.   I don't.

5          Q.   And at any point in time, did Ms. Sanders or

6      Ms. Shelly Phillips threaten you in any way?

7          A.   Their behavior was very threatening and

8      disruptive.  And by her calling me a Karen -- that's a

9      very insulting word.

10         Q.   Did -- did Ms. Sanders or Ms. Phillips at any

11     point in time threaten to physically harm you?

12         A.   No.

13         Q.   Why else did you feel -- aside from -- strike

14     that.

15              Why did the use of the word "Karen" cause you

16     to fear for your physical safety and want you to be --

17     and -- and you felt you wanted to be protected?

18              MR. LAZENBY:  Misstates testimony.

19              You can answer.

20              THE WITNESS:  There -- there was a lot of --

21     there were a lot of things in the news of passenger or

22     customer violence towards airline employees and people

23     just trying to do their jobs -- physical altercations.

24     So for that reason, I stayed in the front of the

25     aircraft for my own safety; and for that reason, I

1    recorded myself because, where I was standing, no one

2    would be able to see.   So I -- I retreated for my own

3    protection.

4    BY MS. SEDAGHATFAR:

5        Q.    Did Ms. Sanders, at any point in time during

6    your discussion with her, stand up?

7        A.    Once she was seated, no.

8        Q.    Did Ms. Phillips, at any point in time, stand

9    up?

10       A.    No.

11       Q.    Any other reason why you felt fearful of

12   physical harm?

13       A.    She was being very -- they were both being very

14   combative, and -- and they were raising their hands.

15   She had her hands very close to my face.   And she was

16   trying to get other people involved and aroused.   And I

17   felt that it could become, like, a group situation.   So

18   yes.

19       Q.    And did -- and who was -- who was Ms. Sanders

20   trying to get involved?   You had mentioned --

21            MR. LAZENBY:   I'm sorry.

22            MS. SEDAGHATFAR:   Sorry.

23   BY MS. SEDAGHATFAR:

24       Q.    You had mentioned the young lady who was

25   video-recording the incident, and you gave testimony as

```
 1                THE WITNESS:  I don't remember the -- that --
 2    that part of the conversation.
 3    BY MS. SEDAGHATFAR:
 4         Q.   So at that point in time, you advised
 5    Ms. Jackson that you didn't feel safe?
 6         A.   The other flight attendants had informed me
 7    that she continued to call me names, or call us names.
 8    And she grew increasingly disruptive and aggressive and
 9    hostile.  So at this point, the safety of the other
10    passengers is at risk; therefore, we made the decision
11    that she should be removed from the aircraft.
12             MS. SEDAGHATFAR:  Okay.  Can you please read
13    back the last question?
14             (Whereupon, the record was read back by the
15             court reporter as follows:
16             "Q.  So at that point in time, you advised
17             Ms. Jackson that you didn't feel safe?")
18             THE WITNESS:  That was the last question?
19    BY MS. SEDAGHATFAR:
20         Q.   Yes.
21         A.   Okay.  Correct.
22         Q.   And so who -- was the captain -- strike that.
23             So at any point in time, was the captain
24    consulted about this particular incident and the fact
25    that you and the other flight attendants didn't feel
```

1    safe?

2         A.    Yes.

3         Q.    And who advised him of that?

4         A.    I can't recall at this time.

5         Q.    Did you ever have a discussion with him?

6         A.    I'm -- I'm sure I absolutely did, but I don't

7    remember at what point and exactly what words I used.

8         Q.    Did you tell Mr. Meifert -- does the name

9    Alex Meifert ring a bell?

10        A.    No.  But if he's the captain, then we can refer

11   to him.

12        Q.    Then ultimately, once -- so you don't recall

13   whether or not, after Ms. Dell Jackson asked -- came up

14   to you after her exchange with Ms. Shelly and

15   Ms. Phillips -- I'm sorry -- Ms. Phillips and

16   Ms. Sanders, you don't recall if, at that point in time,

17   you had a discussion with the captain?

18        A.    No, we absolutely had a discussion with the

19   captain.  He has to be informed anytime somebody has to

20   come off.

21        Q.    Okay.  And -- but you don't recall the

22   substance of that conversation?

23        A.    I don't remember verbatim what was the --

24   the -- the conversation.

