EXHIBIT 41

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ADELENE SANDERS, an individual,   )
                                                )
     Plaintiff,               )
                                                )
vs.                              ) Case No.
                              ) 2:21-CV-00451-DDP-MRW
SOUTHWEST AIRLINES CO., a       )
business entity of unknown form; )
and DOES 1 through 100,       )
inclusive,                   )
                              )
     Defendants.            )
_____)

VIDEOCONFERENCE DEPOSITION OF
ALEX J. MEIFERT

Monday, February 28, 2022

1:59 P.M.

Stenographically Reported By:
Helena Flores, CSR No. 13313, RPR

1       A.    Yes.

2       Q.    Okay.   And do you recall what the flight

3   attendant looked like?   Her appearance?

4       A.    I do not.

5       Q.    Was she very tall, about 6-feet-2?

6       A.    I do not recall.

7       Q.    Okay.   And tell me what you recall about what

8   she said to you.

9       A.    As I recall, she said, "We have" -- "I'm having

10   an issue with a passenger who is wearing minimal

11   clothing covering up," or "not covering up her" -- "her

12   butt."

13          And she had tried to address it or talk to the

14   passenger.   And there were other witnesses and

15   passengers around there as part of this discussion.   And

16   that she was -- that the situation was escalating and

17   getting confrontational.

18       Q.    Okay.   What else did she say?

19       A.    At some point here, we involved the -- the gate

20   agent who boarded the flight.   And somewhere in here,

21   the flight attendant continued to tell me that she was

22   saying that she -- she knew her rights.   She had asked

23   her to cover up, and she said, "I know my rights."

24   "I" -- "I" -- "I know my rights."

25          And so it was not -- it was only escalating.

1    It was not -- there was no resolve.  And that's when we

2    got -- somewhere in there is when we got the customer --

3    the gate agent to come down, the first person that let

4    the -- the passenger on.  And then -- then we ended up

5    eventually getting a customer service supervisor to

6    intervene, to come down on our behalf to resolve the

7    situation -- see if she could resolve it.

8         Q.   So do you -- was the gate agent that came onto

9    the plane -- was that a male or a female?

10        A.   Female.

11        Q.   Do you recall what she looked like?

12        A.   Very -- very vaguely.  She was -- she was -- as

13   I recall, she was a smaller build and dark hair.

14        Q.   So at the time -- and do you know whether or

15   not this flight attendant that had this conversation

16   with you -- was she Flight Attendant A?

17        A.   I do -- I -- I do not recall if she was for

18   sure the "A" or not.

19        Q.   Okay.  And did she ever tell you, during that

20   discussion, that the passenger advised her that she had

21   nothing to cover up with because she had checked in her

22   luggage?

23        A.   That, I don't recall.

24        Q.   Okay.  Did -- strike that.

25             What did you say to this flight attendant

```
 1          A.    Not that I recall.

 2          Q.    Did she tell you that she had smelled a

 3     beverage that Ms. Shelly Phillips was carrying with her

 4     before she was allowed to board the plane?  Did this

 5     flight attendant ever tell you that?

 6          A.    I don't recall ever hearing that.

 7          Q.    Do you know who called the gate agent to come

 8     onto the plane?

 9          A.    I think that was a mutual decision between

10     myself and the flight attendant.

11          Q.    But do you know who actually physically made

12     the call?

13          A.    It was either myself or Justin, from the

14     cockpit, with the radio.

15          Q.    But you don't recall if it was you?

16          A.    No.  I don't recall.

17                MR. LAZENBY:  Don't speculate.  She doesn't

18     want you to speculate.

19     BY MS. SEDAGHATFAR:

20          Q.    And tell me what happened when the gate agent

21     came onto the plane.

22                Did you have a discussion with her?

23          A.    She came on.  She came to the entrance of the

24     cockpit to find out what the situation was.  The flight

25     attendant was there -- or two of the flight -- I don't
```

1    remember which -- which or how many of the flight

2    attendants.  But they briefed her on the situation.  I

3    knew nothing more than what they had briefed her on.

4    And so, after the briefing, I don't remember if she went

5    back to address the passenger, or if at that point we

6    just got the customer service supervisor request in and

7    went from there.

8         Q.   What do you recall that these flight attendants

9    were saying to the gate agent as they were briefing her

10   on the situation?

11        A.   That we had a passenger who was not interested

12   in covering up.  And she was getting vocal and saying

13   that she knew her rights.  And that she felt

14   intimidated, or she was shaken.

