# EXHIBIT 42

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ADELENE SANDERS, an individual,   )
                                  )
    Plaintiff,                    )
                                  )
vs.                               ) Case No.
                                  ) 2:21-CV-00451-DDP-MRW
SOUTHWEST AIRLINES CO., a         )
business entity of unknown form;  )
and DOES 1 through 100,           )
inclusive,                        )
                                  )
    Defendants.                   )
_____)

VIDEOCONFERENCE DEPOSITION OF
PHYLLIS CAROL BENEDICT

Friday, March 4, 2022

9:59 A.M.

Stenographically Reported By:
Helena Flores, CSR No. 13313, RPR

```
 1    read back the question?  I don't think there was an
 2    answer.
 3             (Whereupon, the record was read back by the
 4             court reporter as follows:
 5             "Q.  In terms of passengers who are boarding a
 6             flight, are passengers permitted to bring
 7             alcohol onto the flight -- onto the plane?")
 8             THE WITNESS:  No, they are not.
 9    BY MS. SEDAGHATFAR:
10         Q.   And what are you supposed to do if you suspect
11    a passenger might be boarding or attempting to board
12    with an alcoholic beverage?
13             MR. LAZENBY:  Same objection.  Incomplete
14    hypothetical.
15             Did you hear the question?
16             THE WITNESS:  Yeah.
17             I would ask them if that was alcohol.
18    BY MS. SEDAGHATFAR:
19         Q.   Mm-hmm.
20         A.   Sometimes it's obvious; sometimes it's not.
21         Q.   And then what are you supposed to do if they --
22    what are you supposed to do next, if anything?
23             MR. LAZENBY:  Same objection.
24             You can answer.
25             THE WITNESS:  It depends on their answer.
```

1  BY MS. SEDAGHATFAR:
2      Q.   What if they tell you, "No"?
3           MR. LAZENBY:  Same objection.
4           THE WITNESS:  So if they tell me, "No," it
5  depends on the container.  Is it in a beer bottle and
6  they say, "No"?  Well, then I have to ask them, "Well,
7  what is in that beer bottle?"
8           It just -- it depends.
9  BY MS. SEDAGHATFAR:
10     Q.   Okay.  And what if you don't believe that their
11 answer is truthful and you do suspect that they are
12 attempting to board with an alcoholic beverage?  What
13 are you supposed to do in that instance?
14          MR. LAZENBY:  Same objection.
15          You can answer.
16          THE WITNESS:  Well, if they say, "No," and I
17 smell it, I would ask them if I could smell it.  I --
18 why would I -- I don't know why I would think that there
19 would be alcohol in there unless I could smell it or --
20 that would be about it, probably.  I don't know -- I
21 don't know any other -- any other reason that I would
22 think there was alcohol if there wasn't and they said,
23 "No."
24 BY MS. SEDAGHATFAR:
25     Q.   And have you ever smelled a beverage to

1  determine whether or not it was an alcoholic beverage?

2           And by that, I mean the passenger boarding the

3  plane.

4           Have you ever done that?

5           MR. LAZENBY:  Objection.  Vague.

6           You can answer.

7           THE WITNESS:  I do not remember doing that

8  particularly.  I may have, but I don't remember that.

9  BY MS. SEDAGHATFAR:

10     Q.   And do you know whether or not Southwest had

11  any policies that you had to follow in the event that

12  you suspected a passenger was boarding the flight or

13  attempting to board a flight with an alcoholic beverage?

14          MR. LAZENBY:  Objection.  Form.

15          You can answer.

16          THE WITNESS:  I know that they -- they are not

17  allowed to.  They -- I don't know what the policy

18  specifically says.  But if they were boarding with an

19  alcoholic beverage and I knew it, then I would ask them

20  for it, tell them they couldn't board with an alcoholic

21  beverage.  It's not allowed on the airplane.

22  BY MS. SEDAGHATFAR:

23     Q.   So you testified that the first time you saw

24  Ms. Adelene Sanders and her companion,

25  Ms. Shelly Phillips, is when they were boarding the

1    T-shirt, was the supervisor still standing there,

2    speaking with plaintiff and her companion?

