EXHIBIT 45

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ADELENE SANDERS, an individual,    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                ) Case No.
                                   ) 2:21-CV-00451-DDP-MRW
SOUTHWEST AIRLINES CO., a          )
business entity of unknown form;   )
and DOES 1 through 100,            )
inclusive,                         )
                                   )
        Defendants.                )
_____)

DEPOSITION OF
SARAH JANE VANDERMARK

Wednesday, May 25, 2022

10:00 A.M.

Stenographically Reported By:
Helena Flores, CSR No. 13313, RPR

1          Q.    Do you need some water?

2          A.    He does not have one specific city or location.

3    His team oversees the base operation admin for all of

4    the 11 bases.

5          Q.    Okay.  And when did you speak with

6    Mr. Vandergrift?

7          A.    This morning.

8          Q.    Did you speak with him over the phone?

9          A.    A Teams call.

10         Q.    I'm sorry?

11         A.    A Teams, T-e-a-m-s -- it's like Zoom, but it's

12   a Microsoft product.

13         Q.    And tell me what you discussed with

14   Mr. Vandergrift on that call.

15         A.    I wanted to clarify my understanding of what

16   his team is responsible for in regards to disciplinary

17   action.

18         Q.    And what response did he give you?

19         A.    He explained when his team handles flight

20   attendant events and conducts the findings or relays

21   that information to another department for

22   investigation.

23         Q.    And that would encompass flight attendants

24   throughout Southwest Airlines?

25         A.    Correct.

1    Q.   And did he give you the response that you

2    requested?

3    A.   Yes.

4    Q.   Okay.   And what else did you discuss with him?

5    A.   Just, again, clarifying or ensuring that I was

6    correct on when the base supervisor coaches and counsels

7    versus when it goes to his team.

8    Q.   And under what circumstances would it go to his

9    team versus a base supervisor?

10   A.   The base supervisor handles what we call

11   coaching and counseling meetings.   And his team handles

12   it when it is repetitive and/or egregious behavior that

13   could involve disciplinary action.

14   Q.   Okay.   And what else did you discuss with him?

15   A.   That's all.

16   Q.   Okay.   And how long would you say your

17   conversation was?

18   A.   Fifteen minutes.

19   Q.   And who else did you speak with to help

20   familiarize yourself with the topics?

21   A.   I didn't speak to anyone else.

22   Q.   Okay.   And have you reviewed any of the

23   deposition transcripts or videos in this case?

24   A.   Not the deposition transcripts, no.   And no

25   video.

1        Q.   The best you can.  I know.

2        A.   Dallas, Houston, Orlando, Atlanta, Baltimore,

3    Chicago, Phoenix, Las Vegas, Los Angeles, Oakland.  I'm

4    trying to remember if I said Phoenix and Chicago.

5             MS. PARDASANI:  I have ten on my list; so I

6    think there's one that you missed.

7             THE WITNESS:  Yeah, I'm missing one.

8    BY MS. SEDAGHATFAR:

9        Q.   Would it be Ontario?  Would Ontario be one of

10   those?

11       A.   No.  The California locations are L.A.,

12   Oakland; Phoenix, Vegas, Chicago, Houston, Dallas,

13   Atlanta, Orlando, Baltimore, Denver.

14       Q.   Okay.  Isn't it true that, on or about the time

15   of the incident -- and I'll represent to you that the

16   incident occurred on July 18, 2020 -- that Southwest

17   didn't employ training to its employees regarding the

18   discrimination and harassment of passengers?

19            MS. PARDASANI:  Objection.  Vague.

20            THE WITNESS:  We do provide -- did provide and

21   do provide training on discrimination, harassment,

22   sexual harassment, and retaliation.

23   BY MS. SEDAGHATFAR:

24       Q.   Of passengers?

25       A.   It is for internal customers as well as

1      external customers.

2          Q.   And can you tell me what an internal customer

3      is?

4          A.   Yeah.  Internal customer is what we call

5      employees who work for Southwest.  We think about each

6      other as customers of each other.  We're each other's

7      customer.

8          Q.   And what is an external customer?

9          A.   An external customer is someone -- obviously, a

10     customer on the airplane.  It could also be our --

11     our -- people at the hotels that we stay at, shuttle

12     drivers, anyone that we work with that touches Southwest

13     is considered an external customer.

14         Q.   So is it your testimony that, on or about 2020,

15     Southwest provided training to its employees regarding

16     discrimination and harassment of passengers?

17              MS. PARDASANI:  Objection.  Vague.

18              THE WITNESS:  Could you repeat the question?

19              MS. SEDAGHATFAR:  Helena, can you please read

20     back the question.