25              But if I were to paraphrase, he knew that -- he

1    knew why we called the sup, for the -- for the

2    clothing -- the inappropriate clothing.  And then he

3    knew that she grew -- I mean, he -- I don't want to

4    speak for them, but I'm pretty sure that the pilots

5    could hear her yelling from the cockpit because the door

6    was open.  But he knew that she and Ms. Phillips had

7    become increasingly disruptive and that, at this point,

8    the safety and security of the passengers was at risk

9    and she had to come off.

10       Q.   So -- and he conveyed that to you?

11            MR. LAZENBY:  Objection.  Misstates her

12   testimony.

13            THE WITNESS:  I -- he conveyed what to me?

14            I'm telling what -- the conversation I had with

15   him.

16   BY MS. SEDAGHATFAR:

17       Q.   You said, at that point, he knew.  So I'm just

18   saying, did he tell you that?

19            MR. LAZENBY:  Objection.  Vague.

20            THE WITNESS:  Tell me what exactly?

21   BY MS. SEDAGHATFAR:

22       Q.   You said, at that point, he --

23            Can you read back the answer, Helena?

24            THE REPORTER:  Yes.  And after that, I will

25   need a little break.

1    weren't getting off, which is when Ms. Jackson came to

2    the front of the aircraft.

3            And I thought, as I wrote in my irregularity

4    report, that the police were called.  I didn't call the

5    police, but I was -- I thought somebody did.  I thought

6    Ms. Jackson had because we felt that Ms. Sanders and her

7    companion were growing aggressive -- growing

8    aggressively -- growing -- they were becoming more

9    aggressive.

10       Q.   So how do you know that, when Ms. Dell Jackson

11   asked them to leave the plane, that they didn't comply?

12       A.   Because I was at the front of the plane and

13   they were not deplaning.

14       Q.   But could you hear them saying anything that --

15   to the effect that they're not going to deplane?

16       A.   I don't recall what they said.  But when they

17   were supposed to get off the plane, I was at the front

18   of the plane and they were not coming.

19       Q.   And you heard Ms. Jackson -- you didn't hear

20   what they said, but did you hear Ms. Jackson telling

21   them they needed to leave the plane?

22       A.   No.  I did not hear her say that.

23       Q.   So how do you know that they didn't comply?

24   Initially, I should say.

25       A.   Because, after Ms. Jackson had her -- had --

1    had her interaction, then she came to us and said, "What

2    would you like to do?"  And we told her we didn't feel

3    safe.  Then she went back to Ms. Sanders and her

4    companion and said that they would have to deplane.

5        Q.   Yeah.  And at that point -- go ahead.

6        A.   And at that point, I am at the front of the

7    aircraft.  So if they're now deplaning, it's taking them

8    a while.

9        Q.   But how do you know that at that point in time

10   Ms. Dell Jackson told them to deplane?

11       A.   Because, as I said in our conversation, after

12   her initial conversation with them, she had asked me and

13   my crew how would we like to proceed.  And we had

14   advised her that we do not feel safe with her taking

15   this flight with us.

16       Q.   And so then when Ms. Dell Jackson came back to

17   the front of the plane, what did she say to you, if

18   anything?

19            MR. LAZENBY:  Objection.  Vague.

20            THE WITNESS:  At which -- which conversation

21   are you referring to?

22   BY MS. SEDAGHATFAR:

23       Q.   Is it your testimony that Ms. Dell Jackson was

24   called in; she went and had a discussion with

25   Ms. Sanders and Ms. Phillips; then she came and spoke

1   with you and the other flight attendants, saying, "What

2   do you guys want to do?"; you indicated you didn't feel

3   safe and that you thought it was best that they deboard;

4   and then Ms. Dell Jackson went back and had a discussion

5   with Ms. Phillips and Ms. Sanders, and that she came

6   back again and talked to you?

7        A.   I don't remember that particular conversation,

8   after she asked them to deplane.

9             I do remember there was mention of the cops

10  being called.   I believe it was Ms. Jackson because she

11  would be the one to call.   We don't actually call anyone

12  when we're on the plane.   So it would have had to be an

13  operations agent or a supervisor that would radio the

14  airport police.

15            So, because of that, I was in the front of the

16  aircraft waiting for them to deplane and assuming that

17  the cops were coming in case they do not deplane.

18       Q.   And so then what happened next?   Did

19  Dell Jackson tell you words to the effect that -- "I

20  told them to deplane, and they're refusing to do so"?

21  Did she convey anything to you in that regard?

22       A.   I believe so, but I can't recall the

23  conversation.