15        Q.   And did these flight attendants ever tell you,

16   at any point in time, that this passenger was claiming

17   that she was being discriminated against because she's

18   Black?

19        A.   I don't recall.

20        Q.   Did these flight attendants, at any point in

21   time, ever tell you that Ms. Sanders was claiming that

22   she was being harassed because she's Black?

23        A.   I don't recall.

24        Q.   Tell me what discussions you had with the

25   flight attendant regarding race, the race of the

1    plaintiff and her companion.

2              MR. LAZENBY:  Objection.  Vague and overbroad.

3              You can answer.

4              THE WITNESS:  Until I turned around and saw the

5    plaintiff standing, I don't recall that her race was

6    ever brought to my attention.

7    BY MS. SEDAGHATFAR:

8        Q.   So you don't recall the flight attendant ever

9    telling you that the passenger, Ms. Adelene Sanders, and

10   her companion were claiming that the flight attendants

11   were being racist because they were Black?

12             MR. LAZENBY:  Objection.  Vague.

13             You can answer.

14             THE WITNESS:  At this time, I can't say I have

15   a -- a direct recall of that.  No.

16   BY MS. SEDAGHATFAR:

17       Q.   Okay.  And you then testified that a customer

18   service supervisor came onto the plane; correct?

19       A.   Correct.

20       Q.   And who called for her?

21       A.   Either -- the gate agent took care of that for

22   us.

23       Q.   Do you know who asked the gate agent to do

24   that?

25       A.   I assume it was -- I -- I think it was myself.

1    Q.    And did you tell her to request an

2  African-American supervisor?

3    A.    I asked her if there was one available.

4    Q.    Why?

5    A.    Because from my turning around and seeing the

6  passenger, seeing that she was African American; and

7  that we had a Caucasian flight attendant; and that the

8  situation was escalating and intensifying; and that the

9  plaintiff was repeatedly saying that she has her rights

10  and she knows her rights and she didn't need to cover

11  herself any more than she was, that this would be --

12  this would help, hopefully, stabilize and not escalate

13  the situation if we were to have a female

14  African American, that was available, handle the

15  situation.

16    Q.    And how would having an African American help

17  stabilize the situation, in your view?

18          MR. LAZENBY:   Objection.   Mischaracterizes

19  testimony.

20          But you can answer.

21          THE WITNESS:   To help reduce the perception

22  that this was, in any way, race motivated.

23  BY MS. SEDAGHATFAR:

24    Q.    But you testified earlier that the issue of

25  race didn't even come up during any of those discussions

1    BY MS. SEDAGHATFAR:

2        Q.   Was your response --

3            MR. LAZENBY:  You can read his response back.

4    Sorry.

5            MS. SEDAGHATFAR:  Sorry.

6        Q.   Okay.  Well, let me ask you again.

7            Did you have any conversations with the

8    African-American supervisor who came onto the plane?

9        A.   I don't recall.

10       Q.   Did you -- I'm sorry.

11       A.    Initially I don't recall.  At some point there

12   was a meeting between her and the flight attendants to

13   evaluate the situation, and it was mutually agreed that

14   the passenger would be removed.

15       Q.   So at the time that the -- the supervisor came

16   onto the plane, you don't recall having any discussions

17   with her.

18           But do you recall observing any of the flight

19   attendants having any discussions with her?

20       A.   It was all behind me.  I did not observe any of

21   that.

22       Q.   Did you hear any of that?

23       A.   No.

24       Q.   Okay.  And what did you observe the supervisor

25   doing after she got onto the plane, if anything?

1        A.   At one point, I looked, and she was back there.

2    That's -- that's all I know, is that she came on and she

3    went back there.  I didn't observe any of the rest of it

4    or hear any of the rest of it.

5        Q.   So at some point in time, there was a meeting

6    between the supervisor and the flight attendants to

7    evaluate the situation, you said?

8        A.   I think so.

9        Q.   Okay.  And tell me -- and were you part of that

10   discussion?

11       A.   They may have had discussions outside the

12   cockpit.  When it came up to the cockpit for a final

13   decision, I listened to their stories.  The flight

14   attendant was -- was visibly shaken and felt intimidated

15   by this circumstance.  And the election to have the

16   passenger removed was agreed upon.

17       Q.   Okay.  So tell me about the discussion that you

18   had with the supervisor and the flight attendants after

19   the supervisor had her discussions with the plaintiff

20   and Ms. Phillips.

21       A.   I just did to the best of my recollection.

22   We -- I don't remember any of the details surrounding

23   it.