3          MR. LAZENBY: Objection. Form. There's, like,

4    two or three questions there. But --

5          MS. SEDAGHATFAR: Okay. Strike that.

6    BY MS. SEDAGHATFAR:

7       Q. What happened next?

8       A. I don't -- in the video -- I mean, I wouldn't

9    have remembered unless I saw the video.

10         But in the video, it -- it looked like the

11    supervisor turned to leave. And I -- I do remember the

12    companion -- even though I felt like maybe it had been

13    resolved -- she got the T-shirt -- that the companion

14    said something to the effect of "Well, I'm" -- "I'm just

15    going to take my shirt off," or something like that.

16    And she lifted her shirt up to her neck, exposing her

17    bra. And -- yeah.

18       Q. And your back -- and you observed --

19       A. I observed it. I saw it.

20       Q. Yeah. Let me just ask the question.

21       A. Sorry.

22       Q. You observed the companion lift up her shirt

23    and expose her bra?

24       A. Yes.

25       Q. Did you talk about that with anybody?

1    A.   Yes.

2    Q.   That you -- that you had observed that?

3    A.   Yes.

4    Q.   Who did you -- who did you have a discussion

5  with about that?

6    A.   I followed the supervisor to the front of the

7  aircraft.  And I believe, at that time, she was saying,

8  "Are you guys comfortable with them flying?"

9         And I said, "No.  She just lifted" -- "The

10 companion just lifted her shirt up to her neck.  And I

11 don't" -- you know, "I don't feel comfortable."

12   Q.   And can you tell me whether or not any

13 passengers complained to you about plaintiff's wardrobe

14 or her sides?

15   A.   I did not speak to any of the passengers about

16 that, in my recollection.

17   Q.   Okay.  And do you know -- give me your best

18 estimate as to how old Ms. Shelly Phillips is.

19   A.   I don't know who Shelly Phillips is.

20   Q.   The companion that you testified lifted up her

21 shirt, that was traveling with Ms. Adelene Sanders.

22   A.   How old is she?

23   Q.   Mm-hmm.  Yes.

24   A.   No idea.  Maybe -- in my best estimation, maybe

25 50s.

1          "Q.  So when you walked up to the front of the
2          plane at that point and had a discussion with
3          the supervisor, you advised her that you didn't
4          feel comfortable with plaintiff and her
5          companion on the plane?")
6          THE WITNESS:  Yeah.  That's correct.
7    BY MS. SEDAGHATFAR:
8       Q.  Okay.  And what did Ms. Jackson, the
9    supervisor, say in response?
10      A.  I really don't know what happened after that.
11   I -- I don't remember.
12          But I believe that I turned around, and -- and
13   I didn't hear the rest of the discussion.  I -- I
14   separated myself from it, to the best of my knowledge.
15      Q.  Was Ms. Karenev present during the discussion
16   with the supervisor?
17      A.  I believe so.  Yes.
18      Q.  And what -- and what did Ms. Karenev say, if
19   anything, at that time?
20      A.  Nothing that I heard.
21      Q.  Did Ms. Karenev ever tell the supervisor that
22   she felt in physical fear of the plaintiff and her
23   companion?
24      A.  I do not know.
25      Q.  Did she ever tell you that she felt in physical

1    Q.   Is there any particular reason why you didn't
2 document that in your irregularity report?
3         MR. LAZENBY:  Objection.  Form.  Vague.
4         THE WITNESS:  There's not a particular reason.
5 BY MS. SEDAGHATFAR:
6    Q.   In the third paragraph of your report, you
7 write "I was concerned about all of our safety."
8         Do you see that?
9    A.   Yes.
10   Q.   And why were you concerned about all of your
11 safety?
12   A.   Because they were very agitated and angry --
13   Q.   Mm-hmm.
14   A.   -- and -- a couple of things.
15        So the first thing is she got up -- the
16 plaintiff got up and shouted out to all the passengers
17 on the plane about whether or not they had a problem
18 with her attire.  So, to me, that was extremely
19 intimidating to the other passengers.
20        And secondly, her -- okay.  Calling out the
21 other woman based on what she's wearing, you know;
22 bothering that other passenger; that the companion
23 lifted up her shirt to her neck, exposing her bra.
24        I felt like, "What's next?  What else are they
25 going to do?"  I mean, they were very angry.  And, to