21              (Whereupon, the record was read back by the

22              court reporter as follows:

23              "Q.  So is it your testimony that, on or about

24              2020, Southwest provided training to its

25              employees regarding discrimination and

1          harassment of passengers?")

2              MS. PARDASANI:  I'll add the objection that

3      it's asked and answered.

4              THE WITNESS:  We have a policy on harassment,

5      sexual harassment, discrimination, and retaliation.  And

6      that is delivered to all employees in a written format.

7              And then we also talk about discrimination,

8      both internally and externally -- that we don't

9      discriminate -- verbally in training.  We have online

10     modules, which we call "distance learning," that is

11     available for customers -- I'm sorry -- for employees as

12     well.

13     BY MS. SEDAGHATFAR:

14        Q.   And can you please specifically tell me what

15     training was provided to Southwest employees regarding

16     discrimination and harassment of passengers on or about

17     2020?

18              MS. PARDASANI:  Objection.  Vague and compound.

19              THE WITNESS:  As I've stated, there is written

20     and video of our philosophies on discrimination and

21     harassment.  We also teach verbally and, also, in -- I

22     don't know how to say -- placarding, if that's the right

23     word, in the workplace.  It's part of our overall

24     philosophy at Southwest and our company promise.

25     That's made available to all of our employees.  That

1  does speak about treating our -- that our employees will

2  be treated with care, respect, and concern, just as

3  we're expected to do that for our external customers as

4  well.

5          MS. SEDAGHATFAR:  And I'm sorry,

6  Ms. Court Reporter.  Can you please read back that

7  response.

8          (Whereupon, the record was read back by the

9          court reporter as follows:

10         "A.  As I've stated, there is written and video

11         of our philosophies on discrimination and

12         harassment.  We also teach verbally and, also,

13         in -- I don't know how to say -- placarding, if

14         that's the right word, in the workplace.  It's

15         part of our overall philosophy at Southwest, and

16         our company promise.  That's made available to

17         all of our employees.  That does speak about

18         treating our -- that our employees will be

19         treated with care, respect, and concern, just as

20         we're expected to do that for our external

21         customers as well.")

22  BY MS. SEDAGHATFAR:

23     Q.  And can you tell me what the word "placarding"

24  means?

25     A.  Another word I use is "signage."

1    have access to irregularity reports that are completed

2    by flight attendants; correct?

3         A.   Yes.

4         Q.   And does the flight attendant have to

5    specifically send that -- an irregularity report to

6    those individuals, or once it's in the system, those

7    individuals would have access to the irregularity

8    report?

9         A.   The second part of what you said is true.

10        Q.   Okay.  And under the policy on or about 2020,

11   if a flight attendant fails to complete an irregularity

12   report regarding a passenger complaint of discrimination

13   or harassment, are there any consequences?

14             MS. PARDASANI:  Objection.  Vague.

15             THE WITNESS:  Can you rephrase the question?

16   BY MS. SEDAGHATFAR:

17        Q.   Sure.  So to the extent a flight attendant

18   fails to complete an irregularity report upon the

19   discovery that there's a passenger who has made a

20   complaint of discrimination or harassment, if they don't

21   do that, can they get in trouble?  Are there any

22   repercussions set forth in the policy?

23             MS. PARDASANI:  Objection.  Vague.

24             THE WITNESS:  It is a -- it is a possibility,

25   depending on the situation.

1    BY MS. SEDAGHATFAR:

2         Q.   Can you explain what you mean by that?

3         A.   It's -- it's not clear-cut, black and white

4    that, yes, they will receive discipline if they don't

5    fill out an irregularity report.

6         Q.   And I'm only focusing on if they don't fill out

7    an irregularity report regarding a customer complaint of

8    discrimination and harassment.

9              So does that change your response in any way?

10        A.   It's not specific to that.

11        Q.   Okay.   And who has the discretion in that

12   instance, under Southwest policy, as to whether or not

13   discipline will be implemented in the event a flight

14   attendant does not fill out an irregularity report?

15             MS. PARDASANI:   Objection.   Vague.

16             THE WITNESS:   The base supervisor or manager.

17   BY MS. SEDAGHATFAR:

18        Q.   And once the IR goes into the database that you

19   testified about and the admin person and/or base manager

20   reviews the IR, what does the policy require those

21   individuals to do then?

22             MS. PARDASANI:   Objection.   Vague.

23             THE WITNESS:   Can you clarify the last part, on

24   "those" -- you said "those people"?

25   / / /

1      BY MS. SEDAGHATFAR:

2          Q.    Right.   So you testified that, once the IR gets

3      completed, it's in the system and that the admin person

4      and base manager now have access to the IR; correct?