24       Q.   Okay.   And so then what happened next?

25       A.   Then we -- we waited.   But Ms. Sanders and

1    Ms. Phillips were still causing a scene in the middle of

2    our aircraft.

3        Q.    Because at this point in time, the flight

4    attendants and Ms. Jackson were all at the front of the

5    plane; correct?

6        A.    No.   They were -- they were scattered.

7              So I -- at some point, I was alone in the front

8    of the aircraft.   The pilots were probably in -- I don't

9    know where the pilots were.   But I was alone in the

10   front of the aircraft.   And that is when I took my

11   video.

12       Q.    And then what happened next?   Did Ms. Jackson

13   approach Ms. Sanders and Ms. Phillips now for the third

14   time?

15       A.    I do not know because I was hiding in my

16   galley.

17       Q.    Okay.   But at some point, you came to see that

18   Ms. Phillips and Ms. Sanders deboarded the plane;

19   correct?

20       A.    When I -- when she -- repeat the question.

21       Q.    At some point in time, Ms. Sanders and

22   Ms. Phillips deboarded the plane; correct?

23       A.    That's correct.

24       Q.    Did you observe them deboarding the plane?

25       A.    Yes.

```
 1                    MR. LAZENBY:  Same objection.

 2     BY MS. SEDAGHATFAR:

 3          Q.   Okay.  You weren't holding your cell phone at

 4     the time that you were recording, were you?

 5          A.   I was not.

 6          Q.   Why not?

 7          A.   Because I wanted a full view of -- of myself

 8     and if someone came to attack me.

 9          Q.   So you believed that you were going to be

10     attacked by -- by "someone," who do you mean?

11          A.   I meant by Ms. Sanders and her companion.

12          Q.   And so is that the purpose of the phone -- cell

13     phone video you took?

14          A.   Yes.  I was alone in my galley, where I was

15     supposed to be.  And when -- when Ms. Jackson had

16     informed us that she wasn't coming off and that possibly

17     the cops would be getting involved, that, to me, meant

18     that the situation continued to escalate.  And I felt

19     that my safety was in danger, and I placed the phone in

20     full view of anyone who could -- who was in the galley

21     but recording myself in case she chose to attack me in

22     an area where most people wouldn't see.

23          Q.   When did Ms. Sanders tell you that she wasn't

24     getting off?

25                    MR. LAZENBY:  Objection.  Misstates testimony.
```

1        Q.   Oh, Ms. Jackson.  Okay.  My bad.  Okay.  So

2    then I misheard the question [sic].  Did -- perfectly

3    fine.  Okay.  So let's move on to the next question.

4              So at that point in time, you testified that

5    you were now in fear that you would be physically

6    attacked by Ms. Sanders and Ms. Phillips, and so you

7    chose to stand in the galley of the plane?

8        A.   I felt that my -- I was physically in danger.

9        Q.   Mm-hmm.  And so why did you choose to stand

10   alone in the galley of the plane?

11             MR. LAZENBY:  Asked and answered.

12             THE WITNESS:  Well, first of all, that's my

13   boarding position.  So anytime during boarding, I should

14   be in the front of the aircraft.  Also because the

15   customers were becoming increase- -- "the customers."

16   Excuse me.

17             Because Ms. Sanders and her companion were

18   becoming increasingly disruptive and aggressive, I chose

19   to be near the cockpit as well.

20   BY MS. SEDAGHATFAR:

21        Q.   Okay.  And you didn't deboard the plane, did

22   you?

23             MR. LAZENBY:  Vague.

24             THE WITNESS:  I did not.

25   / / /

1    BY MS. SEDAGHATFAR:

2        Q.   And what did you discuss?

3             MR. LAZENBY:  Vague.  Overbroad.

4             THE WITNESS:  Basically the other two flight

5    attendants said that I handled the situation really

6    well.

7    BY MS. SEDAGHATFAR:

8        Q.   What else?

9        A.   They -- yeah.  The other two flight attendants

10   just -- they just kept complimenting me on my cool and

11   calm demeanor on how I handled a really rough situation.

12       Q.   Did you tell them that you feared for your

13   physical safety?

14       A.   I -- I don't remember if I mentioned that.

15            But -- I know it happened over the course of an

16   hour or half an hour, but it happened very fast; so I

17   don't know if we discussed details.

18       Q.   You don't recall if you told them at that point

19   that you had feared for your physical safety?