24       Q.   Did the supervisor ever tell you that she

25   couldn't see the plaintiff's buttocks or sides because

1    she was sitting down?

2        A.   Not to my recollection.

3        Q.   Okay.  And in that discussion, who brought up

4    the suggestion that plaintiff and her aunt should be

5    removed from the flight?

6        A.   I don't recall whose suggestion that was.

7        Q.   At some point did you make that suggestion?

8        A.   I don't recall that I did make the suggestion.

9    It's always an option.  It's either resolved or remove,

10   one of the two.

11       Q.   And did -- did you have any discussions with

12   anybody about how it could be resolved?

13            MR. LAZENBY:  Objection.  Vague.

14            THE WITNESS:  They had already informed me that

15   they had offered her -- at least a passenger had offered

16   her some garment to cover up.  And she -- she said, "I'm

17   not covering up.  I have no" -- "I know my rights."  And

18   she refused to comply with that, and she just stood her

19   ground, saying "I know my rights, and" -- "and I'm

20   not" -- to my understanding, she wasn't willing to -- to

21   compromise on it.  So no.

22            That was -- like I said, we either resolve it,

23   or we have to have them removed.  And the flight

24   attendant was visibly shaken, at this point, and didn't

25   feel comfortable going on with the situation.

1    were asking why a Caucasian passenger with a low-cut

2    shirt was not asked to cover up?

3         A.   Again, no.

4         Q.   Can you tell me the name of the passenger or

5    passengers who complained about plaintiff's sides or her

6    attire?

7         A.   No.

8         Q.   And is that because there were no passenger

9    complaints, as far as you know?

10        A.   No.  I'm -- I -- no, that is not.

11             It's -- the identity -- the flight attendant

12   told me there was passengers that had brought it to her

13   attention or that were upset by it.  I did not -- I did

14   not know the names, or I did not witness or see any of

15   those passengers, that I'm aware of, that were involved.

16        Q.   Who told you -- what flight attendant told you

17   that there was a passenger or passengers that brought up

18   the plaintiff's attire to her?  Was it the flight

19   attendant that you had the initial discussion with that

20   you said was distraught?

21        A.   I do not know if it was her or one of the other

22   two flight attendants.

23        Q.   What do you recall about that discussion?

24             MR. LAZENBY:  Objection.  Vague.

25             THE WITNESS:  All I recall -- or one thing I

1  regarding the passenger who brought to her attention the

2  plaintiff's attire.

3          MR. LAZENBY:  So what's the question?

4  BY MS. SEDAGHATFAR:

5      Q.   Do you understand the question?

6      A.   I -- I think it's vague.  It's -- my counsel's

7  asking you to re- -- rephrase the question.  And -- and

8  I'll be happy to answer it.

9      Q.   Tell me everything --

10          (Overlapping dialogue.)

11          THE REPORTER:  One person, please.

12          THE WITNESS:  No, I don't think -- something

13  about the conversation between myself and this flight

14  attendant and the passenger who became an issue, but not

15  about Justin right now.  So I don't remember what --

16  please rephrase it.

17  BY MS. SEDAGHATFAR:

18      Q.   What do you recall about the conversation you

19  had with this flight attendant regarding a passenger

20  that allegedly brought to her attention plaintiff's

21  wardrobe?

22          MR. LAZENBY:  Objection.  Vague.  Form.

23          You can answer.

24          THE WITNESS:  The first I was made aware of

25  this situation was the flight attendant -- a flight

1    attendant -- one of them coming to the cockpit to tell

2    me of the situation, that we had a woman back there who

3    was not wearing very many clothes around her buttocks,

4    and that a passenger or passengers had brought that to

5    her attention.  She had talked to the woman, and she was

6    coming back to just report this situation to me.

7    BY MS. SEDAGHATFAR:

8        Q.   Did you ever advise any of the flight

9    attendants or the supervisor to provide to the plaintiff

10   any type of policy regarding passenger attire?

11            MR. LAZENBY:  Objection.  Vague.

12            You can answer.

13            THE WITNESS:  No.  That is not my field of

14   expertise.

15   BY MS. SEDAGHATFAR:

16       Q.   Right.  I'm just asking --

17            MS. SEDAGHATFAR:  Can you please read back the

18   question?

19            (Whereupon, the record was read back by the

20            Court Reporter as follows:

21            "Q.  Did you ever advise any of the flight

22            attendants or the supervisor to provide to the

23            plaintiff any type of policy regarding passenger

24            attire?")