1  me, it was not about what she's wearing anymore.  It
2  was -- in my mind, it was only about their reaction to
3  everything and their behavior and how they were so
4  agitated and upset.  What were they going to do at
5  30,000 feet?  That was my concern.
6      Q.  And did you understand why they were upset and
7  agitated?
8      A.  I thought that their reaction was so -- so
9  blown out of proportion to the actual incident, in my
10  mind.  Someone asking you, "Hey, could you put on a
11  sweater because it's a little inappropriate?"  What's --
12  if that's what she said -- you know, "What you're
13  wearing is, in our policy, inappropriate.  Could you
14  just put on a sweater?" -- for them to get as angry as
15  they did, it -- it seemed like it was a safety issue.
16          What -- what else are they going to do?
17      Q.  Is it not true that you didn't hear the
18  discussion that Ms. Karenev had with the plaintiff and
19  her companion?
20      A.  I did not hear it, but she told me that she
21  asked her to put on a sweater.
22      Q.  But she didn't tell you that the plaintiff
23  advised her she didn't have a sweater to put on?
24      A.  I didn't say she didn't tell me.  I said I
25  don't remember her telling me.

```
 1        A.    I do see it now.  Okay.
 2        Q.    Does that -- mm-hmm.
 3        A.    Okay.  You're right.
 4        Q.    Does that -- does that in any way change your
 5   response to the previous question?
 6              MR. LAZENBY:  Objection.  Form.  Vague.
 7              THE WITNESS:  What -- what was the -- what --
 8   okay.  I just want to clarify something with you.  May
 9   I?
10   BY MS. SEDAGHATFAR:
11        Q.    Of course.
12        A.    You asked me if I thought the situation was
13   that they were upset because she was asked to cover up.
14   You're inferring that she was also upset that she didn't
15   have something to cover up with.
16              Is that what you're inferring?
17        Q.    No, no.  Well, there's no pending question.
18   We'll just move on to the next question.
19              Is there any other particular reason why you
20   wrote in this report that -- that plaintiff and her
21   aunt -- her companion were intimidating?
22        A.    Well, someone who gets up and shouts at the
23   other passengers, calls someone out based on what
24   they're wearing, said -- calls a flight attendant a
25   racist, one person telling the other person that -- "If
```

1    you weren't black and fat, this wouldn't have happened,"
2    telling the other -- each other that the flight
3    attendant is too fat to be a flight attendant, the way
4    she spoke to the supervisor -- I mean -- what was the
5    question?
6              MS. SEDAGHATFAR:  You can read back the
7    question.
8              THE WITNESS:  Oh.  Why they were intimidating?
9    BY MS. SEDAGHATFAR:
10        Q.   Yes.
11        A.   There you go.
12        Q.   And did you hear any of the discussion that
13   transpired between the supervisor and the plaintiff?
14             MR. LAZENBY:  Objection.  Vague.
15             THE WITNESS:  I don't remember hearing it.
16             But I -- in the video, it shows that I was
17   close by; so I must have heard some of it.  But you know
18   what?  I didn't recall it until I heard the video.
19   BY MS. SEDAGHATFAR:
20        Q.   And it's your testimony that plaintiff stood up
21   from her seat and asked the passengers if anybody had a
22   problem with what she was wearing?
23        A.   Is it -- is it what to me?
24        Q.   Is it your --
25             MS. SEDAGHATFAR:  Can you read back the

1          CERTIFICATION OF COURT REPORTER

2                   FEDERAL JURAT

3

4          I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6    That the foregoing proceedings were taken remotely at

7    the date and time herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath;

10          That a verbatim record of the proceedings was

11   made by me using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof; that

14   before completion of the deposition, a review of the

15   transcript ( ) was (X) was not requested.

16          I further certify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19          IN WITNESS WHEREOF, I have this date subscribed

20   my name, _____.

21   Dated March 12, 2022.

22

23   Helena Flores, CSR Number 13313, RPR

24

25