5          A.    Yes.

6          Q.    Okay.   And once they -- those individuals

7      access an IR, documenting that there's been a passenger

8      complaint of discrimination and harassment, what, in

9      2020, are those individuals now required to do, if

10     anything?

11             MS. PARDASANI:   Objection.   Vague.

12             THE WITNESS:   They are going to review it.   And

13     based on the flight attendant's history, if the

14     procedures were followed as documented in the IR, they

15     will determine whether or not to proceed forward with it

16     or wait and see if a complaint comes in.

17     BY MS. SEDAGHATFAR:

18         Q.    And when you say to "see if a complaint comes

19     in," are you referencing -- are you referencing to the

20     passenger actually writing in a complaint?

21         A.    Yes, ma'am.

22         Q.    Okay.   And can you tell me where in the policy

23     what you just described is set forth in terms of the

24     duties of the admin person or manager?

25             MS. PARDASANI:   Objection.   Vague.

1          THE WITNESS:  No.  It is not -- I've not seen a

2    policy that tells what the administrative assistant or

3    the base manager -- how they are to handle it.

4    BY MS. SEDAGHATFAR:

5      Q.   Okay.  And when you say that they will review

6    the IR and determine whether to proceed forward or see

7    if a complaint comes in, what do you mean by "determine

8    whether to proceed forward"?  What do you mean by that?

9      A.   There are different options.  They can call the

10   flight attendant and ask more questions, see what

11   happened, get further details if it's not clear in the

12   IR.  If it is something that is an egregious situation,

13   then it can be escalated to the base admin operations

14   team.

15     Q.   And what you just described, that's not set

16   forth in any policy; correct?

17     A.   Correct.  To my knowledge.

18     Q.   Do you know whether or not, under the policy --

19   and I'm focusing on or about 2020 -- that anyone at

20   Southwest -- if anyone at Southwest is required to

21   report to the DOT passenger complaints of discrimination

22   or harassment?

23          MS. PARDASANI:  Objection.  Vague.

24          THE WITNESS:  Not to my knowledge.

25   / / /

```
 1              MS. SEDAGHATFAR:  Let's go back on.

 2   BY MS. SEDAGHATFAR:

 3       Q.   Isn't it true that, on or about 2020, Southwest

 4   did not have any policies regarding the investigation of

 5   passenger complaints of discrimination and harassment?

 6              MS. PARDASANI:  Objection.  Vague.  Leading.

 7              THE WITNESS:  Can you rephrase the question?

 8              MS. SEDAGHATFAR:  Can you read back the

 9   question, Helena.  I'll try to rephrase it.

10              (Whereupon, the record was read back by the

11              court reporter as follows:

12              "Q.  Isn't it true that, on or about 2020,

13              Southwest did not have any policies regarding

14              the investigation of passenger complaints of

15              discrimination and harassment?")

16   BY MS. SEDAGHATFAR:

17       Q.   Do you understand the question?

18       A.   There is a company -- or not "company" --

19   department within Southwest customer relations that

20   would be involved in -- if a customer said that they

21   were being discriminated against.

22              MS. SEDAGHATFAR:  Okay.  I'll move to strike as

23   nonresponsive.  Can you please read back the last

24   question one more time, please.

25              (Whereupon, the record was read back by the
```

1          court reporter as follows:

2          "Q.  Isn't it true that, on or about 2020,

3          Southwest did not have any policies regarding

4          the investigation of passenger complaints of

5          discrimination and harassment?")

6   BY MS. SEDAGHATFAR:

7          Q.   Was there a policy, in 2020, regarding the

8   investigation of passenger complaints of discrimination

9   and harassment?

10          MS. PARDASANI:  Objection.  Vague.  Asked and

11   answered.

12          THE WITNESS:  I'm not -- I'm not aware of a

13   specific written policy that says Southwest must do

14   this, this, this.

15          I do know that there's a department at

16   Southwest called employee relations -- I'm sorry, not

17   employee relations -- customer relations that would be

18   involved with a customer complaint.  They may have --

19   within their department may have something, but I don't

20   know of a specific written policy.

21   BY MS. SEDAGHATFAR:

22          Q.   And that would have been in 2020 that you would

23   have been aware?  If there was a policy in 2020?

24          A.   Correct.

25          Q.   All right.  So your understanding about

1          Q.    Okay.   And how are flight attendants under this

2    policy supposed to make that determination?

3               And by "that determination," I mean to say

4    whether or not a passenger is attempting to board with

5    an alcoholic beverage.