20       A.   The -- I remember that -- I believe the "C"

21   flight attendant definitely told me that she did not

22   feel safe with Ms. Sanders and her companion.

23            I think we all didn't feel safe, and we were

24   relieved that the -- the hostile situation was removed

25   from our aircraft.

```
 1              MS. SEDAGHATFAR:  I'm adding "regarding the

 2      incident."  The objection was "vague"; so I was just

 3      being more specific in my question.

 4              THE WITNESS:  I think I mentioned to my

 5      coworkers, the two flight attendants, that I tried to

 6      handle the situation with sensitivity, especially with

 7      what had been happening with the BLM movement during the

 8      time and me not being of the same race as Ms. Sanders

 9      and her companion.

10      BY MS. SEDAGHATFAR:

11          Q.   Anything else?

12          A.   At one point, I just started crying.

13          Q.   Okay.  Anything else?

14          A.   I can't remember any more specifics.

15          Q.   And so after this flight ends and you -- the

16      flight goes to Vegas, when was the next time you

17      communicated with anyone at Southwest regarding this

18      incident?

19              MR. LAZENBY:  Objection.  Vague.  Overbroad.

20              THE WITNESS:  After the flight landed in Vegas,

21      I was no longer fit to fly because I was so emotionally

22      distraught over what had just occurred.  I called what

23      we call the "NFC," which is part of headquarters where

24      they organize the -- the flights and the routes and the

25      crew.  And I called scheduling, and I told them I -- I
```

1    was inconsolable and could not continue flying.

2           The "B" flight attendant, whose name is

3    somewhere -- she was based in Vegas; so she was done

4    with the trip.  And she sat with me in the airport, as I

5    was crying, until I was able to board another flight

6    alone to go home.

7    BY MS. SEDAGHATFAR:

8        Q.   And when you said you called, you gave an

9    abbreviation.

10           Can you tell me what -- what that was?  BNB?

11       A.   No.  It's -- it's the NOC.  It's that one.

12       Q.   You said you called the NOC, where they

13   organized the flights and scheduling?

14       A.   Well, they're in charge of all the routing

15   and -- they're in charge of a lot of things.  But they

16   were in charge.  They are kind of like an after-hours

17   phone line as well.

18       Q.   Can you just tell me what it stands for, NOC,

19   if you know?

20           And it's okay if you don't.  It's okay.

21       A.   I'm going to guess Network Operations Center,

22   but -- but don't quote me on that.

23       Q.   But is that -- is that a part of Southwest --

24       A.   Yes.

25       Q.   -- the division of Southwest?  Okay.

1          Q.    So you're tasked with being very specific in

2     the IR is what you're saying?

3          A.    It is encouraged.

4          Q.    But nowhere in this IR do you mention that you

5     smelled the beverage when you were holding

6     Ms. Phillips's cup, do you?

7          A.    I mentioned that I held her -- her drink for

8     her while she looked in her purse, but I did not mention

9     that I smelled it.

10         Q.    Why not?

11         A.    I felt it was irrelevant.

12         Q.    Okay.   You also reference in the next -- two

13    sentences thereafter "The lady in the first row (who was

14    of the same race) came up to me and said, 'Bless your

15    heart with what you have to deal with on here.'"

16              Do you see that?

17         A.    Yes, ma'am.

18         Q.    Okay.   You didn't -- you didn't reference the

19    second lady that you had testified about earlier.

20         A.    Correct.

21         Q.    Is there any particular reason why that's not

22    intentioned in your report?

23         A.    Because she did not come to talk to me.   Only

24    the other one did.

25         Q.    And is it your testimony that the other one

1   came up to talk to you?

2       A.   I'm confused.   What are you saying?

3       Q.   Why didn't you mention the other lady, in your

4   report, that you testified about earlier making a

5   comment regarding Ms. Adelene Sanders's attire?

6           MR. LAZENBY:   Objection.   Misstates testimony.

7   And asked and answered.

8           THE WITNESS:   Yeah.   I don't believe that's

9   what I said.

10  BY MS. SEDAGHATFAR:

11      Q.   What did you say?

12          MR. LAZENBY:   Objection.   Vague.

13          THE WITNESS:   That was hours ago.   But both

14  women in the front row took an issue to Ms. Sanders's

15  attire.   But only the one on the aisle closest to me

16  came to actually verbally address it.