25            MR. LAZENBY:  Asked and answered.

1    from work, Joe, I don't know who Joe is because I was

2    unemployed then.  So a Joe from Southwest, since I'm

3    unemployed, wouldn't be calling me.  He was still

4    employed.  So if there was a problem, Joe from work --

5    whoever Joe might be -- might have called him, but they

6    wouldn't be calling me.

7        Q.   Have any text messages been deleted with

8    respect to this exchange?

9        A.   No.

10       Q.   And do you know who Joe Wahl is?

11       A.   Well, I think you brought that name up before,

12   Joe Wahl.  No.

13       Q.   Okay.  Why did you refer to Ms. Adelene Sanders

14   as "that crazy lady"?

15               MR. LAZENBY:  Objection.  Misstates his

16   testimony.

17               THE WITNESS:  I was just responding to his

18   text, that he regarded -- he was referring to the

19   individual as "the crazy Vegas lady."  And so that

20   was -- that was the term I was using to respond back

21   with the question "Who are you talking about?"

22   BY MS. SEDAGHATFAR:

23       Q.   So your -- your testimony is that, at the time

24   you sent that particular text message, you didn't know

25   who "that crazy lady" was in reference to?

1         A.    Exactly.

2         Q.    Got it.

3               On Tuesday, February 15th, you write, in the

4    last sentence of that text message, "Who would have

5    thought" -- "Who would have thought was going to

6    'digress' this far!?"

7               Do you see that?

8         A.    "Who would have thought was going to 'digress'

9    this far!?"

10              I do see that.

11        Q.    And what did you mean by that?

12        A.    To be quite honest, it appears -- it appears

13   there's more text above that that was possibly cut off.

14              MR. LAZENBY:  It's on the prior page.

15              THE WITNESS:  Is it?  That's 224.  Let me look

16   at -- just to see if there's anything I'm missing.

17   BY MS. SEDAGHATFAR:

18        Q.    Take your time.

19        A.    Okay.  Like he said, yes, it's on the previous

20   page.

21              Okay.  I just reread it.  And your question

22   again?  I'm sorry.

23        Q.    What did you mean when you wrote "Who would

24   have thought" this "was going to 'digress' this far!?"

25        A.    That -- that this was going to -- that that

1      Q.    Mr. Justin Moyer writes "I can't believe it has

2    escalated this far.  I'm glad SWA isn't going to settle.

3    This lady shouldn't get any money."

4          Do you see that text message?

5      A.    I do.

6      Q.    Okay.  And then you respond "I could not agree

7    more on all three of those points!"

8          Do you see that?

9      A.    I do.

10     Q.    Okay.  Can you tell me why you could not agree

11   more on all of those three points?

12     A.    Because this was not in any way, as I see it, a

13   racial discrimination case.  It was about a person

14   coming on with improper attire that was offensive to

15   others and possibly violating Southwest dress code.  I

16   do not know that.  But it was -- it was that simple.  It

17   was not about race.

18     Q.    How do you know it was not about race?

19     A.    Because -- because I am not racist.  And

20   because the flight attendant that brought this to my

21   attention had never mentioned the fact that she was an

22   African-American woman.

23          She came forward and told me about the

24   situation.  The person does not have on enough clothes.

25   People are offended by this, leading to a heated

1   discussion.  The plaintiff is starting to call the race

2   card and -- "My" -- "My" -- "I know my constitutional

3   rights.  I know my rights."

4          And Justin, who had seen the woman, never

5   mentioned to me her race.  When I turned around in my

6   seat to see who the flight attendant was referring to,

7   that's the first time that her race was even made aware

8   to me.

9          It had nothing to do with her race that she was

10  being removed from the airplane.  And that's why, when

11  we got the customer service supervisor, if -- if they

12  had one that was African American that was available, I

13  wanted to further help resolve this by having her try to

14  do the negotiation to eliminate any prejudice.

15      Q.   And how was plaintiff playing the race card?

16          MR. LAZENBY:  Objection.

17          He just explained it to you.

18          You can answer.

19          THE WITNESS:  This was during heated

20  racial-tension-environment time frame.  And she was

21  African American.  The flight attendant is Caucasian.

22  And I wanted to help reduce or eliminate the chance that

23  it was -- that the intensity had anything to do with

24  race.  Because it certainly shouldn't have had anything

25  to do with the fact that she was wearing no clothes.

1        A.    It is a text message that happened this

2    morning, unsolicited by myself, from a friend and co- --

3    ex-coworker.  And it was initiated regarding financial

4    firms that we've talked about and involved

5    in [sic].  And we have not been in contact for a long

6    time; so after he asked me about that, I just said that

7    I'm here in Beverly Hills and I had a deposition in a

8    few hours.  You can read that.