6               MS. PARDASANI:   Objection.   Vague.

7               THE WITNESS:   They have -- flight attendants

8    are -- it's our procedure to have flight attendants

9    throughout the cabin -- one in the front, one in the

10   middle, one in the back -- so they can observe

11   passengers boarding the aircraft.   So if you saw a -- if

12   a flight attendant sees a passenger boarding the

13   aircraft with an alcoholic beverage, they can stop that

14   from happening.

15   BY MS. SEDAGHATFAR:

16        Q.    Sure.   And I'm trying to find out, under the

17   policy, how the flight attendant is supposed to make the

18   determination as to whether or not a particular beverage

19   contains alcohol as passengers are trying to board the

20   flight.

21        A.    They can use --

22               MS. PARDASANI:   Objection.   Vague.   Asked and

23   answered.

24               Go on.

25               THE WITNESS:   They can look.   They can ask.

1    They can smell.

2    BY MS. SEDAGHATFAR:

3        Q.   Are you aware that one of the allegations made

4    in this lawsuit by Plaintiff Adelene Sanders is that one

5    of the flight attendants snatched a cup out of the hand

6    of Miss Sanders's flight companion and smelled that

7    beverage to determine whether or not it contained

8    alcohol?

9        A.   I don't know the details as you just said.  But

10   I do know that there was concern that they were bringing

11   on -- or one of the individuals was bringing on alcohol.

12       Q.   And you understood that one of the allegations

13   made was that the plaintiff is alleging that one of the

14   flight attendants actually smelled that cup?  You

15   understood that; correct?

16       A.   Yes.

17       Q.   And is that why you just testified that one of

18   the ways a flight attendant can determine whether or not

19   a cup contains alcohol is by smelling it?

20       A.   That can be a way.

21       Q.   But is that why you provided that response?

22            MS. PARDASANI:  Objection.  Vague.

23            THE WITNESS:  In our alcohol training, we train

24   flight attendants to assess a multitude of different

25   signs for possible intoxication and/or to determine that

```
1    flight attendants?

2         A.   I don't know for sure.

3         Q.   And do -- under the -- the policy -- strike

4    that.

5              Aside from the alcohol training that you

6    testified about, I specifically want to know whether or

7    not there's a policy setting forth how employees are to

8    screen passenger beverages to determine if they contain

9    alcohol.  And I will limit that to flight attendants.

10             MS. PARDASANI:   Objection.  Vague.

11             THE WITNESS:   There's not a specific policy

12   that says you must do A, B, C to screen for it.  Flight

13   attendants are instructed in many ways to use their

14   just -- best judgment in a multitude of situations, and

15   this could be one of those.

16   BY MS. SEDAGHATFAR:

17        Q.   What could be one of those?

18        A.   If you are concerned that the cup of beverage

19   that is being brought on the aircraft -- if you're

20   concerned that it's alcohol, that you use your best

21   judgment to figure out, "Is that alcohol?"

22             That could include asking the passenger,

23   looking inside the cup.  It could be smelling the cup to

24   see if it's alcohol.

25        Q.   But that's not true.  That's not what the
```

```
 1    policy states.
 2              MS. PARDASANI:  Objection.  Vague.  Asked and
 3    answered.  Misstates prior testimony.
 4              THE WITNESS:  There's not a list of steps that
 5    says you must do one, two, three to determine whether
 6    alcohol is in a cup that's being brought on board by a
 7    customer.
 8    BY MS. SEDAGHATFAR:
 9        Q.   There isn't?
10        A.   No.
11        Q.   So in terms of the "best judgment" that you
12    testified about, there's no written policy that says
13    that one of the things a flight attendant can do is ask
14    the passenger?
15              MS. PARDASANI:  Objection.  Vague.
16              THE WITNESS:  Correct.
17    BY MS. SEDAGHATFAR:
18        Q.   And in that policy, there's nothing that says
19    that the flight attendant can smell the beverage;
20    correct?
21              MS. PARDASANI:  Objection.  Vague.
22              THE WITNESS:  There's not a policy that
23    specifically tells them how to go about ascertaining
24    whether or not it's alcohol.  It's more general.
25              Use your situational awareness, which would be
```

1   looking, asking -- in this situation, smelling -- to

2   determine whether or not that drink that's being brought

3   on board -- if your concern is alcohol, how to determine

4   that.

5   BY MS. SEDAGHATFAR:

6       Q.   Okay.  And can you tell me how Southwest --

7   under the policy, how flight attendants are to be

8   reprimanded for smelling passenger cups on or about

9   2020?

10          MS. PARDASANI:  Objection.  Vague.

11          THE WITNESS:  There is no policy about

12  reprimanding a flight attendant for smelling a beverage.