17  BY MS. SEDAGHATFAR:

18      Q.   I understand what you're saying.

19          Did she get up from her seat and approach you

20  to verbally address it, or was she speaking to you while

21  she was seated?

22      A.   I believe she got up and tapped me on the

23  shoulder.

24      Q.   And then she -- she went and sat back down in

25  her seat?

1        A.    Correct.

2        Q.    Okay.   And you don't recall what you said in

3    response to her?

4        A.    I don't recall.

5        Q.    And why was it important for you to write,

6    quote, "who was of the same race"?

7        A.    Because they took an issue with her attire, and

8    they were of the same race.   They were surprised by what

9    she had chosen to wear on the aircraft that day.

10       Q.    And how is that important in any way, shape, or

11   form?

12             MR. LAZENBY:   Objection to the form of the

13   question.

14             THE WITNESS:   It was relevant because she had

15   made -- she was the -- the first customer to make a

16   comment about it.

17   BY MS. SEDAGHATFAR:

18       Q.    I understand that.   I'm just asking you why you

19   felt that it was important for you to note in your IR

20   that this particular customer was of the same race.

21       A.    Because me addressing Ms. Sanders had nothing

22   to do with her race.   It had to do with her outfit.

23       Q.    Okay.   And you believed, by writing that this

24   woman was of the same race, it somehow relates to your

25   discussion with Ms. Sanders not having to do with her

1    race?

2             MR. LAZENBY:  Objection.  Vague.

3             THE WITNESS:  That's not what I said.

4    BY MS. SEDAGHATFAR:

5        Q.   Okay.  You can clarify.

6        A.   Once again, the issue with her outfit had

7    nothing to do with her race.  I saw an issue with it

8    and -- as did two other women who were a different race

9    than me.

10       Q.   So because an African American apparently,

11   according to you, had an issue with the attire, you

12   believed that it was important to note that woman's

13   ethnicity in your report?

14           MR. LAZENBY:  Objection.  Mischaracterizes and

15   misstates her testimony.

16           THE WITNESS:  That's not what I said.

17           MS. SEDAGHATFAR:  Okay.  Can you please read

18   back the answer.

19           (Whereupon, the record was read back by the

20           court reporter as follows:

21           "Q.  Once again, the issue with her outfit had

22           nothing to do with her race.  I saw an issue

23           with it and -- as did two other women who were a

24           different race than me.")

25   / / /

1      Q.    And can you -- so by meeting you halfway, is

2    that what you meant?  That Ms. Sanders could have gone

3    out to the terminal and purchased clothing or put on

4    more clothing?

5      A.    I meant any of the options that I gave her that

6    would have fixed her attire -- the issue of her attire

7    and we could go about the day.

8      Q.    And then you go on to write into the next

9    sentence "FA C said she didn't feel comfortable with

10   them flying like this so we called a Sup."

11           Did FA "C" say that to you?

12     A.    Yes.

13     Q.    You didn't mention in here, at this point,

14   though, that you also felt uncomfortable, did you?

15     A.    I didn't feel that it -- I would feel it was

16   redundant.

17     Q.    To mention that you were also not comfortable?

18     A.    And it only takes one -- one flight crew to not

19   feel comfortable for the rest of us to back them up.

20     Q.    And is that the only reason why you didn't

21   indicate that you, too, felt uncomfortable?

22     A.    Yes, ma'am.

23     Q.    You didn't include that in your IR?

24     A.    Let me check.

25           I believe so.

1      A.    Okay.

2      Q.    And so you also posted quite a bit about white

3   privilege, did you not?

4      A.    There are posts that have a "hashtag white

5   privilege" or the words "white privilege."  But that is

6   in relation to understanding that you have white

7   privilege and bias, et cetera, and -- in relation to

8   helping and understanding Black Lives Matter.

9      Q.    And, in fact, one of your posts states that

10   white people should recognize that they have a white

11   privilege; correct?

12      A.    Could you explain which one you're referencing

13   to?

14      Q.    Let me ask you this.

15            What does white privilege mean to you?

16      A.    White privilege is an innate privilege that

17   people born with white skin are not usually aware that

18   they have because they don't go through the same

19   obstacles and the same judgment, et cetera.  They don't

20   go about their lives with the same kind of oppression,

21   et cetera.  I mean, it's very -- it's a very broad

22   definition that -- it's a very -- it's a very big

23   definition.  I hope that that was okay.

24      Q.    Yeah.  So is it your personal belief that white

25   privilege exists?