9              And he said, "Whoa!"

10             And in the process of him -- I saw there

11   were -- he said, "Whichever one that is?" with a

12   question mark.

13             And he's familiar with the business.  And I

14   just -- well, you can see what I wrote.  And as I saw

15   more bubbles coming up, that he was doing something, I

16   texted again.  "I can't go any deeper till it's

17   resolved."  And that was the end of it.  He put the

18   thumb up after that, and we didn't talk.  That was the

19   end of our discussion.

20        Q.    Okay.  And what is Paul's last name?  What is

21   Paul's last name?

22             THE WITNESS:  Is that involved?

23             MR. LAZENBY:  You can answer.  You can answer.

24             THE WITNESS:  Anglin.

25   / / /

1      BY MS. SEDAGHATFAR:

2            Q.    Can you spell it?

3            A.    A-n-g-l-i-n.

4            Q.    And he was an ex-coworker at Southwest?

5            A.    He's currently still employed by Southwest.

6      He's a pilot.   But, yes, he and I are no longer

7      coworkers because I'm retired.

8            Q.    Understood.   Okay.

9                  And when you wrote in the text message "Have a

10     deposition in a few hours for that passenger suing SW,"

11     did you have reason to believe that he knew about this

12     particular lawsuit?

13           A.    No.   That was just a simple -- a simple way of

14     explaining what I was in Beverly Hills, doing a

15     deposition for, without going into detail.

16           Q.    So you had never had a discussion with Paul

17     regarding this lawsuit prior to this text message

18     exchange?

19           A.    Not that I recall.   Paul and I rarely

20     correspond.

21           Q.    And then he responds to you, and then you write

22     "We removed a lady that had her entire ass exposed and

23     she's suing for Racial discrimination."

24                 Do you see that?

25           A.    Yes.

1        Q.    Did Ms. Adelene Sanders have her entire ass

2    exposed?

3        A.    When I saw it in the window, it was.

4        Q.    So when you saw it in the window, she had her

5    entire ass exposed?

6        A.    Yes.

7        Q.    So is it your testimony that she pulled her

8    pants down?

9             MR. LAZENBY:   Objection.   Misstates his

10   testimony.

11            You can answer.

12            THE WITNESS:   As he just said, you misstated my

13   testimony.

14            She walked up to the window.   She flipped me

15   the bird, and Justin.   Then she proceeded to turn

16   around, bend over, and press her ass against the window

17   and wiggle it.

18            Did she change her garment?   Was that what she

19   was wearing?   I never saw it.   I don't know.   I don't

20   know if she pulled anything aside or up or over.

21            She bent over, and I was looking at all ass.

22   If she had a G string, I couldn't see it from 60 feet

23   away.   So that was my only encounter with it.   But that

24   was something that she was -- whatever -- comfortable

25   showing or -- I don't know if that represented what she

1    had on the plane or not.

2    BY MS. SEDAGHATFAR:

3        Q.   But -- but her entire ass was exposed at that

4    time?  You could see that?

5            MR. LAZENBY:  Objection.  Asked and answered.

6            THE WITNESS:  Yes.

7    BY MS. SEDAGHATFAR:

8        Q.   And when Ms. Adelene Sanders was walking off

9    the plane, did you have an opportunity to observe what

10   she was wearing at that time?

11       A.   No.

12       Q.   Okay.  Oh.  Did anyone ever mention to you that

13   the topic of the Black Lives Matter movement came up in

14   discussion during that particular incident?

15       A.   No.

16       Q.   Did you ever hear anyone talking about the

17   Black Lives Matter movement during that particular

18   incident?

19       A.   I don't recall the -- the Black Lives Matter

20   movement coming into the discussion regarding anything

21   with this.  No.

22       Q.   And do you recall seeing Ms. Shelly Phillips,

23   the companion of the plaintiff, with a Black Lives

24   Matter mask?

25       A.   No.

1                    CERTIFICATION OF COURT REPORTER

2                           FEDERAL JURAT

3

4            I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6    That the foregoing proceedings were taken remotely at

7    the date and time herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath;

10           That a verbatim record of the proceedings was

11   made by me using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof; that

14   before completion of the deposition, a review of the

15   transcript ( ) was (X) was not requested.

16           I further certify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19           IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21   Dated March 7, 2022.

22

23   Helena Flores, CSR Number 13313, RPR

24

25