13  BY MS. SEDAGHATFAR:

14      Q.   And that's true even so during the pandemic,

15  which would have been, also, on or about July of 2020,

16  as far as you know; correct?

17      A.   Correct.

18      Q.   So you're not aware of any policy -- and I'm

19  just going to ask it more specifically -- on or about

20  July of 2020, where a flight attendant can be

21  reprimanded for smelling a passenger beverage -- a

22  passenger's beverage to determine whether or not that

23  beverage contained alcohol?

24          MS. PARDASANI:  Objection.  Vague.  Asked and

25  answered.

1          Are those individuals trained not to apply this

2     policy disproportionally?

3          MS. PARDASANI:  Objection.  Vague.

4          THE WITNESS:  Our training, really, is not to

5     be disproportionate but to treat all with care, concern,

6     respect, and the Golden -- Golden Rule.

7          MS. SEDAGHATFAR:  Can you please read back the

8     question.

9          (Whereupon, the record was read back by the

10         court reporter as follows:

11         "Q.  And in terms of the individuals that are to

12         make the determination, you described it would

13         be the flight attendant -- flight attendants in

14         conjunction with the pilot.  Are those

15         individuals trained not to apply this policy

16         disproportionally?")

17    BY MS. SEDAGHATFAR:

18      Q.  Is there such training, is the question.

19      A.  Sorry.  Can you say that again?

20      Q.  That's okay.

21         The question is, is there any such training?

22         MS. PARDASANI:  Objection.  Vague.  Asked and

23    answered.

24         THE WITNESS:  Is there any such training on how

25    to address a person on their clothing or how to not be

1    sorry.

2         A.   An initial training and recurrent training --

3    I'd have to verify the initial training.  I know for

4    recurrent training it's part of the security module.

5         Q.   And that would have been part of the module in

6    2020?

7         A.   Yes.  It was either a part of the distance

8    learning, which is the computer-based training, or in

9    the actual in-person training.

10        Q.   I'm just trying to find out if you know what

11   year this applied to.

12             If you know, would this have been in 2020?

13   Would that have been part of the training in 2020?

14        A.   I believe it is.

15        Q.   And so that was -- the discrimination

16   disclaimer -- and can I call this a slide, or what would

17   you call this?

18        A.   I would call it a slide.

19        Q.   Okay.  Was this discrimination disclaimer slide

20   only provided as part of the training after 2020?

21        A.   I don't know the answer to that.  I'd have

22   to -- to research that.

23        Q.   And is it a true statement, in terms of the

24   policy of Southwest regarding discrimination and

25   harassment of passengers, that Southwest does not

1   tolerate employee discrimination against customers?

2       A.   That's correct.

3       Q.   And that was true in 2020?

4       A.   Yes.

5       Q.   And to the extent that an employee violates

6   this particular policy, what are the consequences?

7            MS. PARDASANI:  Objection.  Vague.

8            THE WITNESS:  The consequences could be a

9   variety of things.  Again, depending on the situation,

10  the flight attendant's history, background, if there's

11  repeated pattern.  And that would be determined -- that

12  would be determined by the -- I always have to pause --

13  Base Operation and Administration Team.

14  BY MS. SEDAGHATFAR:

15      Q.   And isn't it true that, on or about 2020, an

16  employee at Southwest who has been found to have

17  discriminated or harassed a passenger would not be

18  subject to summary termination?

19           And if you don't know what that means, I can

20  explain that.

21      A.   Yeah --

22           MS. PARDASANI:  Objection.  Vague.  Leading.

23  BY MS. SEDAGHATFAR:

24      Q.   Isn't it true that, on or about 2020, if a

25  Southwest employee was found to have engaged in

1                    CERTIFICATION OF COURT REPORTER

2                         FEDERAL JURAT

3

4              I, the undersigned, a Certified Shorthand

5      Reporter of the State of California, do hereby certify:

6      That the foregoing proceedings were taken remotely at

7      the date and time herein set forth; that

8      any witnesses in the foregoing proceedings, prior to

9      testifying, were placed under oath;

10             That a verbatim record of the proceedings was

11     made by me using machine shorthand which was thereafter

12     transcribed under my direction; further, that the

13     foregoing is an accurate transcription thereof; that

14     before completion of the deposition, a review of the

15     transcript ( ) was (X) was not requested.

16             I further certify that I am neither financially

17     interested in the action nor a relative or employee of

18     any attorney of any of the parties.

19             IN WITNESS WHEREOF, I have this date subscribed

20     my name, _____.

21

22     Dated June 4, 2022.

23

24     Helena Flores, CSR Number 13313, RPR

25