1      A.    Absolutely.

2      Q.    Okay.   And you also post about the fact that

3   it's not enough to not be racist but that white people

4   should be actively anti-racist; is that correct?

5      A.    That's correct.

6      Q.    What does that mean to you?

7      A.    To me, that means that a lot of people say,

8   "Oh, I'm not racist.   I'm cool with Black people," and

9   then living their lives the way they do, for example.

10   But they don't actively try to help or get involved in

11   issues that pertain to African Americans.   Or we can say

12   "Black people" because Black lives matter.

13          I'm sorry.   Restate your question again?

14      Q.    Doesn't that then -- wouldn't that, then,

15   inform your judgment in this particular instance, your

16   belief that you just testified about?

17      A.    Would what inform my belief?

18      Q.    You acknowledge that you believe that white

19   privilege exists; correct?

20      A.    Yes.

21      Q.    Okay.   And several times during this

22   deposition, you've explained how you felt you were

23   targeted by being called a Karen and you were being

24   targeted because of the color of your skin by

25   Ms. Sanders and Ms. Phillips; correct?

1      A.   So I never used the word "targeted."

2      Q.   Okay.  What --

3      A.   I did not feel targeted.

4           I said that the conversation became about race,

5      and she could no longer see me as a person.  She saw me

6      as the enemy.

7      Q.   Okay.  But you never mentioned that you felt

8      that you were being called a Karen and that you were

9      being judged by the color of your skin?

10          MR. LAZENBY:   Objection.  Vague.

11     BY MS. SEDAGHATFAR:

12     Q.   You didn't testify to that during this

13     deposition?

14     A.   Say it again?

15          MS. SEDAGHATFAR:  Can you read it back?

16          (Whereupon, the record was read back by the

17          court reporter as follows:

18          "Q.   Okay.  But you never mentioned that you

19          felt that you were being called a Karen and that

20          you were being judged by the color of your

21          skin?")

22          MR. LAZENBY:  Misstates testimony.

23          THE WITNESS:  That's not what I said.

24     BY MS. SEDAGHATFAR:

25     Q.   I can have her go back and reread that portion

1    of the testimony.

2              But is it your testimony that you did not

3    believe that you were being judged by the color of your

4    skin by Ms. Adelene Sanders and Ms. Phillips?

5        A.   I believe that I was judged by the color of my

6    skin.

7        Q.   And what does -- sorry.  I didn't mean to cut

8    you off.

9        A.   That's okay.  I don't remember what I was going

10   to say.

11       Q.   I'm sorry.

12              And what does the word "Karen" mean to you?

13       A.   "Karen" is a word that came of popularity, I

14   believe, because of an actual incident regarding a woman

15   named Karen.  But it could just be -- I don't know -- I

16   don't remember right now the exact incident, but I -- I

17   do remember there was an incident where a white woman

18   called the cops on a man that was just trying to watch

19   birds.  I believe he was Harvard educated.  He was in a

20   park and was just watching birds, and she felt her life

21   was threatened.

22              There's many instances of unnecessarily calling

23   the cops on African-American people and people of color,

24   and that leading to police brutality and violence and

25   lives lost tragically.

1      Q.     So having been a supporter of Black Lives

2   Matter and acknowledging that you believe white

3   privilege exists, can you understand why Ms. Phillips,

4   Ms. Adelene Sanders felt that this was racial, that she

5   was being targeted because of the color of her skin?

6      A.     I can understand, because we are different

7   races, why she would use my race as a reason why I

8   addressed her attire.  But I can assure you it had

9   nothing to do with me asking her about her attire that

10  day.

11     Q.     I understand that.

12           But you can understand why she might have

13  believed or felt as though she was being targeted

14  because of her race?

15     A.     I understand that.

16           But, as I thought I made myself clear, I told

17  her it was not about that.

18     Q.     And you expected her to believe you?  Based on

19  your understanding of white privilege, not having walked

20  in the foot of an African-American woman for 40 years

21  like she had, you expected her to believe you and remain

22  calm during that interaction?

23     A.     I was working in a capacity where my race

24  shouldn't matter.

25     Q.     But isn't that part of white privilege, is that

1    race actually does matter, and to deny the realities of

2    race is actually denying that white privilege exists?

3    Is that not true?

4              MR. LAZENBY:  Objection.  Vague.

5              THE WITNESS:  Rephrase your question.

6              MS. SEDAGHATFAR:  Can you read back the

7    question, please.

8              (Whereupon, the record was read back by the

9              court reporter as follows:

10             "Q.  But isn't that part of white privilege, is

11             that race actually does matter, and to deny the

12             realities of race is actually denying that white

13             privilege exists?  Is that not true?")

14             THE WITNESS:  I feel like there's just too many

15   questions.  Could you break it up, please?

16   BY MS. SEDAGHATFAR:

17        Q.  Sure.  And I'm just referencing one of the

18   posts that you posted regarding white privilege.

19             MS. SEDAGHATFAR:  Helena, can you read back the

20   question so I can write it down this time so I can break

21   it up for her?

22             MR. LAZENBY:  And do you care to share which

23   post you're referring to, or do you want her to just try

24   to draw on her memory of 118 posts?

25             MS. SEDAGHATFAR:  Well, she testified that

1    she's a believer in white privilege.    She's posted -- I

2    saw at least five or six posts on the "white privilege"

3    belief, and she's espoused her feelings about it.    So I

4    think I'm entitled to ask her.    But I will break up the

5    question.

6            MR. LAZENBY:    I never said you're not entitled.

7    But you just said you're referring to a post, but you

8    haven't told us what post you're referring to.    I'm

9    saying I think it would be fair for you to identify that

10   post if you're going to ask her about it.

11           MS. SEDAGHATFAR:    So let me not refer to the

12   post, and let's just break down this question.

13           THE WITNESS:    And I'm not a believer in white

14   privilege.

15           MR. LAZENBY:    There's no question pending.

16           MS. SEDAGHATFAR:    Oh, I'm sorry.

17           MR. LAZENBY:    Let her ask the question.

18           (Whereupon, the record was read back by the

19           court reporter as follows:

20           "Q.    But isn't that part of white privilege, is

21           that race actually does matter, and to deny the

22           realities of race is actually denying that white

23           privilege exists?    Is that not true?")

24   BY MS. SEDAGHATFAR:

25       Q.    Do you understand the question?

1      A.    Yes.

2      Q.    So can you answer it, please?

3      A.    I believe that you put words in my mouth.   I'm

4   not a believer in white privilege.   I believe that white

5   privilege exists.   Those are two different things.

6   Could you please break up your question.

7      Q.    White privilege is a theory; correct?   As far

8   as you understand it, it's a theory?

9             MR. LAZENBY:   Objection.   Vague.

10            THE WITNESS:   I don't -- I don't know if I

11   would use the word "theory" or if there are other words

12   to describe what white privilege is.

13   BY MS. SEDAGHATFAR:

14      Q.    Okay.   And white privilege would be -- and you

15   can correct me if I'm wrong -- an inherent advantage --

16   inherent advantages possessed by a white person on the

17   basis of their race in a society characterized by racial

18   inequality and injustice?

19      A.    Correct.

20      Q.    And you posted about that; correct?

21      A.    Correct.

22      Q.    Okay.   So by supporting white privilege, I

23   wasn't implying that you support that the white race is

24   superior.   I was just stating that you agree with the

25   notion that white privilege exists.

1           Correct?

2      A.   Again, I'm not supporting the notion or

3  supporting white privilege.  I have "hashtag white

4  privilege" to raise awareness about white privilege on

5  my posts.

6      Q.   And now that you've explained your belief as to

7  white privilege existing, my question -- does my

8  question now, in that context, make sense?

9      A.   Ask your question again, please?

10          MS. SEDAGHATFAR:  Helena, can you please read

11  back the question.

12          (Whereupon, the record was read back by the

13          court reporter as follows:

14          "Q.  But isn't that part of white privilege, is

15          that race actually does matter, and to deny the

16          realities of race is actually denying that white

17          privilege exists?  Is that not true?")

18          MR. LAZENBY:  Objection.  Vague.

19          THE WITNESS:  It's a very vague question.  You

20  said "to deny the" -- "the realities of race."  I

21  mean...

22          Racial issues are multifaceted, and white

23  privilege is not the only way to -- the only factor of

24  what was happening during that time.

25  / / /

```
 1              CERTIFICATION OF COURT REPORTER

 2                      FEDERAL JURAT

 3

 4           I, the undersigned, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify:

 6   That the foregoing proceedings were taken remotely at

 7   the date and time herein set forth; that

 8   any witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath;

10           That a verbatim record of the proceedings was

11   made by me using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof; that

14   before completion of the deposition, a review of the

15   transcript ( ) was (X) was not requested.

16           I further certify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19           IN WITNESS WHEREOF, I have this date subscribed

20   my name, _____.

21   Dated March 5, 2022.

22

23   Helena Flores, CSR Number 13313, RPR

24

25
```

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4

5    ADELENE SANDERS, AN              )
     INDIVIDUAL,                      )
6                                     )
                    PLAINTIFF,        )
7                                     )
                                      )
8         vs.                         ) CASE NO.
                                      ) 2:21-CV-00451-DDP-MRW
9                                     )
     SOUTHWEST AIRLINES CO., A        )
10   BUSINESS ENTITY OF UNKNOWN       )
     FORM; AND DOES 1 THROUGH 100,    )
11   INCLUSIVE,                       )
                                      )
12                  DEFENDANTS.       )
     _____)

13

14

15

16

17            DEPOSITION OF ELENA KARENEV, VOLUME II

18                    TUESDAY, JULY 19, 2022

19                        VIA ZOOM

20

21

22

23

24   REPORTED BY:
     TISHA C. OKUMA
25   CSR NO. 9774

```
13:55:19    1              MR. LAZENBY:  Objection.  Misstates the

            2    record.

            3              You can answer the question.

            4              THE WITNESS:  According to this e-mail, he's

13:55:26    5    an inflight base manager at the NOC.  And he and I spoke

            6    when I was crying hysterically over the incident.  But I

            7    would not be able to identify him at a lineup.

            8    Q.        BY MS. SEDAGHATFAR:  Okay.  Why did you call

            9    him?

13:55:42   10    A.        When I stepped off the plane, I was

           11    emotionally distraught over what had happened, and I was

           12    no longer fit to fly.

           13              So I had to call the NOC which would help in

           14    replacing me and someone else to come in, because I

13:56:12   15    needed to go home.

           16    Q.        And so the e-mail is directed to inflight

           17    base.  Do you know who that might be?

           18    A.        Inflight base is a group of the people

           19    employed at the base at LAX.

13:56:39   20    Q.        Did you turn over document 1564?

           21              MR. LAZENBY:  Objection.  Vague.

           22              THE WITNESS:  No.

           23    Q.        BY MS. SEDAGHATFAR:  Okay.  If you go to 1565,

           24    please, and take a moment and read that particular page

13:56:55   25    and let me know when you're ready.
```

14:07:07   1              "A.   I believe they did refer me to Clear

           2              Skies just because that's standard for

           3              them.   And I did reach out to Clear

           4              Skies.")

14:10:19   5       Q.      BY MS. SEDAGHATFAR:   Who did you speak to at

           6       Clear Skies or CISM that was a therapist regarding this

           7       incident?

           8       A.      I don't recall.

           9       Q.      Did you speak with a therapist regarding this

14:10:34   10      incident?

           11      A.      Yes.

           12      Q.      How many times?

           13      A.      Many.

           14      Q.      And did you produce any documents regarding

14:10:42   15      those discussions you had?

           16              MR. LAZENBY:   Objection.   There was no request

           17      to produce any such documents, nor was there an order to

           18      produce any such documents.   We're far beyond not only

           19      your time, but the subject matter that you've been

14:10:55   20      permitted to ask about.

           21              MS. SEDAGHATFAR:   So it's your position that

           22      the subject matter regarding what statements she gave or

           23      what discussions she had with people regarding this

           24      incident is irrelevant or beyond the scope of discovery?

14:11:09   25      That's ridiculous.

1    STATE OF CALIFORNIA   )
                            )   SS.
2    COUNTY OF LOS ANGELES )

3

4            I, Tisha C. Okuma, Certified Shorthand

5    Reporter, Certificate No. 9774 in the State of

6    California, duly empowered to administer oaths, do

7    hereby certify:

8            I am the deposition officer that

9    stenographically recorded the testimony in the foregoing

10   deposition;

11           Prior to being examined, the deponent was by

12   me first duly sworn;

13           The foregoing transcript is a true record of

14   the testimony given;

15           I was relieved of my duty pursuant to Code

16   of Civil Procedure, Section 2025 (Q)(1), and therefore

17   any changes made by the deponent or whether or not the

18   deponent signed the transcript are not set forth.

19

20   Dated: August 10, 2022, Los Angeles, California.

21

22

23                    _____

24

25